**24-60002 consolidated with**
**24-60197**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

GAS TRANSMISSION NORTHWEST, L.L.C.,

Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

Respondent,

and

Consolidated with No. 24-60280

COLUMBIA RIVERKEEPER; ROGUE CLIMATE;
STATE OF WASHINGTON, and STATE OF OREGON,

Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

Respondent,

Consolidated with No. 24-60354

STATE OF WASHINGTON and STATE OF OREGON,

Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

Respondent.

On Petition for Review of an Order
FERC Orders Under Review:
Order Issuing Certificate 185 FERC ¶ 61,035 (Oct. 23, 2023),
Order Issuing Certificate 187 FERC ¶ 61,023 (Apr. 16, 2024),
CP22-2-000 and CP22-2-0001

**OPENING BRIEF OF PETITIONERS COLUMBIA RIVERKEEPER AND
ROGUE CLIMATE**

| | |
|---|---|
| Maura C. Fahey<br>Crag Law Center<br>3141 E Burnside St.<br>Portland, OR 97214<br>503-525-2722 \| Phone<br>Email: maura@crag.org | Jan Hasselman<br>Earthjustice<br>810 Third Ave., Suite 610<br>Seattle, WA 98104<br>(206) 343-7430 \| Phone<br>Email: jhasselman@earthjustice.org |

*Counsel for Petitioners Columbia Riverkeeper and Rogue Climate*

**CERTIFICATE OF INTERESTED PERSONS**

Counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this court may evaluate possible disqualification or recusal.

Petitioners:

1. Gas Transmission Northwest, L.L.C.
2. Columbia Riverkeeper
3. Rogue Climate
4. State of Washington
5. State of Oregon

Counsel for Petitioners:

1. Johannah Walker, Gas Transmission Northwest, L.L.C.
2. Sean Marotta, Gas Transmission Northwest, L.L.C.
3. Matthew J. Higgins, Gas Transmission Northwest, L.L.C.
4. Jan Hasselman, Columbia Riverkeeper and Rogue Climate
5. Maura C. Fahey, Columbia Riverkeeper and Rogue Climate
6. Megan Sallomi, State of Washington
7. Paul Garrahan, State of Oregon

Respondent:

1. Federal Energy Regulatory Commission

Counsel for Respondent:

1. Angela X. Gao, Federal Energy Regulatory Commission
2. Robert Solomon, Federal Energy Regulatory Commission

Intervenor-Respondent:

1. Canadian Association of Petroleum Producers

Counsel for Intervenor-Respondent:

1. James Holt, Canadian Association of Petroleum Producers
2. Katherine Ann Wade, Canadian Association of Petroleum Producers
3. Debbie-Anne A. Reese, Canadian Association of Petroleum Producers

Additional Interested Parties

1. American Gas Association
2. Bp Canada Energy Marketing Corp.
3. Cascade Natural Gas Corporation
4. Intermountain Natural Gas Company
5. MDU Utilities Group and MDU Resources, Inc.
6. Northwest Natural
7. Pacific Gas and Electric Company
8. Puget Sound Energy, Inc.
9. Shell Energy North America, L.P.
10. TC Energy Corporation
11. Tourmaline Oil Marketing Co. and any affiliates or subsidiary companies

Dated: October 28, 2024

*s/ Jan E. Hasselman*
Jan Hasselman
Earthjustice
810 Third Ave., Suite 610
Seattle, WA 98104
(206) 343-7430 | Phone
Email: jhasselman@earthjustice.org

Maura C. Fahey
Crag Law Center
3141 E Burnside St.
Portland, OR 97214
503-525-2722 | Phone
Email: maura@crag.org

*Counsel for Petitioners Columbia*
*Riverkeeper and Rogue Climate*

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Local Rule 28.2.3, Petitioners Columbia Riverkeeper and Rogue Climate respectfully request that the Court hold oral argument in this case. There are three separate petitions challenging the same Natural Gas Act Certificate issued by FERC. Petitioners submit that oral argument would assist the Court with the complex legal issues and voluminous administrative record in this case.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ iii

STATEMENT REGARDING ORAL ARGUMENT ........................................... vi

INTRODUCTION ........................................................................................ 1

JURISDICTIONAL STATEMENT ............................................................... 2

STATEMENT OF ISSUES ............................................................................ 4

STATEMENT OF THE CASE ....................................................................... 4

   I.   LEGAL FRAMEWORK ....................................................................... 4

      A.   Natural Gas Act .......................................................................... 4

      B.   National Environmental Policy Act ........................................... 5

   II.   FACTUAL BACKGROUND................................................................ 6

      A.   GTN Divides its Expansion Proposal into Separate Phases ................... 6

      B.   FERC Evaluates A Portion of GTN's Expansion Plan as a Stand-Alone Project. ................................................................... 9

SUMMARY OF ARGUMENT ................................................................... 12

STANDARD OF REVIEW .......................................................................... 14

ARGUMENT ............................................................................................... 15

   I.   PETITIONERS HAVE STANDING. .............................................. 15

      A.   Associational Standing in a NEPA Case. ............................... 15

      B.   Petitioners Have Standing to Challenge FERC's Approval of the Project. ............................................................................ 16

   II.   FERC VIOLATED NEPA BY FAILING TO CONDUCT A LAWFUL ALTERNATIVES ANALYSIS. ................................... 21

      A.   An EIS "Shall" Include an Analysis of the "No Action" Alternative. .. 21

      B.   FERC Unlawfully Refused to Consider a No Action Alternative, then Arbitrarily Claimed that It Did. ......................................... 26

      C.   FERC's Failure to Consider the No Action Alternative Violates NEPA and the APA. ................................................................ 30

  III.  FERC UNLAWFULLY SEGMENTED THE EXPANSION PROJECT FROM THE COMPRESSOR STATION UPGRADES. ............................... 31

      A.   NEPA Requires Agencies to Consider "Connected Actions." ............. 32

B.  FERC Failed to Consider the Compressor Upgrades and the Expansion Project as "Connected Actions." ............................................................34

C.  FERC's Determination that the Compressor Unit Upgrades Are Not Connected Actions to the Expansion Project is Arbitrary and Capricious and Violated NEPA .................................................................................37

IV.  FERC ARBITRARILY AND UNLAWFULLY DECLINED TO ASSESS LEGITIMATE SAFETY CONCERNS. ......................................................41

A.  FERC Has a Duty to Consider and Disclose Safety Risks. ..................41

B.  FERC Failed to Consider and Disclose Documented Safety Hazards Associated with the Pipeline's Expansion. ...........................................43

C.  FERC's Failure to Address Safety Issues was Arbitrary and Violated NEPA. ....................................................................................................46

V.  THIS COURT SHOULD VACATE THE CERTIFICATE AND REMAND FOR A NEW EIS. ......................................................................51

CONCLUSION ...................................................................................................52

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Alaska Wilderness Recreation and Tourism Ass'n v. Morrison*,
   67 F.3d 723 (9th Cir. 1995) ..................................................................23

*ANR Storage Company v. FERC*,
   904 F.3d 1020 (D.C. Cir. 2018) ...........................................................49

*Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*,
   894 F.3d 692 (5th Cir. 2018) ................................................................14

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
   462 U.S. 87 (1983)..................................................................................6

*Bob Marshall All. v. Hodel*,
   852 F.2d 1223 (9th Cir. 1988) ..............................................................23

*Calvert Cliffs' Coordinating Comm'n, Inc. v. U. S. Atomic Energy
   Commission*,
   449 F.2d 1109 (D.C. Cir. 1971)......................................................23, 47

*Chamber of Com. v. U.S. Securities and Exchange Comm'n*,
   88 F.4th 1115 (5th Cir. 2023) ...............................................................51

*Citizens for Clean Air & Water in Brazoria Cnty. v. U.S. Dept. of
   Transp.*,
   98 F.4th 178 (5th Cir. 2024) ..........................................................*passim*

*Citizens' Comm. to Save Our Canyons v. U.S. Forest Service*,
   297 F.3d 1012 (10th Cir. 2002) ............................................................33

*City of Boston Delegation v. FERC*,
   897 F.3d 247 (D.C. Cir. 2018)...............................................................40

*City of Oberlin v. FERC*,
   937 F.3d 599 (D.C. Cir. 2019)...............................................................41

*City of Port Isabel v. FERC*,
   111 F.4th 1198 (D.C. Cir. 2024)........................................29, 33, 39, 40

*City of Shoreacres v. Waterworth*,
420 F.3d 440 (5th Cir. 2005) ...............................................................21

*Ctr. for Biological Diversity v. Bernhardt*,
982 F.3d 723 (9th Cir. 2020) ..........................................................23, 24

*Ctr. for Biological Diversity v. EPA*,
937 F.3d 533 (5th Cir. 2019) ..............................................................20

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
72 F.4th 1166 (10th Cir. 2023) .......................................................23, 24

*Custer Cnty. Action Ass'n v. Garvey*,
256 F.3d 1024 (10th Cir. 2001) .........................................................23

*Davis Mountains Trans-Pecos Heritage Ass'n. v. Fed. Aviation Admin.*,
116 Fed. Appx. 3 (5th Cir. 2004)........................................................51

*Del. Riverkeeper Network v. FERC*,
753 F.3d 1304 (D.C. Cir. 2014).....................................................*passim*

*Fath v. Tex. DOT*,
924 F.3d 132 (5th Cir. 2018) ........................................................32, 41

*FCC v. NextWave Pers. Commc'ns*,
537 U.S. 293 (2003).........................................................................51

*Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Oklahoma*,
426 U.S. 776 (1976)........................................................................47

*Food & Water Watch v. FERC*,
28 F.4th 277 (D.C. Cir. 2022).......................................................32, 33

*Friends of the Earth v. Laidlaw Env't. Servs.*,
528 U.S. 167 (2000).........................................................................19

*Gulf Restoration Network v. Haaland*,
47 F.4th 795 (D.C. Cir. 2022).............................................................24

*Gulf Restoration Network v. Salazar*,
683 F.3d 158 (5th Cir. 2012) ........................................................18, 20

*Hunt v. Wash. Apple Advert. Comm'n,*
432 U.S. 333 (1977)...................................................................20

*Jupiter Energy Corp. v. FERC,*
407 F.3d 346 (5th Cir. 2005) .....................................................30

*Marsh v. Or. Nat. Res. Council,*
490 U.S. 360 (1989)...................................................................48

*Massachusetts v. EPA,*
549 U.S. 497 (2007)...................................................................15

*Mid-States Coal. for Progress v. Surface Transp. Bd.,*
345 F.3d 520 (8th Cir. 2003) .....................................................24

*Midship Pipeline Co. v. FERC,*
45 F.4th 867 (5th Cir. 2022). ....................................................14

*Miss. River Basin All. v. Westphal,*
230 F.3d 170 (5th Cir. 2000) .....................................................14

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983).....................................................................14

*N.C. Wildlife Fed. v. N.C. Dept. of Transp.,*
677 F.3d 596 (4th Cir. 2012) .....................................................25

*Nat'l Infusion Center Assoc. v. Becerra,*
116 F.4th 488 (5th Cir. 2024) ..............................................16, 18

*Nat'l Parks Conservation Ass'n v. EPA.,*
788 F.3d 1134 (9th Cir. 2015) ...................................................49

*New York v. Nuclear Reg. Comm'n,*
681 F.3d 471 (D.C. Cir. 2012)...................................................42

*O'Reilly v. U.S. Army Corps of Eng'rs,*
477 F.3d 225 (5th Cir. 2007) .....................................................50

*Ocean Advocs. v. U.S. Army Corps of Eng'rs,*
402 F.3d 846 (9th Cir. 2005) .....................................................42

*Or. Env'tl Council v. Kunzman*,
    714 F.2d 901 (9th Cir. 1983) ................................................................47

*Pit River Tribe v. U.S. Forest Serv.*,
    469 F.3d 768 (9th Cir. 2006) ...............................................................30

*Sea Robin Pipeline Co. v. FERC*,
    127 F.3d 365 (5th Cir. 1997) ...............................................................30

*Sierra Club v. FERC*,
    827 F.3d 36 (D.C. Cir. 2016) ...............................................................42

*Sierra Club v. Glickman*,
    67 F.3d 90 (5th Cir. 1995). ..................................................................14

*Sierra Club v. Morton*,
    510 F.2d 813 (5th Cir. 1975) ...............................................................47

*Sierra Club v. Sigler*,
    695 F.2d 957 (5th Cir. 1983) .............................................6, 42, 50, 51

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    985 F.3d 1032 (D.C. Cir. 2021) ...............................................43, 49, 51

*Steamboaters v. FERC*,
    759 F.2d 1382 (9th Cir. 1985) .............................................................47

*Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*,
    207 F.3d 789 (5th Cir. 2000) ...............................................................15

*Tex. Off. of Pub. Util. Couns. v. F.C.C.*,
    183 F.3d 393 (5th Cir. 1999) ...............................................................15

*Texas v. Biden*,
    20 F.4th 928 (5th Cir. 2021) ................................................................51

*Texas v. Nuclear Reg. Comm'n*,
    78 F.4th 827 (5th Cir. 2023) ..........................................................18, 20

*UAW v. Brock*,
    477 U.S. 274 (1986) .............................................................................20

*Van Abbema v. Fornell,*
    807 F.2d 633 (7th Cir. 1986) ...............................................................23

*WildEarth Guardians v. U.S. Bureau of Land Mgmt.,*
    870 F.3d 1222 (10th Cir. 2017) ..........................................................25

**Federal Statutes**

5 U.S.C. § 706 .........................................................................................2

5 U.S.C. § 706(2) ...................................................................................51

5 U.S.C. § 706(2)(A) .......................................................................*passim*

15 U.S.C. § 717(a) ...................................................................................4

15 U.S.C. § 717(c) ...................................................................................4

15 U.S.C. § 717f(c)(1)(A) ........................................................................4

15 U.S.C. § 717f(e) ...............................................................................4, 5

15 U.S.C. § 717r(b) ..........................................................................*passim*

28 U.S.C. § 2112(a) .................................................................................3

42 U.S.C. § 4321 .....................................................................................5

42 U.S.C. § 4332(2)(C) .......................................................................5, 46

42 U.S.C. § 4332(C) .........................................................................21, 48

42 U.S.C. § 4332(C)(iii) .........................................................................21

42 U.S.C. § 4332(H) ..............................................................................21

**Regulations**

18 C.F.R. § 2.55(b) ..........................................................................*passim*

18 C.F.R. § 2.55(b)(1)(ii) .........................................................................8

18 C.F.R. § 380.1 ................................................................................6, 22

18 C.F.R. § 380.5(b)(1) ...........................................................................8

18 C.F.R. § 380.12(l)(1) ................................................................22

23 C.F.R. § 771.111(f) ..................................................................37

40 C.F.R. § 1501.9(e)(1) ............................................................*passim*

40 C.F.R. § 1502.1 ..........................................................................6

40 C.F.R. § 1502.4(a) ....................................................................31

40 C.F.R. § 1502.14 .......................................................................21

40 C.F.R. § 1502.16 .......................................................................41

40 C.F.R. § 1502.21(d) ........................................................41, 42, 46

40 C.F.R. § 1508.1(aa) ..................................................................42

## Federal Register

46 Fed. Reg. 18,026 (March 23, 1981) ..................................22, 26

76 Fed Reg. 3,848 (Jan. 21, 2011) ...............................................50

85 Fed. Reg. 43,304 (July 16, 2020) .......................................6, 22

## Other Authorities

88 FERC ¶ 61,227 (1999) ...............................................................5

90 FERC ¶ 61,128 (2000) ...............................................................5

92 FERC ¶ 61,094 (2000) ...............................................................5

187 FERC ¶ 61,023 (2024) .............................................................3

185 FERC ¶ 61,035 (2023) .............................................................3

Mandelker, *NEPA Law and Litig.* (2024) .....................................24

# INTRODUCTION

Petitioners Columbia Riverkeeper and Rogue Climate ("Riverkeeper") challenge the approval of a Natural Gas Act certificate issued to Gas Transmission Northwest, Inc. ("GTN") by the Federal Regulatory Energy Commission ("FERC"). The certificate allows GTN to expand the capacity of an existing gas pipeline that crosses Washington, Oregon, and Idaho. GTN's GTN Xpress expansion project (hereinafter, the "Project") would increase the amount of natural gas carried by the pipeline, exposing Petitioners' members to increased pollution and risk of accidents, and undercutting their efforts to secure cleaner energy sources in the Pacific Northwest. Petitioners bring this challenge because FERC's decision to authorize the Project was arbitrary and capricious and contrary to law. Petitioners ask this Court to find FERC's certificate unlawful and vacate it pending further review by FERC.

In this brief, Petitioners focus on their challenge to the environmental review of the Project conducted by FERC pursuant to the National Environmental Policy Act ("NEPA"). NEPA directs agencies to prepare an environmental impact statement ("EIS") assessing the impacts of, and alternatives to, certain federal actions. As explained below, the EIS for the Project was arbitrary and capricious and violated NEPA for three reasons. First, the EIS unlawfully refused to assess the "no action" alternative, under which the Project would not be built and the

energy demands it purports to satisfy would be met in other ways. The "no action alternative" fills a critical role under NEPA by providing an environmental baseline against which the Project's impacts can be compared, but FERC arbitrarily and unlawfully refused to comply with this basic element of NEPA. Second, the EIS unlawfully segmented the environmental review of a single expansion plan into multiple separate administrative proceedings, evading the comprehensive review required by law. And third, FERC unlawfully dismissed well-documented safety concerns with the Project on the grounds that pipeline safety is regulated by another agency. But that is not how NEPA works. To the contrary, it is well settled that FERC's decision must be informed by a complete assessment of all of the Project's direct and indirect impacts, including safety risks, and its refusal to consider and disclose evidence in the record regarding safety and wildfire risks was arbitrary and unlawful. Any one of these errors is fatal to the certificate.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over this petition for review of a FERC final order pursuant to the Natural Gas Act, 15 U.S.C. § 717r(b), and the Administrative Procedure Act, 5 U.S.C. § 706. On October 23, 2023, FERC issued a certificate of public convenience and necessity authorizing the construction of the Project. 185

FERC ¶ 61,035 (2023); R521:01 ("Certificate Order").[1] Petitioners, who were

intervenors in the administrative process, timely moved for rehearing on November

21, 2023, R565:01, which was denied by operation of law on December 26, 2023.

185 FERC ¶ 62,169; R588:01. Petitioners timely filed a petition for review of the

Certificate Order in the D.C. Circuit on January 4, 2024. FERC subsequently

issued an order on rehearing addressing the merits on April 16, 2024. 187 FERC ¶

61,023 (2024); R620:01 ("Rehearing Order"). Petitioners filed a new petition for

review of the Rehearing Order shortly thereafter. The D.C. Circuit consolidated

these petitions and transferred the matter to this Court on May 13, 2024. This

Circuit consolidated Riverkeepers' petition with two other petitions, filed by the

States of Washington and Oregon, and by GTN itself, on August 6, 2024. ECF 42-

1 (No. 24-60280).[2]

---

[1] For purposes of this opening brief, Petitioners will refer to the record by referencing the Record Item number as stated in the Certified Index of Record, ECF 112, and the pdf page number of the referenced document, even if different from internal pagination. For example, Record Item 1, pdf page 5 will be cited as R01:05.

[2] Riverkeeper previously joined a motion to dismiss GTN's petition for lack of standing and ripeness. ECF 57-58. In a divided opinion, this Court denied the motion. ECF 92-1. Riverkeeper expects to renew that argument when it responds to GTN's petition. Because this Court lacks jurisdiction over GTN's petition, Riverkeeper renews its previously filed request that this Court transfer Riverkeeper's petition back to where it was filed pursuant to 28 U.S.C. § 2112(a). *Id.*

## STATEMENT OF ISSUES

1.      Whether FERC violated NEPA and the APA when it refused to consider and disclose the impacts of the "no action" alternative to the Project in the EIS?

2.      Whether FERC violated NEPA and the APA when it segmented the Project into separate components for purposes of administrative review?

3.      Whether FERC violated NEPA and the APA when it failed to consider and disclose the safety risks of the Project in the EIS?

## STATEMENT OF THE CASE

I.    LEGAL FRAMEWORK

A.    Natural Gas Act

Congress enacted the Natural Gas Act in 1938 after finding that "the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest, and that Federal regulation . . . is necessary in the public interest." 15 U.S.C. § 717(a). Section 7(c) requires applicants seeking to construct, operate, or acquire facilities for transporting or selling natural gas to obtain a certificate of public convenience and necessity. *Id.* § 717f(c)(1)(A). Section 7(e) provides that a certificate shall be issued only if the action proposed by the natural gas company "is or will be required by the present or future public convenience and necessity." *Id.* § 717f(e). The Natural Gas Act also authorizes FERC to condition the certificate as reasonably required by the public convenience

and necessity. *Id.* In 1999, FERC promulgated its Statement of Policy explaining the process by which it would "determin[e] whether there is a need for a specific project and whether, on balance, the project will serve the public interest." *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227, 61,737 (1999), *clarified* 90 FERC ¶ 61,128 (2000), *further clarified* 92 FERC ¶ 61,094 (2000).

B.    National Environmental Policy Act

Issuance of a Natural Gas Act certificate is a major federal action that, in turn, implicates the requirements of NEPA. NEPA was enacted to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality." 42 U.S.C. § 4321. NEPA requires all Federal agencies to prepare a "detailed statement" on the "reasonably foreseeable environmental effects" of any proposed "major Federal action[]," highlighting the adverse effects of, and alternatives to, the proposal, and including a "no action" alternative. 42 U.S.C. § 4332(2)(C). "The primary purpose of an environmental impact statement prepared pursuant to section 102(2)(C) of NEPA is to ensure agencies consider the environmental

impacts of their actions in decision making." 40 C.F.R. § 1502.1. NEPA demands

that agencies "take a hard look at the environmental consequences before taking a

major action." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,* 462 U.S. 87,

97 (1983).[3]

## II.   FACTUAL BACKGROUND

### A.   GTN Divides its Expansion Proposal into Separate Phases

GTN operates a natural gas pipeline connecting Idaho (at the Canadian

border) and Oregon (at the California border). R01:66. On October 4, 2021, GTN

submitted an application to FERC requesting authorization to expand the pipeline's

capacity, in a proposal it called GTN XPress. R01:02. The Project would increase

capacity on GTN's mainline system by 150,000 dekatherms (equivalent to 150

million cubic feet) per day ("Dth/d"). As proposed to FERC, GTN Xpress

consisted of installing a single new compressor at the Starbuck station in

Washington, "uprating" three recently replaced compressor units—at the Athol,

---

[3] Implementation of NEPA is governed by regulations promulgated by the Council on Environmental Quality ("CEQ") which are "binding on this court and on agencies preparing EIS's." *Sierra Club v. Sigler*, 695 F.2d 957, 972 (5th Cir. 1983). FERC has its own implementing NEPA regulations which call for following the CEQ regulations except where "inconsistent" with FERC's statutory requirements. 18 C.F.R. § 380.1. CEQ's implementing regulations have been revised twice in recent years. GTN initiated the certificate process with an application to FERC dated October 4, 2021. R135:10. Accordingly, the version of the rules in effect on that date govern and will be cited in this brief. 85 Fed. Reg. 43,304 (July 16, 2020).

Kent, and Starbuck compressor stations—by removing software controls limiting their capacity, and installing new gas cooling bays and appurtenant piping, roads, and other facilities. *Id.*

The Project represented the second phase of a significantly larger expansion plan. Just weeks prior to filing its application for the Project, GTN replaced the compressor units at Athol, Kent, and Starbuck with significantly larger and more powerful units. R304:11. But there was never any question that these compressor replacements were part of an overall expansion project. In 2019, for example, GTN announced to investors that it intended to replace the three compressors in order to expand the system's capacity. R102:112-13, 118-19. GTN held an "open season" to sell the additional capacity that would be created by the compressor replacements and the Project in July 2019. R01:84-88. During a February 2020 earnings call, GTN's parent company TC Energy described a two-phased expansion proposal including first the replacement of three compressor stations with "new state-of-the-art compression technology," and second, expansion of capacity on the GTN system. R565:49; *see also* R43:04 ("GTN has previously indicated that the total price of the GTN XPress Project is $335 million, to be constructed in multiple stages with a potential additional capacity of 250,000 Dth/d").

Although the two phases were part of a single project, GTN separated them into different steps for FERC's regulatory review. In March 2020, GTN notified FERC that it sought to replace the compressor units at the Athol, Kent, and Starbuck stations as "routine" replacements under § 2.55(b) of FERC's regulations. 18 C.F.R. § 2.55(b); R521:06. That truncated regulatory procedure is limited to replacements of existing infrastructure that do not expand capacity. 18 C.F.R. § 380.5(b)(1). But these "replacements" were neither routine nor even replacements. Instead, each of the three units was upgraded with a more powerful compressor that had the ability to operate at considerably higher horsepower than GTN's prior certificate allowed. R304:13; R47:06 (customer protest that new compressors had significantly higher capacity than old ones). In order to purport to satisfy the conditions of § 2.55(b), GTN proposed to use software to artificially limit the ability of the compressors to operate at a level higher than the ones they replaced. 18 C.F.R. § 2.55(b)(1)(ii) (replacement facilities must have "substantially equivalent designed delivery capacity" as the facilities they replace); R620:16. The upgraded compressor units were placed into service, with the software limits, in October and November 2021 at a total cost of around $250 million. R521:06 n.20; R521:21.

B.    FERC Evaluates A Portion of GTN's Expansion Plan as a Stand-Alone Project.

Before the replacements were even complete, GTN submitted its application for the Project. R304:11. With the upgraded compressor units a *fait accompli* as far as the regulatory process was concerned, GTN could submit a far more modest application for the Project. Costing only $75 million, a significant component of the Project was removing the recently installed software controls that artificially limited the newly upgraded compressor stations from operating at their full capacity. R521:02-03.

Columbia Riverkeeper and Rogue Climate, nonprofit organizations dedicated to protecting human health and the environment, filed motions to intervene and were granted party status by FERC. So did three of the States (Washington, Oregon, and California) that the pipeline purportedly served, as did some of GTN's customers. Numerous filings from all of these intervenors highlighted the inappropriate segmentation of the expansion project into: 1) the compressor upgrades (incorrectly processed as routine replacements), and 2) the rest of the expansion, labeled as GTN Xpress. *See, e.g.,* R102:14 ("GTN cannot rely on Section 2.55(b) to exclude the $251 million it spent to replace existing compressors because those replacements increased capacity of the pipeline.").

While the § 2.55(b) replacements did not receive any environmental review, FERC released a draft environmental impact statement ("DEIS") on the Project on

June 30, 2022. R86:01. Riverkeeper submitted detailed critical comments on the

DEIS. R93:01; R100:01; R105:01. Many other entities, including the U.S.

Environmental Protection Agency ("EPA") and the three States, also submitted

detailed critical comments. R93:01; R103:01. All highlighted the inappropriate

separation of the Project's components for FERC review. Many other issues came

to the fore as well, including significant questions about the Project's safety, the

operator's poor safety and compliance record, and climate-related impacts, among

other deficiencies. *Id.*

On November 18, 2022, FERC issued a final environmental impact

statement ("FEIS"). R135:01. Like the draft, it concluded that the Project would

not cause significant adverse environmental impacts. R135:12. Rogue Climate

submitted a Supplemental Protest to FERC on May 10, 2023, to raise additional

concerns. R311:01. Rogue Climate and Columbia Riverkeeper also submitted

additional comments and an expert report on June 8, 2023, in response to GTN's

arguments regarding the market demand and need for the Project. R338:01;

R168:01; R287:01. Riverkeeper also submitted supplementary comments

regarding the FEIS's failure to adequately address public safety in light of recent

explosions on TC Energy's other pipeline systems. R384:01. FERC's review

generated substantial public controversy, resulting in multiple statements from the

elected leaders of Washington, Oregon, and California objecting to FERC's

issuance of the certificate. R148:01 (Oregon senate letter); R149:01 (state attorneys general); R291:01 (Washington governor letter); R341:01 (Oregon governor).

On October 23, 2023, FERC issued its Order granting the Project a certificate. R521:01. The Certificate Order either dismissed or ignored the detailed evidence provided by Riverkeeper, the States, EPA, and others about the flaws in the EIS and Natural Gas Act compliance. Despite abundant evidence that the compressor upgrades and the Project were closely related phases of a single proposal, FERC concluded that the compressor upgrades were distinct projects that were properly excluded from the Project. R521:05-06. It further concluded that the FEIS prepared for the Project met the requirements of NEPA. The certificate was accompanied by two partial concurrence and dissents. The first criticized the Commission's failure to address key issues "which expose this order to profound risk on petition for review." R521:59. The second criticized the Commission's "superficial approach to assessing the need" for the Project that "has left us with a skeletal administrative record that raises more questions than it answers…" R521:75.

As required by the Natural Gas Act, Riverkeeper filed a petition for a rehearing with FERC on November 21, 2023. R565:01. The States of Oregon and Washington also filed petitions for rehearing with FERC, as did GTN. On April 16, 2024, FERC released a divided decision denying Riverkeeper's rehearing

petition, as well as the petitions filed by the States and GTN. R620:01. The

majority dismissed or rejected all of the issues raised on rehearing. Commissioner

Clements dissented on three issues: a) the lack of demonstrated need for the Project

in light of record evidence that undermined GTN's claims; b) FERC's failure to

make a determination as to whether the Project's greenhouse gas emissions were

significant; and c) the EIS's failure to consider alternatives to the Project, including

the "no action" alternative. R620:107-08. On July 10, 2024, GTN requested to

commence service on the Project of up to 50,000 Dth/d by lifting the software

limits on its three recently-upgraded compressors, which FERC granted. GTN later

began the other construction work associated with the Project, which remains

ongoing at the time of this filing.

## SUMMARY OF ARGUMENT

FERC's certificate to GTN is arbitrary and capricious and contrary to law

for three reasons, any of which provides a sufficient basis to vacate the certificate

and remand it for further consideration. Each of these issues pertains to FERC's

NEPA compliance, without which it cannot issue the Natural Gas Act certificate.[4]

---

[4] Riverkeeper also incorporates by reference the arguments made in the opening brief of the states of Washington and Oregon with respect to the validity of the Natural Gas Act certificate. ECF 20 (24-60280) (statement of issues in docketing statement); ECF 30 (24-60280) ("all aligned parties have committed to coordinating as closely as possible" to reduce overlap in briefing). In this brief, Riverkeeper focuses on claims arising under NEPA.

First, FERC relied upon an environmental impact statement that does not include any analysis of the "no action" alternative, a mandatory component of NEPA that is supposed to examine the impacts of not implementing the proposal under review. Without a "no action" alternative, the FEIS has no baseline against which to compare the environmental impacts of the Project, rendering the document deficient in a fundamental respect. FERC's explanation that it did not need to consider this alternative violates key regulations and is arbitrary.

Second, FERC unlawfully segmented multiple parts of GTN's overall expansion proposal into separate administrative steps and reviewed them in isolation from one another. The segmentation of such "connected actions" into distinct actions violates NEPA and deprived FERC and the public of the opportunity to consider the overall impact of, and alternatives to, GTN's expansion plans.

Third, FERC unlawfully declined to consider the safety implications of an increase in pressure and volume inside an aging pipeline managed by a company with a poor safety and compliance record, concluding that such considerations are regulated by separate federal entities. But NEPA has always required agencies to consider the "reasonably foreseeable" impacts of their actions, including the risks of accidents, even if subject to regulatory oversight by another agency.

## STANDARD OF REVIEW

The Court's review of the EIS accompanying GTN's Natural Gas Act certificate is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A); *Midship Pipeline Co. v. FERC*, 45 F.4th 867, 872 (5th Cir. 2022). A reviewing court "shall hold unlawful and set aside agency action, findings and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Id.*; *Sierra Club v. Glickman,* 67 F.3d 90, 96 (5th Cir. 1995). A decision is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency must be able to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 697 (5th Cir. 2018); *Miss. River Basin All. v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000) (EIS "must provide information" to demonstrate NEPA compliance and "the conclusions upon which an [EIS] is based must be supported by evidence in the administrative record"). This Court has confirmed that it should "reverse an agency's action" if it

14

"fail[s] to give a reasonable explanation for how it reached its decision." *Tex. Off. of Pub. Util. Couns. v. F.C.C.,* 183 F.3d 393, 410 (5th Cir. 1999).

## ARGUMENT

## I.    PETITIONERS HAVE STANDING.

A threshold issue is whether Petitioners have standing to bring this challenge to FERC's certificate and accompanying FEIS. For the reasons discussed below, the answer is yes.

### A.    Associational Standing in a NEPA Case.

An association has standing to bring an action on behalf of its members when: (1) its members have standing in their own right; (2) the interests which the association seeks to protect in the lawsuit are germane to the association's purpose; and (3) neither the claim asserted nor the relief requested requires members' individual participation in the lawsuit. *See Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 792 (5th Cir. 2000). Only one petitioner needs to have standing for the case to proceed. *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007).

The first requirement—that an association's members have standing to sue in their own right—has three elements. A petitioner must point to a member who can establish: a) some concrete "injury;" b) that is "fairly traceable" to the actions of the defendant; and c) which would "likely be redressed by a favorable decision." *Citizens for Clean Air & Water in Brazoria Cnty. v. U.S. Dept. of Transp.*, 98 F.4th

178, 186-87 (5th Cir. 2024). As this Circuit recently confirmed, a "threatened

injury" is sufficient to satisfy the "injury" requirement, especially where a plaintiff

seeks to challenge an agency's failure to satisfy a procedural requirement. *Id.* at

187 (citing *Massachusetts v. EPA*, 549 U.S. at 518 ("When a litigant is vested with

a procedural right, that litigant has standing if there is some possibility that the

requested relief will prompt the injury-causing party to reconsider the decision that

allegedly harmed the litigant.")). In such cases, a petition need only establish a

"concrete interest" that is threatened by the agency's allegedly unlawful conduct.

*Id.* at 187 (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 573 n.8 (1992)); *see

also Nat'l Infusion Ctr. Assoc. v. Becerra*, 116 F.4th 488, 503 (5th Cir. 2024) ("A

litigant has standing if there is 'some possibility' that enforcing the procedural

right 'will prompt the [defendant] to reconsider the decision.'").

    B.    <u>Petitioners Have Standing to Challenge FERC's Approval of the
Project.</u>

Petitioners Columbia Riverkeeper and Rogue Climate, membership

organizations headquartered in Oregon, satisfy this three-part test, especially under

the "looser standard" appliable to procedural claims like those involved here. *Nat'l

Infusion Ctr.*, 116 F.4th at 503. First, Petitioners' members unquestionably have

"concrete interests" that are threatened by FERC's authorization of the Project.

*Brazoria Cnty.*, 98 F.4th at 188. For example, Columbia Riverkeeper member

Mary Ann Fleischmann is a resident of Bend, Oregon: her home of fifteen years

sits just a few blocks away from the GTN pipeline. *See* Fleischmann Decl., ¶ 3. Ms. Fleischmann's declaration describes her recreational, aesthetic, and economic interests in her home and community, the nearby outdoor activities she enjoys, and her concern for her and her neighbors' well-being that are impacted by the pipeline, particularly in the event of a safety incident. *Id.* ¶¶ 4-16. Ms. Fleischmann is "extremely concerned" about the Project's safety and pollution risks, which interfere with her enjoyment of her activities and diminish her quality of life. *Id.* at 21.

Similarly, Aisha Wilson is a member of Rogue Climate who resides in Fort Klamath, Oregon, a few miles away from the pipeline. Wilson Decl. ¶ 1. Ms. Wilson is an enrolled member of the Klamath Tribes with close familial, cultural, and Tribal connections to lands along the pipeline's route in Southern Oregon. *Id.* ¶ 2. Ms. Wilson has devoted a significant amount of her life to advocating for the protection of these lands, which include areas for hunting and foraging that she and her family have used for generations. *Id.* ¶¶ 3-9. Ms. Wilson and her family subsist off the food they hunt and collect on lands put at risk by the pipeline. She describes the devastating impact of recent wildfires in her community, the lack of firefighting resources, and her concern that an incident on the aging GTN pipeline would cause irreversible harm to areas of deep cultural and economic importance. *Id.*

Given the risks posed by the Project to lands that are "sacred," "unique," and "incredibly special," *id.* ¶¶ 6, 18, Petitioners have demonstrated a "concrete interest" for standing purposes. The fact that some of the harms posed by the Project—for example, the potential for an accident that could trigger wildfire—are "threatened" is of no moment. *Brazoria Cnty.*, 98 F.4th at 186-87 (finding standing based on "threatened injury" to concrete interest); *Nat'l Infusion Ctr.*, 116 F.4th at 498-501 (finding standing based on potential future economic harm that had yet occurred). Indeed, this Court's precedent bears that out in factually similar situations. In *Gulf Restoration Network v. Salazar*, 683 F.3d 158, 167-68 (5th Cir. 2012), for example, environmental groups submitted declarations from members discussing their research, economic, recreational, and aesthetic interests in an area proposed for oil drilling that had been approved by the Department of the Interior. This Court found that "[t]hreats to these interests" from drilling were "cognizable as injuries for the purpose of standing." *Id.* Similarly, *in Brazoria County*, this Court held that groups had standing to challenge a pipeline that posed "increased risks of oil spills" in areas that the groups' members lived and used, even though an oil spill may or may not occur. 98 F.4th at 188; *see also Texas v. Nuclear Reg. Comm'n*, 78 F.4th 827, 835-36 (5th Cir. 2023) (finding injury where members live and travel in geographic proximity to radioactive materials).

18

Petitioners' fears about the threats to their concrete interests are well grounded. FERC itself confirms as much in the FEIS, which reveals that "[t]he greatest hazard is a fire or explosion following a major pipeline rupture." R135:89 ("The pressurization of natural gas at a compressor station involves some incremental risk to the public due to the potential for accidental release of natural gas."). FERC's conclusion is well supported by the record, which establishes that increasing the volume and rate of methane gas carried in an aging pipeline, managed by a corporate parent with a poor safety and compliance record, increases the likelihood of an accident as well as the potential consequences should one occur. R298:01; R385:01. This point is further amplified in the declaration of Richard Kuprewicz, submitted on behalf of the States, which further explains the technical basis for Ms. Wilson and Ms. Fleischmann's "reasonable concerns" about safety risks. *Friends of the Earth v. Laidlaw Env't. Servs.,* 528 U.S. 167, 183 (2000) (injury "adequately documented" of plaintiffs' "reasonable concerns about the effects of" pollution discharges).

The other elements of the member standing test—causation and redressability—are readily satisfied, particularly under the relaxed standard applicable here. The threats posed by the Project to Petitioners' concrete interests in their homes, communities, recreational and subsistence opportunities, and culturally significant landscapes "directly relate" to FERC's failures to adequately

analyze the Project. *Brazoria Cnty.*, 98 F.4th at 188. Where the agency approves a permit "based on an allegedly deficient environmental review" that leads to the construction of the project in question, these criteria are satisfied. *Id.*; *Texas v. Nuclear Reg. Comm'n,* 78 F.4th at 835-36; *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 543 (5th Cir. 2019) (where information in a different environmental impact statement "could cause [agency] to change its position," traceability is satisfied).

The remaining associational standing criteria are easily met. Petitioner groups are both nonprofit associations with missions to protect the environment and public health and safety. *See* Serres Decl. ¶ 2; Grady-Benson Decl. ¶ 2. Petitioners seek to safeguard their members' interests in ensuring a safe and healthy environment, including by reducing reliance on fossil fuels and reducing risks to water and air quality in the specific areas along the GTN pipeline. *See Gulf Restoration Network,* 683 F.3d at 167-68 (finding that environmental group had standing to challenge oil exploration plans that were germane to organization's purpose). Petitioners satisfy the final criteria because this Court's determination whether FERC's decision to authorize the Project violates applicable law does not require individual participation of Petitioners' members. *Hunt v. Wash. Apple Advert. Comm'n,* 432 U.S. 333, 343 (1977); *UAW v. Brock*, 477 U.S. 274, 287-88

(1986) (associational standing satisfied where statutory requirements do not require evaluation of "unique facts" personal to union members).

## II.   FERC VIOLATED NEPA BY FAILING TO CONDUCT A LAWFUL ALTERNATIVES ANALYSIS.

The FEIS does not include a "no action" alternative, a mandatory feature of an EIS that examines the impacts of not implementing the proposal under review. Instead, FERC concluded that the no action alternative "is not a reasonable alternative because it does not meet the purpose of the Project; and is therefore, not considered in this EIS." R135:29. This is a bald violation of NEPA.

### A.   An EIS "Shall" Include an Analysis of the "No Action" Alternative.

"An essential feature of an EIS is its analysis of alternatives to the proposed action." *City of Shoreacres v. Waterworth,* 420 F.3d 440, 450 (5th Cir. 2005) (describing alternatives analysis as the "heart of the environmental impact statement"); 42 U.S.C. § 4332(C), (H). As this Court has confirmed repeatedly, an EIS must examine alternatives "in a way that permits a reasoned choice among different courses of action." *Brazoria Cnty.*, 98 F.4th at 195 (citing *Miss. River Basin All.,* 230 F.3d at 175).

Foundational to this comparison is the inclusion of a "no action" alternative that examines the impacts of not undertaking the proposed action. 42 U.S.C. § 4332(C)(iii). CEQ's implementing regulations leave no room for ambiguity: agencies "*shall*…[d]iscuss each alternative considered in detail, including the

proposed action, so that reviewers may evaluate their comparative merits," and must "include the no action alternative." 40 C.F.R. § 1502.14 (emphasis added); *id.* § 1501.9 (to determine scope of an EIS, agencies "shall" consider "[a]lternatives, which include the no action alternative…"); 85 Fed Reg. at 43,330 ("where the Federal agency's authority to consider alternatives is limited by statute, the range of alternatives may be limited to the proposed action and the no action alternative."); 46 Fed. Reg. 18,026, 18,027 (March 23, 1981) (NEPA "requires the alternatives analysis in the EIS to 'include the alternative of no action'"). FERC's agency-specific regulations confirm the necessity of including the no action alternative as well. 18 C.F.R. § 380.1. FERC regulations demand a comprehensive analysis of the no action alternative from the proponent as part of its Natural Gas Act certificate application package. 18 C.F.R. § 380.12(l)(1) (proponent "must…[d]iscuss the 'no action' alternative and the potential for accomplishing the proposed objectives through the use of other systems and/or energy conservation").[5]

---

[5] Despite this clear directive, GTN never produced such an analysis. Instead, GTN's application summarily concluded that "[t]he no-action alternative is not considered a viable option because it does not meet the current Project's purpose and need…" and did not mention the issue further. R01:706. FERC did not ask GTN to provide a compliant application and instead repeated GTN's conclusion in its NEPA documentation.

While considering a range of alternatives is key to NEPA's goal of exploring less environmentally harmful means to an end, the "no action" alternative serves a different and crucial purpose. Specifically, the no action alternative serves as a "baseline against which the proposed action and its alternatives may be measured." *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 72 F.4th 1166, 1185-86 (10th Cir. 2023); *Alaska Wilderness Recreation and Tourism Ass'n v. Morrison*, 67 F.3d 723 (9th Cir. 1995) (no action alternative "serves as the benchmark by which effects of all action alternatives are measured"); *Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1040 (10th Cir. 2001) (purpose of no action alternative is to "compare the potential impacts of the proposed major federal action to the known impacts of maintaining the status quo.").

Accordingly, it is black letter law that a no action alternative "*must* be considered in every EIS." *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 734–35 (9th Cir. 2020) (citing 40 C.F.R. § 1502.14(d)) (emphasis added); *Calvert Cliffs Coord. Committee*, 449 F.2d at 1113 (agencies must consider "total abandonment of project" in evaluating alternatives); *Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1039 (10th Cir. 2001) (to comply with NEPA, agency is "required to rigorously explore" no action alternative); *Van Abbema v. Fornell*, 807 F.2d 633, 642 (7th Cir. 1986) (EIS invalid for failure to adequately consider "no build" alternative). Moreover, the no action alternative must be "[i]nformed

and meaningful." *Bob Marshall All. v. Hodel*, 852 F.2d 1223, 1228 (9th Cir. 1988). For example, agencies must use the same methodologies to compare the action and no action alternatives so that they can make an "informed and meaningful choice." *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723 (9th Cir. 2020) (rejecting EIS because no action alternative failed to consider impact of foreign oil consumption).

Importantly, "the no-action alternative is not a do nothing alternative, but must include a discussion of reasonably foreseeable development that would result from its adoption." Mandelker*, NEPA Law and Litig.* § 10:32 (2024). This means that when evaluating the no action alternative for an energy project like this one, the analysis should assess how energy markets would respond if the project in question is not built. *See, e.g., Brazoria County,* 98 F.4th at 195 (no action alternative looked at "the reasonably foreseeable development that would result if the project did not exist"); *see also Mid-States Coal. for Progress v. Surface Transp. Bd.,* 345 F.3d 520, 549 (8th Cir. 2003) (recognizing that EIS for coal rail-line will impact demand for other energy sources). In *Brazoria County*, this Court rejected a challenge to the no action alternative because the agency "reasonably concluded" that crude oil would still be exported from other sites on the Gulf Coast even if the project was not built. *Id.* at 196. Similarly, in *Gulf Restoration Network v. Haaland*, 47 F.4th 795, 800-01 (D.C. Cir. 2022), the D.C. Circuit upheld an EIS

for federal oil leases that assumed other leases would fill the gap in oil demand under the "no action" alternative. *See also Ctr. for Biological Diversity*, 72 F.4th at 1187 (upholding EIS that assessed different water depletions under no action alternative). Conversely, courts reject "no action" alternatives that fail to coherently account for future conditions. *See, e.g., WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 870 F.3d 1222, 1238 (10th Cir. 2017) (invalidating EIS that assumed identical amount of coal would be burned under either the project or the no action alternatives); *N.C. Wildlife Fed. v. N.C. Dept. of Transp.,* 677 F.3d 596, 603 (4th Cir. 2012) ("Courts not infrequently find NEPA violations when an agency miscalculates the "no build" baseline or when the baseline assumes the existence of a proposed project.").

FERC's own guidance calls for exactly this analysis.

> [T]he no-action alternative discussion should discuss *what other options may be pursued by customers of the proposed project to satisfy the need for the proposed project*. For example, if the proposed project were not constructed, describe the alternatives to meet the project objectives and, if known, the likely environmental effects and costs of pursuing these options. These options should include the use of other natural gas systems, non-gas energy alternatives, and/or energy conservation or efficiency, as applicable.

Guidance Manual for Environmental Report Preparation for Applications Filed

Under the Natural Gas Act, FERC Office of Energy Projects, 4-135 to 4-136 (Feb.

2017).[6] CEQ's NEPA guidance is similarly clear:

> Where a choice of "no action" by the agency would result in predictable actions by others, this consequence of the "no action" alternative should be included in the analysis. For example, if denial of permission to build a railroad to a facility would lead to construction of a road and increased truck traffic, the EIS should analyze this consequence of the "no action" alternative. In light of the above, *it is difficult to think of a situation where it would not be appropriate to address a "no action" alternative.*

46 Fed. Reg. at 18,027 (emphasis added).

B.    <u>FERC Unlawfully Refused to Consider a No Action Alternative, then Arbitrarily Claimed that It Did.</u>

The no action alternative, or lack thereof, was a primary focus of

commenters during FERC's administrative process. In its scoping comments, EPA

urged FERC to evaluate a no action alternative to "consider and evaluate non-gas

energy alternatives as well as other non-project related alternatives that satisfy the

ultimate need for the project, specifically the energy services that would be

provided by the delivered fuel *(e.g.*, building heating and electricity generation)."

R59:05; *see also* R61:01 (petition asking for consideration of "no action" option);

R62:01; R64:07. Despite these recommendations, the DEIS did not consider a no

---

[6] https://www.ferc.gov/sites/default/files/2020-04/guidance-manual-volume-1.pdf.

action alternative at all. Instead, it asserted that any alternative that "does not increase the capacity of GTN's natural gas transmission system is not a reasonable alternative because it does not meet the purpose of the Project," and would not be considered. R86:27.

In its comments on the DEIS, EPA tried again, arguing that FERC should consider a no action alternative "to consider and evaluate non-gas energy alternatives that satisfy the ultimate need for the Project, specifically the energy services that would be provided by the Project." R93:04. Intervenor states similarly urged FERC not to ignore the no action alternative, describing in technical detail what this alternative could look like. *See* R103:19-20 (FERC "must also consider, however, the predictable effects of not expanding gas infrastructure in the Pacific Northwest. In this case, a predictable effect of failing to increase methane gas supply is that Pacific Northwest energy users will turn to other energy sources to meet their energy needs."). So did Riverkeeper. R105:19-20 (EIS "does not provide any basis for comparison of impacts between the proposed alternative and the no action alternative. Failure to establish an adequate baseline renders the alternatives analysis inadequate and constitutes a violation of NEPA."); R100:10. In the FEIS, FERC ignored these recommendations. Instead, like the DEIS, the FEIS simply reiterates that it will not consider a no action alternative at all because it did not meet the "purpose and need" for the Project. R135:29.

In the Certificate Order, FERC pivoted. Rather than defend the FEIS's insistence on omitting the no action alternative, the Certificate Order incorrectly states the FEIS did, in fact, consider the no action alternative. R521:45. FERC even went so far as to conclude that "the no-action alternative would result in fewer environmental impacts than the proposed project," a conclusion that does not appear in the FEIS—which does not even define a no action alternative, let alone consider it. *Id.* Nor did FERC provide any explanation for this 180-degree discrepancy between the Certificate Order and the FEIS.

This incoherent approach formed a core focus of Petitioners' rehearing request. R565:40-44. Riverkeeper devoted an entire section of its rehearing petition to laying out the regulations, governing caselaw, guidance, and technical support for its view that the FEIS was irretrievably flawed for failing to consider the no action alternative. *Id.* The same was true for the States' rehearing petition. R562:115-18 ("As an agency obliged to consider ways to avoid environmental impacts, reduce costs from overbuilding, and protect consumers, the Commission should have seriously considered the no-action alternative, which best accomplishes all these goals."). Moreover, the States' rehearing petition describes in detail how under a no action alternative, numerous adverse impacts of the Project—including greenhouse gas emissions and other air pollution—would be avoided. *Id.*

Given an opportunity to either correct its error or explain itself on rehearing, FERC did neither. R620:65. Instead, it again erroneously claimed to have "evaluated a no-action alternative," while simultaneously claiming that the FEIS "appropriately limited its consideration of alternatives to those that would further the Project's purpose," which it construed to exclude the no action alternative. *Id.* Contradicting its asserted compliance just a few pages later, FERC defended its refusal to consider the no action alternative, arguing that "[b]ecause the no-action alternative would fail to meet the Project's purpose and need, we continue to find that the discussion and rejection of the no action alternative was reasonable and appropriate." *Id.* at 67-68 ("The Final EIS concluded that neither the no-action alternative nor any alternative energy source is capable of meeting the purpose of the Project, and were therefore eliminated from further consideration."). The majority's treatment of this issue prompted a blistering dissent from Commissioner Clements, which explained how "the EIS dismissed the no action alternative out of hand" in violation of both CEQ and FERC regulations and guidance. R620:124. Citing Riverkeeper's and the States' rehearing petitions, the dissent concludes that "it is now clear that the EIS is *fundamentally deficient* for failing to fully evaluate the no action alternative." R620:125 (emphasis added).

C.   FERC's Failure to Consider the No Action Alternative Violates
     NEPA and the APA.

FERC's refusal to consider the no action alternative is fatal to the FEIS and

to the certificate decision. *See, e.g., City of Port Isabel v. FERC,* 111 F.4th 1198,

1218 (D.C. Cir. 2024) (vacating FERC certificate due to invalid FEIS). FERC

cannot ignore the requirement to provide an "informed and meaningful" analysis of

the no action alternative as a point of comparison to the proposal for any reason,

and certainly not because such alternative does not satisfy the "purpose and need"

for the Project. "That a no-action alternative will not meet the needs to be served

by a proposed project is obvious." NEPA Law & Litig. § 10:32. Petitioners

specifically explained as much to FERC. R565:42 ("The same statement is

presumably true of the no action alternative for literally any project. A no action

alternative serves a different purpose, which is to provide a point of comparison

with the proposed project and other alternatives."). FERC's arbitrary dismissal of

the no action alternative because it would not meet the stated purpose of the

Project is a textbook NEPA violation. *Pit River Tribe v. U.S. Forest Serv.,* 469

F.3d 768, 777 (9th Cir. 2006) (rejecting EIS where no action alternative was not

considered because it "would not meet the purpose and need for the proposed

action").

FERC's alternative defense—that it did in fact consider the no action

alternative—fares no better. The claim is flatly contradicted by the FEIS itself,

30

which explicitly says the no action alternative was not considered. R135:29. These inconsistent explanations are the essence of arbitrary and capricious decisionmaking. *See, e.g., Jupiter Energy Corp. v. FERC,* 407 F.3d 346, 351 (5th Cir. 2005) (invalidating FERC decision that was "fatally flawed by…inconsistency"); *Sea Robin Pipeline Co. v. FERC,* 127 F.3d 365, 371 (5th Cir. 1997) (vacating FERC decision where agency "failed to supply the requisite reasoned analysis" for its decision).

This is no flyspecking error, but one central to the entire EIS. For a project like this one, a proper no action alternative would have evaluated ways in which energy markets would respond to energy demands not provided by the Project. This would have facilitated a crucial comparison between the adverse impacts of the Project and alternative ways to meet its claimed energy demand. R562:118. However, FERC did nothing of the sort. Instead, FERC rejected any consideration of the no action alternative out of hand on the basis that it was inconsistent with the purpose and need for the Project. R135:29. As a result, the FEIS is missing one of its core components: a point of comparison on the environmental impacts of implementing, and not implementing, the Project.

## III.  FERC UNLAWFULLY SEGMENTED THE EXPANSION PROJECT FROM THE COMPRESSOR STATION UPGRADES.

The next issue is whether the EIS considered the three compressor upgrades as "connected actions" to the Project, as NEPA requires. There is no dispute that it

did not, and FERC's shifting justifications for segmenting the compressor upgrades from the rest of the expansion cannot withstand scrutiny.

A.    NEPA Requires Agencies to Consider "Connected Actions."

NEPA requires federal agencies to consider "connected actions" in a single NEPA review. 40 C.F.R. §§ 1501.9(e)(1), 1502.4(a). "Connected actions" are those actions closely related to the proposed action. *Id.* Actions are "connected" if they:

> (i)    Automatically trigger other actions that may require environmental impact statements;
> (ii)   Cannot or will not proceed unless other actions are taken previously or simultaneously; or
> (iii)  Are interdependent parts of a larger action and depend on the larger action for their justification.

*Id.* § 1501.9(e)(1). As this Circuit has recognized, "[a]gencies generally should not 'segment,' or 'divide artificially a major Federal action into smaller components to escape the application of NEPA to some of its segments.'" *Fath v. Tex. DOT,* 924 F.3d 132, 137 (5th Cir. 2018) (*quoting Save Barton Creek Ass'n v. Fed. Highway Admin.*, 950 F.2d 1129, 1140 (5th Cir. 1992)).

When evaluating whether gas infrastructure projects are "connected actions" under this standard, courts look to the respective projects' "degree of physical and functional interdependence, and their temporal overlap." *Food & Water Watch v. FERC*, 28 F.4th 277, 291 (D.C. Cir. 2022). Where there is a "clear physical, functional, and temporal nexus between projects," such that they are functionally

interdependent, they must be considered together as a single project. *Del.*

*Riverkeeper Network v. FERC*, 753 F.3d 1304, 1308-09 (D.C. Cir. 2014). On the

other hand, where separate projects serve separate purposes with different benefits

for different sets of customers, they may properly be considered to have

"independent utility" for purposes of NEPA review. *Food & Water Watch*, 28

F.4th at 291-92.

As to the first factor, "physical and functional interdependence," a court

should assess whether separate parts of a single project are useful on their own or

depend on the other parts for their justification. *Del. Riverkeeper*, 753 F.3d at

1311. Actions are connected "where one action could not occur but for the

occurrence of the other." *Citizens' Comm. to Save Our Canyons v. U.S. Forest*

*Service,* 297 F.3d 1012, 1029 (10th Cir. 2002); *City of Port Isabel,* 111 F.4th at

1213. In contrast, if both projects "will serve a significant purpose" and "would

have gone forward absent the other," then they may not be "connected" for

purposes of NEPA. *Food & Water Watch*, 28 F.4th at 291.

As to the second factor, which looks at projects' "temporal overlap," courts

should ask "whether the projects are 'either under construction' or 'pending before

the Commission for environmental review and approval' at the same time." *City of*

*Port Isabel,* 111 F.4th at 1213. A "temporal nexus" exists where projects are

"completed in the same general time frame, and FERC was aware of the

interconnectedness of the projects as it conducted its environmental review[.]" *Del. Riverkeeper*, 753 F.3d at 1308-09. However, where projects proceed on "separate timelines," that weighs against a finding of connectedness. *Food & Water Watch*, 28 F.4th at 292.

B.     FERC Failed to Consider the Compressor Upgrades and the Expansion Project as "Connected Actions."

Despite a clear prohibition on segmenting a single project into separate components for environmental review, that is exactly what FERC did here.[7] Petitioners and others repeatedly urged FERC to evaluate the compressor upgrades and the Project as connected actions during the NEPA process. R105:20-21. FERC summarily rejected the request, analogizing the Project in the FEIS to segments in a highway network that are independently useful and hence not connected. R135:234. The connected action issue also featured prominently in Riverkeeper's rehearing request. R565:45-51. In its rehearing order, FERC dismissed the segmentation concern, but made no effort to explain how the Project has "independent utility" apart from the compressor upgrades. Instead, FERC simply pointed out that the compressor replacements were processed under § 2.55(b).

---

[7] FERC looked at the three compressor upgrades as separate not just from the Project but as separate from each other, conducting three brief assessments confirming that they met the criteria of § 2.55(b). R620:09 n.37; R620:94 n.546.

R620:93-94.[8] Then, in a surprising pivot, FERC claims that it did consider the

impacts of the compressor upgrades as part of the FEIS for the Project. R620:94

n.549.

The record makes clear why considering the compressors together with the

rest of the expansion was so important. For one thing, the impacts of the

compressor upgrades were significant and cumulative to the impacts of the Project.

For example, EPA recommended that FERC engage with impacted communities,

establish a noise monitoring program, and monitor noise impacts to workers and

adjacent communities. R135:87. But in evaluating construction noise, the FEIS

found that "no construction would occur at this site," and hence "additional

mitigation as recommended by the EPA is unwarranted." *Id.* Of course, such a

finding was only possible by segmenting out the portion of the expansion causing

the noise. Similarly, the FEIS states that "construction activities are a substantial

component of total [air pollution] emissions for the Project[.]" R135:73. However,

the FEIS includes no construction emissions data for the Athol Station because "no

construction activities would occur" at that location. R135:73-74. Looking at the

---

[8] In fact, the Rehearing Order undermined its own conclusion that the components of the Project were not connected when it declined to grant GTN's request for a predetermination of rolled-in rate treatment. FERC based its decision to deny rolled-in rates on the fact that "a portion of the horsepower from the replacement units will be used to support the Project." R620:21. There could hardly be a more succinct statement of connectedness.

projects together, in contrast, would have yielded more useful information that could have been used to inform mitigation options.

The segmentation of the expansion into separate components also foreclosed consideration of potentially viable alternatives. *Del. Riverkeeper*, 753 F.3d at 1315. For example, EPA recommended that FERC evaluate the use of electric-powered compressors instead of natural gas-powered compressors. R59:05. Electric compressors have reduced environmental impacts such as less air pollution, have cost advantages, and are better suited to provide sustained pressure. R135:32-33. But by the time the FEIS was prepared, three of the four compressor replacements had already happened, so FERC focused only on the costs of installing a single electric compressor and found it to be cost and schedule prohibitive. R135:34. As a result, FERC missed a key environmental benefit of an all-electric compressor alternative—reductions in localized air pollution.

There is no mystery as to why GTN sought to proceed in this manner: the company separated the two steps of the expansion project to ensure that its customers, not its shareholders, paid for the compressor upgrades. The company itself has explained that the Project is not financially viable unless the cost of the compressor upgrades were covered by GTN's existing customers—something that could only happen by permitting the upgrades under § 2.55(b) rather than a part of the expansion Project. *See* ECF 74-2, ¶ 17 ("If FERC allocates additional base

system dollars to the Project and denies rolled-in rates in the ongoing ratemaking

proceeding, the Project would no longer be financially viable for GTN, and the

Project's future would be uncertain."). In other words, if GTN had included the

compressor upgrades as part of the Project, the overall expansion would not have

been commercially viable. As the record makes clear, this sleight of hand was

obvious to everyone except FERC.

C.   FERC's Determination that the Compressor Unit Upgrades Are Not
     Connected Actions to the Expansion Project is Arbitrary and
     Capricious and Violated NEPA.

FERC's refusal to consider the prior upgrades to the compressor units as

"connected actions" with the Project violates NEPA, and its shifting justifications

for its actions do not withstand scrutiny.

For starters, the analogy FERC offered in the FEIS to highway projects is

easily rejected, as segmentation of federal highway projects is reviewed under

separate factors set out in Federal Highway Administration regulations. *See* 23

C.F.R. § 771.111(f). The scope of FERC's analysis for natural gas pipeline projects

is governed by 40 C.F.R. § 1501.9(e)(1). *Del. Riverkeeper*, 753 F.3d at 1315.

FERC's analogy of a pipeline to a "highway network" has already been rejected by

another court in similar circumstances. *Id.* at 1315–16. Nor can FERC defer to §

2.55(b) as it sought to do in the Rehearing Order. The very purpose of the

connected actions rule is to "prevent agencies from dividing one project into

multiple individual actions each of which individually has an insignificant environmental impact, but which collectively has a substantial impact." *Del. Riverkeeper*, 753 F.3d at 1314. FERC's determination that the compressors met § 2.55(b) criteria, even if correct, does not negate the factors for determining whether actions are "connected" for purposes of NEPA review. 40 C.F.R. § 1501.9(e)(1). When FERC was determining the proper scope of the EIS for the Project, it was required to consider whether there were any "connected actions" that should be analyzed in the EIS, which includes actions already under construction. *Del. Riverkeeper*, 753 F.3d at 1314.

Nor can the pivot in the Rehearing Order, in which FERC claimed to have considered the connected actions after all, save the day. It is abundantly clear that the FEIS skipped over the replacement of the three compressor stations, as it described the Project as only "uprat[ing] existing compressor units at each station and install[ing] a new compressor unit at its Starbuck Compressor Station." R135:10. For example, the FEIS states that "[n]o physical work or ground disturbance would occur at the Athol Compressor Station in Idaho (software upgrade only)." *Id.* FERC could only say this because all of the significant ground disturbing activity at that station had already been completed as part of the replacement of that unit.

Most importantly, the Project does not have "independent utility" apart from the compressor upgrades. R105:20. First, the Project falls within the regulatory definition of connected actions because it could not exist without the compressor upgrades. 40 C.F.R. § 1501.9(e)(1) (connected actions "cannot or will not proceed unless other actions are taken previously or simultaneously."). As the record makes clear, the added capacity that was created with the replacement of the compressors is part of the expansion capacity proposed as part of the Project, and that capacity would not be available but for GTN's upgrade of the units. Even if the compressor upgrades might have "independent utility" apart from the Project, the Project plainly does not have "independent utility" apart from the upgrades. "If any one action cannot or will not proceed without the other(s), those actions are connected." *City of Port Isabel,* 111 F.4th at 1213.

Second, the compressor upgrades are physically and functionally "interdependent" with the Project. Here, as in *Del. Riverkeeper*, even though the various components were constructed separately, the compressor upgrades and Project function together as a single whole. For example, the GTN pipeline has thirteen compressor stations along its length. R01:66. But GTN completed "reliability" upgrades on only the three compressor stations that were subsequently proposed as part of the Project. Accordingly, as a result of the replacement of the Athol compressor unit in 2021, all that was required for GTN to implement the

Project at that station was a software upgrade to lift the artificial limits that kept the compressor within § 2.55(b) requirements. R01:13. Moreover, the 2019 open season that GTN held to sell additional capacity included both the capacity created as a result of the compressor upgrades and the expansion capacity created by adding new compressor equipment proposed in the Project, demonstrating that they were different components of the same overall plan. R01:84-88. Plainly, the compressor upgrades are "interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. § 1501.9(e)(1); *compare City of Boston Delegation v. FERC,* 897 F.3d 247, 252 (D.C. Cir. 2018) (FERC conclusion that actions were not "connected" for NEPA purposes was reasonable where projects had separate open seasons and customer contracts).

Finally, the close "temporal overlap" between the compressor replacements and the expansion Project supports a finding that they are connected. *City of Port Isabel*, 111 F.4th at 1213. Indeed, prior to either segment being initiated, GTN itself discussed the compressor replacements as the first phase of the overall expansion plan. *See supra 6-9.* GTN filed the § 2.55(b) notifications for the replacement of the three compressor units nine months after it held its open season to sell the expanded capacity that would become available as a combined result of both the compressor upgrades and the Project. R01:84; R521:06 n.20. In other words, when GTN filed its § 2.55(b) notification to replace the three compressors,

it had already contracted to sell the gas that would be available from the Project, which was dependent on the utilization of the more powerful compressors. Then, even before the upgraded compressors were put into service, GTN submitted its application to FERC for the second phase of the expansion, mischaracterizing it as a stand-alone project. R521:06 n.20; R01:01. FERC's review of these putatively separate actions was separated by mere months.

In short, by failing to evaluate the compressor upgrades as connected actions with the Project in the EIS, FERC unlawfully excluded consideration of key environmental impacts, alternatives, and mitigation of the Project as a whole. This is exactly why NEPA requires agencies to evaluate connected actions in a single environmental review. *Fath v. Tex. DOT*, 924 F.3d at 137.

## IV. FERC ARBITRARILY AND UNLAWFULLY DECLINED TO ASSESS LEGITIMATE SAFETY CONCERNS.

The final issue is whether FERC adequately considered safety risks of the pipeline, particularly in light of record evidence that the aging pipeline was unsafe and that GTN's parent company had a history of accidents and legal violations. FERC disclaimed responsibility for any such assessment. Its justification for doing so cannot withstand scrutiny.

### A.     FERC Has a Duty to Consider and Disclose Safety Risks.

Under NEPA, agencies must both "look hard at the environmental effects of [its] decision," as well as consider "a project's impact on public safety," such as

the risk of accidents. *See, e.g., City of Oberlin v. FERC*, 937 F.3d 599, 602 (D.C. Cir. 2019); *Brazoria Cnty.*, 98 F.4th at 191 (agency must consider "reasonably foreseeable significant adverse effects" like oil spills); 40 C.F.R. § 1502.16 (EIS must consider all "environmental consequences" of decisions); § 1502.21(d). This Circuit has set aside EISs that fail to do so. *See, e.g., Sigler*, 695 F.2d at 975. In *Sigler*, for instance, this Court invalidated an EIS for a crude oil terminal because it failed to grapple with the risk of an oil spill. An agency, the Court held, "may not hide behind its ignorance of the worst case consequences and avoid confronting the costs of proceeding in the face of uncertainty." *Id.*[9] Similarly, another court held that an agency violated NEPA by approving an oil dock expansion without considering the risk of spills resulting from increased tanker traffic. *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 871 (9th Cir. 2005).

That is because "an agency must look at both the probabilities of potentially harmful events and the consequences if those events come to pass" in a NEPA review. *New York v. Nuclear Reg. Comm'n,* 681 F.3d 471, 482 (D.C. Cir. 2012). NEPA requires close consideration of a potential impact where it is "sufficiently

---

[9] This Court in *Sigler* considered a regulation requiring analysis of "worst case scenarios" that was later modified. The regulation that governs here states that an agency must assess "impacts which have catastrophic consequences, even if their probability of occurrence is low." 40 C.F.R. § 1502.21(d). This change in language does not appear to have been consequential. *See, e.g.*, *Brazoria Cnty.*, 98 F.4th at 191 (assessing FEIS examination of reasonably foreseeable "worst-case oil spills").

likely that a person of ordinary prudence would take it into account in reaching a decision." *Sierra Club v. FERC*, 827 F.3d 36, 47 (D.C. Cir. 2016); 40 C.F.R. § 1508.1(aa). An agency's failure to grapple with credible comments in the record regarding a pipeline operator's poor safety record and risks of accidents is arbitrary and capricious in violation of NEPA. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1047 (D.C. Cir. 2021).

> B.    FERC Failed to Consider and Disclose Documented Safety Hazards
>        Associated with the Pipeline's Expansion.

The safety and public health risks of a significant increase in pressure and volume on an aging methane gas pipeline, run by an operator with a poor safety record, have been a core public concern since the Project's inception. Immediately after the Project was announced, for example, EPA provided detailed recommendations for assessing the "safety and reliability" of the pipeline, including whether pipeline segments were in "high consequence areas;" identifying "major root causes of events that may cause incidents;" and discussing "corrosion prohibitors;" and "shutdown and spill response mechanisms;" among other things. R59:13. FERC included none of this information in the DEIS. Instead, FERC waved off EPA's recommendations, explaining that "the safety of natural gas transmission pipelines and associated transmission facilities are regulated by" the U.S. Department of Transportation ("DOT"). DEIS at 4-50.

This prompted public outcry as well as detailed technical criticism of the DEIS. *See, e.g.,* R105:35 (Petitioners' comments); R103:27 (state comments discussing wildfire risks). For example, Pipeline Safety Trust, an independent pipeline safety organization, submitted two separate comments outlining unaddressed safety concerns with the Project. R298:01. In its first comment, the Trust documented the "safety risks and incident history of GTN and its parent company" in detail, noting that "GTN and TC Energy have a history of failing to meet regulatory requirements, accidents, and controversies relating to safety and reliability of its systems." *Id.* at 3. "[T]he high number of serious enforcement actions taken against TC Energy and GTN is *extremely concerning* given the fact that this application asks to increase the amount of pressure in this pipe which could increase the risk of pipe failure." *Id.* at 2 (emphasis added). The Trust explained that "given the greater amount of methane in a higher pressure pipeline, all else being equal," incidents have a "larger 'blast zone' in the case of explosion." *Id.*

The Trust followed up with a second comment letter drawing attention to an explosion on another gas pipeline managed by GTN's parent company, calling TC Energy's safety record "extremely concerning, and another demonstration that TC Energy shouldn't have its GTN Xpress application granted." R385:01. Many others weighed in as well. Twenty-seven local and national organizations

submitted a letter asking FERC to fully account for the fire and safety hazards of the Project, in light of recent pipeline failures. R384:01. Their letter highlighted comments from communities near the pipeline seeking such an accounting and urged FERC to at least wait for an analysis of the Virginia explosion before making a certificate decision. *Id.* The four U.S. Senators from Oregon and Washington also raised safety risks in light of accidents on other pipelines managed by GTN's parent company. R519:01. In addition, the states honed in on the risks of wildfires triggered by a pipeline incident, a critical issue for Pacific Northwest states in recent years. R103:27-28.

In the FEIS and Certificate Order, FERC did not meaningfully address any of these concerns, provide any additional analysis of safety risks, or provide a reasoned and lawful explanation for why it believed it did not have to. Instead, the FEIS and Certificate Order both point to GTN's "continued compliance" with minimum federal safety standards to summarily conclude, without analysis, that "the Project facilities would be modified, installed, and operated safely." R135:91; R521:28. The FEIS did not consider or disclose the risk of an accident and its attendant impacts on fires, public health and safety, or air quality for communities near the compressor stations or along the pipeline. It did not disclose, let alone evaluate, how GTN's parent company's poor safety record implicated these

considerations. Instead, it summarily concluded that pipeline safety is regulated by another agency and hence that it had no role in assessing them.

These issues were also front and center in the two rehearing petitions filed by Petitioners and the states. R565:77-80; R562:127-29. Yet again, however, given the opportunity to supplement its analysis or at least explain its reasoning, FERC demurred. It confirmed anew that it had no duty to consider the issue because safety is regulated by another agency. R620:102-03. It summarily rejected the notion that there was any "probative value" in considering GTN's parent company's safety record or other accidents on pipelines it managed. *Id.* Finally, in yet another puzzling about-face, it insisted that it did in fact consider the issue carefully in the FEIS, even though the FEIS does nothing of the sort. R620:104 ("Commission staff fully analyzed the Project's potential safety and reliability impacts").

C.    FERC's Failure to Address Safety Issues was Arbitrary and Violated NEPA.

FERC's treatment of these critical safety issues is arbitrary and capricious and violates NEPA. *See* 40 C.F.R. § 1502.21(d) (assessment of low-risk, high-consequence events cannot be based on "pure conjecture"). The key question for this Court is whether FERC adequately explained its decision in light of the record. *Brazoria Cnty,* 98 F.4th at 190 ("An arbitrary or capricious action is one that relies on improper factors, fails to consider key information, offers a decision that the

record does not support, or lacks plausibility."). There are multiple reasons why FERC fails this test.

First, it is black letter law that an agency cannot avoid consideration of an issue in an EIS just because another agency exercises oversight over that issue. This obligation arises from NEPA itself, which directs agencies to study an action's impacts "to the fullest extent possible." 42 U.S.C. § 4332(2)(C). The U.S. Supreme Court has found this language to constitute a "deliberate command" that agencies' obligation to consider impacts "not be shunted aside in the bureaucratic shuffle." *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Oklahoma*, 426 U.S. 776, 778 (1976); *Calvert Cliffs' Coordinating Comm'n, Inc. v. U. S. Atomic Energy Commission*, 449 F.2d 1109, 1123 (D.C. Cir. 1971) (Congress "most certainly did not authorize a total abdication to those agencies" with regulatory authority over aspects of a project); *see also Sierra Club v. Morton,* 510 F.2d 813, 819 (5th Cir. 1975) (citing *Calvert Cliffs* and describing NEPA as "compelling consideration of any and all types of environmental impact of federal action"); *Or. Env'tl Council v. Kunzman*, 714 F.2d 901, 905 (9th Cir. 1983) ("the mere fact that a program involves use of substances registered under FIFRA does not exempt the program from the requirements of NEPA"). It is FERC that is charged by law with evaluating whether a project is in the public convenience and necessity before granting it permission to proceed, not DOT. That decision must be informed by a

full understanding of the project's consequences, including safety and wildfire risks. *Steamboaters v. FERC*, 759 F.2d 1382, 1394 (9th Cir. 1985) (agencies must make "independent assessment" of impacts even if regulated by other agencies). Here, it was not.

Second, FERC defended its decision to "rely on the expertise of other agencies" but did not, in fact, rely on any other agency in reaching its decision. To the contrary, the record contains no comment from DOT or any of its subagencies about the Project, nor even a request from FERC for one. This too contradicts NEPA's clear directive. The statute directs that "[p]rior to making any detailed statement, the head of the lead agency *shall* consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved." 42 U.S.C. § 4332(C) (emphasis added). But FERC neither consulted with nor obtained comments from DOT or any other relevant pipeline safety regulatory agency. FERC cannot rely on "expertise" that was never sought nor shared.

Third, in the Rehearing Order, FERC provided an extended disquisition on why a supplemental EIS was not required. R620:102. A supplemental EIS is sometimes required after a decision has been made when there remains major federal action to occur and new information reveals major environmental impacts not previously considered. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373

(1989). But that was not the appropriate analysis. Instead, FERC was deciding whether or not to issue the certificate in the first instance, and was confronted with information that its FEIS was deficient. FERC's supplemental EIS argument is a distraction.

Fourth, FERC's decision is internally inconsistent. After disclaiming any responsibility to assess the issue at all, FERC then pivots to claim to have "fully analyzed the Project's potential safety and reliability impacts." The claim is inexplicable, as the FEIS plainly contains no such analysis. R620:104. An agency cannot claim that it adequately considered an issue when it did not, especially while disclaiming any responsibility to do so. Its reasoning must be coherent. Courts reject agency decisions, like this, that are at war with themselves. *See, e.g., ANR Storage Company v. FERC,* 904 F.3d 1020, 1022 (D.C. Cir. 2018) (setting aside FERC decision as "internally inconsistent"). "[A]n internally inconsistent analysis is arbitrary and capricious." *Nat'l Parks Conservation Ass'n v. EPA.*, 788 F.3d 1134, 1141 (9th Cir. 2015).

Finally, FERC's insistence that failures on other gas pipelines managed by GTN's parent company lack "probative value" cannot be squared with the record. R620:102. Credible technical experts explained the "probative value" of these other incidents very clearly: a company that has "a history of failing to meet regulatory requirements, accidents, and controversies relating to safety and

reliability" is a riskier bet, and stands in a different regulatory posture, than others. R298:01. In a closely parallel situation, the D.C. Circuit found arbitrary and capricious an agency's failure to weigh accident risk in light of the operator's "specific safety record," finding that the agency had failed to "cogently explain why it has exercised its discretion in a given manner." *Standing Rock Sioux Tribe*, 985 F.3 at 1047. Here too, FERC was presented with credible record information that the operator's poor compliance and safety record was a factor for assessing the risk of an incident. But instead of grappling with that evidence in the FEIS and accompanying decisions, FERC merely asserted that the information had no "probative value" and moved on. The APA demands more.

Had the FEIS and certificate adequately grappled with safety risks of this aging pipeline, managed by an operator with a poor safety record, it would have informed FERC's decision as to whether the Project was truly in the public convenience and necessity. *Sigler*, 695 F.2d at 982 ("Important and significant environmental costs were omitted from the FEIS and therefore were not considered by the Colonel in his permit decision."); *compare Brazoria County*, 98 F.4th at 190-91 (upholding EIS that "includes two thorough analyses of [the project's] oil spill risks" with varying scenarios, including multiple "worst-case" scenarios, satisfying NEPA). Alternatively, FERC could have imposed mitigation measures to reduce these risks. *See O'Reilly v. U.S. Army Corps of Eng'rs,* 477 F.3d 225,

228 (5th Cir. 2007) (requiring explanation of how measures would mitigate effects

to less-than-significant); 76 Fed Reg. 3,848 (Jan. 21, 2011) (mitigation guidance).

Instead, FERC waved the problem away, in violation of NEPA and the APA.

## V.    THIS COURT SHOULD VACATE THE CERTIFICATE AND REMAND FOR A NEW EIS.

The APA directs this Court to "set aside agency action . . . found to be . . .

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

the law." 5 U.S.C. § 706(2). As the U.S. Supreme Court has emphasized, "*in all*

*cases* agency action must be set aside if the action" is inconsistent with APA. *FCC*

*v. NextWave Pers. Commc'ns*, 537 U.S. 293, 300 (2003) (emphasis added). In this

Circuit, "by default, remand with vacatur is the appropriate remedy" in APA cases.

*Texas v. Biden,* 20 F.4th 928, 1000 (5th Cir. 2021). "Departing from that default

rule is justifiable only in 'rare cases.'" *Chamber of Com. v. U.S. Securities and*

*Exchange Comm'n*, 88 F.4th 1115, 1118 (5th Cir. 2023). This is true in NEPA

cases too. *Sigler,* 695 F.2d at 984 (ordering agency to rewrite flawed EIS and

"reconsider its permit decision in light of the rewritten FEIS"); *Davis Mountains*

*Trans-Pecos Heritage Ass'n. v. Fed. Aviation Admin*., 116 Fed. Appx. 3 (5th Cir.

2004) (vacating decision and remanding for new EIS). As another Circuit reasoned

in a similar situation, it would "vitiate" NEPA's procedural requirements to allow

an agency action to proceed after a court has found a violation of NEPA. *Standing*

*Rock Sioux Tribe*, 985 F.3d at 1052. Accordingly, Petitioners request that this

Court vacate the Certificate Order and FEIS and remand the matter back to FERC for a new certificate decision.

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that this Court find unlawful and set aside the certificate for the Project and its accompanying environmental impact statement.

Respectfully submitted this 28th day of October, 2024.

*s/ Jan E. Hasselman*
Jan Hasselman
Earthjustice
810 Third Ave., Suite 610
Seattle, WA 98104
(206) 343-7430 | Phone
Email: jhasselman@earthjustice.org

Maura C. Fahey
Crag Law Center
3141 E Burnside St.
Portland, OR 97214
503-525-2722 | Phone
Email: maura@crag.org

*Counsel for Columbia Riverkeeper*
*and Rogue Climate*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,978 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.1.

This brief complies with the typeface and typestyle requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) and Fifth Circuit Rule 32.1 because it has been prepared in a proportionally spaced typeface using Office 360 Microsoft Office Word in Times New Roman 14-point font.

Dated: October 28, 2024

*s/ Jan E. Hasselman*
Jan Hasselman
Earthjustice
810 Third Ave., Suite 610
Seattle, WA 98104
(206) 343-7430 | Phone
Email: jhasselman@earthjustice.org

Maura C. Fahey
Crag Law Center
3141 E Burnside St.
Portland, OR 97214
503-525-2722 | Phone
Email: maura@crag.org

*Counsel for Petitioners Columbia Riverkeeper and Rogue Climate*

## CERTIFICATE OF SERVICE

I certify that on October 28, 2024, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

Dated: October 28, 2024.

*s/ Jan E. Hasselman*
Jan E. Hasselman