**ORAL ARGUMENT NOT SCHEDULED**
**No. 24-60002**

**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

24-60002
consolidated with
24-60197

GAS TRANSMISSION NORTHWEST, L.L.C.,
*Petitioner,*

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent.*

consolidated with

No. 24-60280

COLUMBIA RIVERKEEPER; ROGUE CLIMATE; STATE OF
WASHINGTON; STATE OF OREGON,
*Petitioners,*

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent.*

consolidated with

No. 24-60354

STATE OF WASHINGTON; STATE OF OREGON
*Petitioners,*

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent.*

PETITION FOR REVIEW FROM THE
FEDERAL ENERGY REGULATORY COMMISSION
No. CP22-2-000; CP22-2-001; CP22-2-002

**OPENING BRIEF FOR THE STATES OF WASHINGTON AND OREGON**

ROBERT W. FERGUSON
Attorney General of Washington

MEGAN SALLOMI
SARAH REYNEVELD
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 389-2437
Megan.Sallomi@atg.wa.gov
Sarah.Reyneveld@atg.wa.gov

ELLEN F. ROSENBLUM
Attorney General of Oregon

PAUL GARRAHAN
Attorney-in-Charge
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel: (503) 947-4540
Paul.Garrahan@doj.oregon.gov

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made for the judges of this Court to evaluate possible disqualification or recusal.

James Holt
Katherine Ann Wade
Betts & Holt LLP
*Counsel for Canadian Association of Petroleum Producers*

Jan Hasselman
Earthjustice
Maura C. Fahey
Crag Law Center
*Counsel for Columbia Riverkeeper and Rogue Climate*

Robert H. Solomon
Solicitor, Federal Energy Regulatory Commission
Angela Gao
Attorney, Federal Energy Regulatory Commission
*Counsel for the Federal Energy Regulatory Commission*

Sean Marotta
Matthew Higgins
Johanna Walker
Hogan Lovells US LLP
*Counsel for Gas Transmission Northwest, LLC*

Paul Garrahan
Attorney-in-Charge, Oregon Department of Justice
Steve Novick
Special Assistant Attorney General, Oregon Department of Justice
*Counsel for the State of Oregon*

Megan Sallomi
Sarah Reyneveld
Assistant Attorneys General, Washington State Attorney General's Office
*Counsel for the State of Washington*

Canadian Association of Petroleum Producers and their member companies

Columbia Riverkeeper

Gas Transmission Northwest, LLC

Rogue Climate

American Gas Association

Bp Canada Energy Marketing Corp.

Cascade Natural Gas Corporation

Intermountain Natural Gas Company

MDU Utilities Group and MDU Resources, Inc.

Northwest Natural

Pacific Gas and Electric Company

Puget Sound Energy, Inc.

Shell Energy North America, L.P.

TC Energy Corporation

Tourmaline Oil Marketing Co. and any affiliates or subsidiary companies

*s/ Megan Sallomi*
Megan Sallomi
Assistant Attorney General

## STATEMENT REGARDING ORAL ARGUMENT

This petition seeks review of a decision from the Federal Energy Regulatory Commission. The Commission arbitrarily approved the expansion of a natural gas pipeline that is unnecessary and will likely only serve to enrich the pipeline company at consumers' expense. The Commission's decision is internally inconsistent: it approved the project because its proposed revenue exceeded costs, but also acknowledges that substantial costs may be left out of the equation. And under the Commission's policy and regulations, it *was* leaving out substantial costs from the equation. The rest of the Commission's decision is equally flawed. The Commission bases its conclusions on pure conjecture and ignores undisputed evidence to the contrary. Accordingly, straightforward and well-established principles of administrative law resolve this case. However, the Court may still benefit from oral argument to distill the relevant facts and pin down the regulatory scheme and procedural history involved. *See* 5th Cir. R. 28.2.3.

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................. 1

II.   JURISDICTION ............................................................................. 2

III.  ISSUES PRESENTED .................................................................... 4

IV.   STATEMENT OF THE CASE ........................................................ 6

      A.  Legal Background .................................................................... 6

      B.  The Expansion Was a Two-Phase Project, But FERC's Approval
          Only Considered the Second Phase ........................................... 8

          1.   The Expansion relies on existing customers to pay for
               upgrading compressors necessary to expand ........................ 9

          2.   Washington, Oregon, California, environmental advocates,
               and two utilities protested the Expansion ........................... 12

          3.   FERC reviewed undisputed evidence showing that declining
               regional demand threatens GTN's economic viability ........ 14

          4.   FERC approves the Expansion and denies rehearing ......... 19

V.    SUMMARY OF ARGUMENT ........................................................ 23

VI.   STANDING .................................................................................. 26

      A.  The Expansion Injures the States' Quasi-Sovereign Interests in
          Protecting Consumers and Imposes Regulatory Burdens on the
          States .................................................................................... 27

      B.  The Expansion Injures the States' Quasi-Sovereign and
          Proprietary Interests by Increasing Air Pollution and Safety
          Hazards and Harming State-Owned Wildlife .......................... 29

VII.  ARGUMENT ................................................................................ 31

A.  Standard of Review .................................................................. 32

B.  FERC Erred by Relying on Precedent Agreements as Conclusive
    Evidence of Need Although the Agreements Would Not Fully
    Pay for the Expansion ............................................................ 33

    1.  FERC's attempt to defer these critical questions to a
        future rate case is not reasonable .................................. 34

        a)  FERC cannot defer questions central to its public
            need finding .......................................................... 35

        b)  FERC did not consider the consequences of its
            decision for future gas consumers ...................... 38

    2.  The Expansion's costs will long outlive the agreements,
        but there was no evidence of future demand to pay for
        them ............................................................................ 40

        a)  FERC did not substantiate its policy to use a
            depreciation rate unmoored from the evidence
            before it ................................................................ 41

        b)  No evidence supports FERC's finding that the
            Expansion would have an economic life of 47
            years ..................................................................... 44

    3.  The precedent agreements do not pay for upgrading the
        compressors necessary to expand .............................. 47

        a)  FERC's finding that 18 C.F.R. § 2.55(b)
            authorized the compressor upgrades does not
            accord with law ................................................... 48

        b)  FERC arbitrarily failed to consider all the evidence
            or offer a reasonable explanation based on the
            evidence ............................................................... 55

C.  Without the Precedent Agreements, Nothing Supports FERC's Order ........................................................................ 56

D.  FERC Failed to Develop a Complete Record by Refusing to Consider Evidence from GTN's Rate Filing that Contradicted its Conclusions ............................................................... 59

VIII. CONCLUSION ............................................................. 63

# TABLE OF AUTHORITIES
<u>Cases</u>

*Air Prod. & Chemicals, Inc. v. FERC*,
   650 F.2d 687 (5th Cir. 1981) ........................................................................60

*Atl. Ref. Co. v. Pub. Serv. Comm'n*,
   360 U.S. 378 (1959) ....................................................................................37

*BNSF Ry. Co. v. Fed. R.R. Admin.*,
   105 F.4th 691 (5th Cir. 2024) ...............................................................38, 47

*BNSF Ry. Co. v. U.S.*,
   775 F.3d 743 (5th Cir. 2015) ......................................................................54

*Calumet Shreveport Refin., LLC v. EPA*,
   86 F.4th 1121 (5th Cir. 2023). ....................................................................46

*Chamber of Com. v. SEC*,
   85 F.4th 760 (5th Cir. 2023) ......................................................................59

*Citizens for Clean Air & Clean Water in Brazoria Cnty. v. U.S. Dep't of*
   *Transp.*,
   98 F.4th 178 (5th Cir. 2024) ......................................................................31

*Clean Wis. v. EPA*,
   964 F.3d 1145 (D.C. Cir.), *judgment entered*, 812 F. App'x 4 (D.C. Cir.
   2020) ...........................................................................................................30

*Data Mktg. P'ship, LP v. U.S. Dep't of Labor*,
   45 F.4th 846 (5th Cir. 2022) ......................................................................48

*El Paso Elec. Co. v. FERC*,
   76 F.4th 352 (5th Cir. 2023) ......................................................................38

*El Paso Elec. Co. v. FERC*,
   832 F.3d 495 (5th Cir. 2016) ......................................................................42

*Env't Def. Fund v. FERC*,
  2 F.4th 953 (D.C. Cir. 2021) ............................................................8, 57

*Evergy Kan. Cent., Inc. v. FERC*,
  77 F.4th 1050 (D.C. Cir. 2023) ................................................... 3

*Fed. Power Comm'n v. Hope Nat. Gas Co.*,
  320 U.S. 591 (1944) ...............................................................1, 6

*Fla. Gas Transmission Co. v. FERC*,
  876 F.2d 42 (5th Cir. 1989) ....................................................42

*Fla. Power & Light Co. v. FERC*,
  598 F.2d 370 (5th Cir. 1979) .................................................. 1

*Gulf S. Pipeline Co., LP v. FERC*,
  955 F.3d 1001 (D.C. Cir. 2020) ...............................................44

*Gulfport Energy Corp. v. FERC*,
  41 F.4th 667 (5th Cir. 2022) ...................................................27

*Jupiter Energy Corp. v. FERC*,
  482 F.3d 293 (5th Cir. 2007) .............................................47, 58

*La. Env't Action Network v. EPA*,
  382 F.3d 575 (5th Cir. 2004) ...................................................57

*La. v. U.S. Dep't of Energy*,
  90 F.4th 461 (5th Cir. 2024) ..............................................55, 58

*MCR Oil Tools, L.L.C. v. U.S. Dep't of Transp.*,
  110 F.4th 677 (5th Cir. 2024) ..................................................44

*Md. People's Couns. v. FERC*,
  760 F.2d 318 (D.C. Cir. 1985) .................................................27

*Mich. Consol. Gas Co. v. Fed. Power Comm'n*,
  283 F.2d 204 (D.C. Cir. 1960) .................................................60

*Mo. Pub. Service Comm'n v. FERC,*
    601 F.3d 581 (D.C. Cir. 2010) ....................................................37

*Motor Vehicle Mfrs. Ass'n v. State Farm,*
    463 U.S. 29 (1983) ..............................................32, 36, 40, 56

*Myersville Citizens for a Rural Cmty., Inc. v. FERC,*
    783 F.3d 1301 (D.C. Cir. 2015) ..............................................31

*N.J. Conserv. Found. v. FERC,*
    111 F.4th 42 (D.C. Cir. 2024)...................................................8

*Pac. Gas & Elec. Co. v. FERC,*
    106 F.3d 1190 (5th Cir. 1997) ...........................................27, 29

*People's Org. for Wash. Energy Res. v. Wash. Utils. & Transp. Comm'n,*
    104 Wash. 2d 798 (1985).........................................................28

*R.R. Comm'n of Tex. v. FERC,*
    874 F.2d 1338 (10th Cir. 1989) ...............................................61

*Scenic Hudson Preserv. Conf. v. Fed. Power Comm'n,*
    354 F.2d 608 (2d Cir. 1965) ....................................................60

*Shell Oil v. FERC,*
    707 F.2d 230 (5th Cir. 1983) .............................................42, 43

*Sierra Club v. Cedar Point Oil Co.,*
    73 F.3d 546 (5th Cir. 1996) ....................................................30

*Tex. Democratic Party v. Abbott,*
    978 F.3d 168 (5th Cir. 2020) .....................................................4

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. U.S. Dep't of Health & Hum.
    Servs.,*
    985 F.3d 472 (5th Cir. 2021) ...................................................48

*Wages & White Lion Invs., LLC v. FDA,*
    90 F.4th 357 (5th Cir. 2024), *cert. granted,* 144 S. Ct. 2714 (2024)............33

## Statutes, Regulations, and Rules

15 U.S.C. § 717a ................................................................................27

15 U.S.C. § 717f ...........................................................................passim

15 U.S.C. § 717n ...............................................................................27

15 U.S.C. § 717r ...........................................................................passim

5 U.S.C. § 706 ............................................................................32, 48

Or. Rev. Stat. § 498.002(1) ...............................................................30

Wash. Rev. Code § 77.04.012 ...........................................................30

18 C.F.R. § 2.55(b) ...............................................................24, 48, 49

18 C.F.R pt. 201 ................................................................................46

18 C.F.R. § 157.202 .............................................................10, 24, 51, 52

18 C.F.R. § 157.205 ...........................................................................53

18 C.F.R. § 157.208 .....................................................................51, 53

18 C.F.R. § 157.5 ..........................................................................38, 61

18 C.F.R. § 157.6 ...............................................................................38

18 C.F.R. § 385.713 ...........................................................................61

5th Cir. R. 28.2.3 ................................................................................ v

## Other Authorities

*ANR Pipeline Co.*,
   171 FERC ¶ 61,233 (2020), *vacated in part*, *ANR Pipeline Co.*, 180
   FERC ¶ 61,119 (2022) ...................................................................50

Certification of New Interstate Natural Gas Pipeline Facilities,
88 FERC ¶ 61,227 (1999), *clarified*, 90 FERC ¶ 61,128 (2000), *further clarified*, 92 FERC ¶ 61,094 (2000)......................................................passim

*City of Kaukauna*,
137 FERC ¶ 61,072 (2011) ...........................................................................62

*Columbia Gas Transmission Corp.*,
68 FERC ¶ 61,043 (1994)........................................................................49, 50

*Dominion Transmission, Inc.*,
129 FERC ¶ 61,048 (2009) ..........................................................................50

*Equitrans, L.P.*,
153 FERC ¶ 61,381 (2015), *aff'd on reh'g* 155 FERC ¶ 61,194 (2016) .......44

*Great Lakes Gas Transmission Co.*,
38 FERC ¶ 61,051 (1987)..............................................................................62

Interstate Pipeline Certificates for Routine Transactions,
47 Fed. Reg. 24,254 (June 4, 1982) ..............................................................53

*N. Border Pipeline*,
76 FERC ¶ 61,141 (1996)..............................................................................46

*NorAm Gas Transmission Co.*,
82 FERC ¶ 62,121 (1998)..............................................................................50

Order 603,
64 Fed. Reg. 26,572 (May 14, 1999) ..............................................51, 52, 53

Order 603-A,
64 Fed. Reg. 54,522 (Oct. 7, 1999)..................................................51, 52, 53

*Panhandle E. Pipeline Co., LP*,
181 FERC ¶ 61,211 (2022) ...........................................................................47

*Spire STL Pipeline LLC*,
 169 FERC ¶ 61,134 (2019), *vacated by Envir. Def. Fund v. FERC*, 2
 F.4th 953 (D.C. Cir. 2021).............................................................40, 57

*State-Fed. Reg'l RTO Panels*,
 98 FERC ¶ 61,309 (2002)............................................................62

*Tenn. Gas Pipeline, LLC*,
 169 FERC ¶ 61,230 (2019)............................................................43, 44

*Transwestern Pipeline Co.*,
 79 FERC ¶ 62,102 (1997)............................................................50

*Transwestern Pipeline Co.*,
 81 FERC ¶ 61,172 (1997)............................................................50

*Wrightsville Power Facility, L.L.C. v. Entergy Ark., Inc.*,
 102 FERC ¶ 61,212 (2003)............................................................62

*Wyo. Interstate Co.*,
 119 FERC ¶ 61,251 (2007)............................................................44

## I.   INTRODUCTION

Natural gas pipelines are both an "essential and monopolistic industry." *Fla. Power & Light Co. v. FERC*, 598 F.2d 370, 379 (5th Cir. 1979). Accordingly, Congress passed the Natural Gas Act to "protect [] consumer interests against exploitation" from those companies. *Fed. Power Comm'n v. Hope Nat. Gas Co*., 320 U.S. 591, 612 (1944). A centerpiece of that legislation requires the Federal Energy Regulatory Commission approve new pipeline facilities only if they serve a demonstrated public necessity.

Commission policy (and common sense) requires projects to meet a threshold test of market need: the new business must fully pay the cost to serve that new business. Pipelines cannot rely on existing captive customers to subsidize expansions. And if other public benefits justify the project, there must be evidence showing those benefits are likely.

Here, the Commission ignored that test and approved an unnecessary expansion, leaving millions of dollars in costs unaccounted for. The Commission ignored or unreasonably discounted ample evidence in the record indicating that the expansion's new business would not fully pay for its costs, or deferred consideration of that evidence for no rational reason. The Commission then hypothesized that the expansion could provide other public

benefits, but ignored evidence that those benefits were illusory. Because the Commission failed to meet its statutory obligation to only approve projects required by the public convenience and necessity and to make a rational, reasonably explained decision based on the facts before it, the Court should vacate the Commission's Orders and remand for further consideration.

## II.    JURISDICTION

The Federal Energy Regulatory Commission ("FERC") approved the GTN Xpress pipeline expansion project (the "Expansion") based on its authority under the Natural Gas Act to permit expansions of interstate pipelines "required by the present or future public convenience and necessity." 15 U.S.C. § 717f(e); Order Issuing Certificate, 185 FERC ¶ 61,035, ¶ 12 (Oct. 23, 2023) ("Certificate Order")[1].

Parties "aggrieved by" a FERC order may petition for review in the Court of Appeals, provided they first seek rehearing at FERC. *See* 15 U.S.C. § 717r(b). Parties must petition for review within sixty days after FERC rules on their rehearing request. *See id*. The States requested rehearing of

---

[1] Petitioners cite FERC's Orders by the paragraph number, e.g. "Certificate Order ¶ [Paragraph Number]." We cite all other original-record documents as R.[Record Item Number in FERC's Certified Index]:[Page Number of the Document]. We cite these documents by their overall PDF page number, even when the document has internal pagination.

FERC's Order, which FERC denied by operation of law on December 22, 2023. *See* R.588. On February 12, 2024, the States timely petitioned for review in the D.C. Circuit. *See* Pet. for Review, No. 24-60280, ECF 3-2 (5th Cir.); 15 U.S.C. § 717r(b).

FERC subsequently modified its Order on rehearing. *See* Order Addressing Arguments Raised on Rehearing and Dismissing Stay, 187 FERC ¶ 61,023 (Apr. 16, 2024) ("Rehearing Order"). The States requested rehearing of the Rehearing Order to the extent it raised new issues, which FERC denied by operation of law on June 14, 2024. R.643. On June 17, 2024, the States timely petitioned for review in the D.C. Circuit, seeking review of the Order, the Rehearing Order, and the denial of their second rehearing request. *See* Pet. Review, No. 24-60354, ECF 1-3 (5th Cir.). The same day, FERC issued a second rehearing order, reaching the same result as the first, for the same reasons.[2] *See* Order Addressing Arguments Raised on Rehearing, 187 FERC ¶ 61,177 (June 17, 2024) ("Second Rehearing Order").

---

[2] The States did not need to specifically list the Second Rehearing Order in their petition. The Second Rehearing Order only modifies the first Rehearing Order and reaches the same result, so requesting review of the first Rehearing Order and denial of its second request for rehearing was sufficient. *See Evergy Kan. Cent., Inc. v. FERC*, 77 F.4th 1050, 1054-55 (D.C. Cir. 2023).

The States seek review of FERC's Certificate Order, Rehearing Order, and the Second Rehearing Order, which are final judgments that dispose of all the States' claims.

The D.C. Circuit transferred the States' petitions to this Court because the applicant, Gas Transmission Northwest ("GTN"), had already petitioned for review of FERC's orders in this Circuit. *See* Order, No. 24-1002, ECF 2054176 (D.C. Cir. May 13, 2024); Order, No. 24-1204, ECF 2064207 (D.C. Cir. July 11, 2024). The States moved to dismiss GTN's petition for lack of jurisdiction and to return the States' petitions to the D.C. Circuit, since an improper petition cannot establish venue. *See generally* Mot. Dismiss, ECF 34. A divided Fifth Circuit panel denied the States' motion. *See* Order, ECF 92. That decision is not binding on the merits panel. *See Tex. Democratic Party v. Abbott*, 978 F.3d 168, 176 (5th Cir. 2020). The States maintain that venue is improper in this Circuit.

### III.   ISSUES PRESENTED

1. Whether FERC's reliance on the existence of precedent agreements that did not cover the full cost to expand was arbitrary, capricious, not in accordance with law, and unsupported by substantial evidence in violation of the Administrative Procedure Act ("APA") and Natural Gas Act?

a.  FERC concluded it could postpone deciding what the Expansion's

costs are to a future rate case, despite arguments that doing so ignored

important aspects of the public need analysis and would harm future

consumers. Was FERC's attempt to defer these issues to a future

proceeding arbitrary and capricious?

b.  The Expansion's costs will long outlive the term of the agreements,

and the undisputed evidence showed there would not be sufficient

future demand to pay those remaining costs. FERC ignored this

evidence based on "policy," without further explanation. Did FERC

violate the APA by failing to substantiate its policy or otherwise

support its reasoning with substantial evidence?

c.  18 C.F.R. § 2.55(b) allows routine replacements of facilities without

FERC approval, but replacements cannot incidentally increase

pipeline capacity. Here, GTN replaced three compressors with larger

compressors that would increase capacity for the Expansion's use.

FERC excluded the cost of the upgrades from Expansion costs,

claiming section 2.55(b) authorized the replacements. Was FERC's

interpretation of section 2.55(b) unlawful and arbitrary?

2. The APA requires agencies to support their findings with substantial evidence and address contradictory evidence. Here, FERC found that the Expansion would provide certain public benefits but did not cite evidence supporting that finding or grapple with contradictory evidence. Was FERC's finding of public benefits arbitrary, capricious, and unsupported by substantial evidence?

3. FERC considered some, but not all, of GTN's rate filing on its own initiative. At the same time, FERC categorically rejected the States' answer to GTN's rehearing request, which re-submitted GTN's rate filing into the Certificate docket, as "prohibited." Was FERC's refusal to consider the entire rate filing and categorical rejection of the States' answer arbitrary and capricious?

## IV.    STATEMENT OF THE CASE

### A. Legal Background

To protect consumers from monopolistic pipeline companies, Congress directed FERC to review proposals to construct new pipeline facilities and approve only to those "required by the present or future public convenience or necessity." 15 U.S.C. § 717f(e); *see also Hope Nat. Gas Co.*, 320 U.S. at 611-12. FERC exercises that "Certificate" authority pursuant to its regulations and

Certificate Policy. *See* Certification of New Interstate Natural Gas Pipeline Facilities, 88 FERC ¶ 61,227 (1999), *clarified*, 90 FERC ¶ 61,128 (2000), *further clarified*, 92 FERC ¶ 61,094 (2000) ("Certificate Policy").

The Certificate Policy imposes a "threshold requirement . . . that the pipeline must be prepared to financially support the project without relying on subsidization from its existing customers." 88 FERC at ¶ 61,746. The new customers must be "willing to purchase capacity at a rate that pays the full costs of the project." 90 FERC at ¶ 61,392. Ensuring projects can stand on their own financially is an "important indicator of market-based need." 88 FERC at ¶ 61,747.

When new customers do not face the true costs of the project, it "send[s] the wrong price signals to the market [and can] lead to inefficient investment and contracting decisions which can cause pipelines to build capacity for which there is not a demonstrated market need." 90 FERC at ¶ 61,391. Existing customers may face rate hikes to pay for expansion costs that they are "ill equipped to bear," or be forced "to shoulder the costs of unused capacity that results from competing projects that are not financially viable." 88 FERC at ¶ 61,745-46.

7

If the project satisfies this threshold test, then FERC will consider "*all relevant factors*" bearing on public need. *Env't Def. Fund v. FERC*, 2 F.4th 953, 959 (D.C. Cir. 2021); *see also* Certificate Policy, 88 FERC at ¶ 61,747. Precedent agreements (contracts to buy the project's capacity) are important evidence, but are "not a sufficient indicator by itself of the need for a project." *Id*. ¶ 61,744; *see also id*. ¶¶ 61,748-49; *Env't Def. Fund*, 2 F.4th at 973; *N.J. Conserv. Found. v. FERC*, 111 F.4th 42, 58-62 (D.C. Cir. 2024). Relying exclusively on precedent agreements raises "difficult questions of establishing the public need for the project." Certificate Policy, 88 FERC at ¶ 61,744. Instead, "the evidence necessary to establish the need for the project will usually include a market study . . . vague assertions of public benefits will not be sufficient." *Id*. ¶ 61,748.

## B. The Expansion Was a Two-Phase Project, But FERC's Approval Only Considered the Second Phase

GTN operates a natural gas pipeline that transports gas produced in Western Canada through Idaho, Washington, and Oregon, where it connects to pipelines serving California. In 2019, GTN announced GTN Xpress, a project

to increase the capacity of its pipeline through replacing existing compressors[3] with larger compressors and other work. R.102:112-113. In 2021, after upgrading the three compressors, GTN applied for a certificate to increase its capacity by removing artificial software limits on the three recently upgraded compressors, adding a fourth compressor, and performing ancillary work at the compressor stations. *See* R.1:13-14.

### 1. The Expansion relies on existing customers to pay for upgrading compressors necessary to expand

GTN announced its Expansion to investors in 2019, claiming it would provide "up to 250,000 [Dekatherms/day ('Dth/d')] of additional firm transportation service"[4] on its pipeline for a cost of $335 million. *See* R.102:112-113. Existing customers would pay $251 million, three-quarters of the total cost. *Id*. In 2019, GTN offered the 250,000 Dth/d in new firm service, with 100,000 Dth/d available in "Phase I" of the Expansion, and 150,000 Dth/d available in "Phase II." R.1:86. GTN executed agreements with three companies to purchase the 250,000 Dth/d in new capacity:

---

[3] Compressors are machines that increase the pressure of gas by reducing its volume, which enables the pipeline to transport more gas without enlarging the pipe.

[4] GTN sells the ability to transport natural gas on its pipeline, referred to as pipeline capacity. When GTN sells "firm" capacity, GTN guarantees that capacity will always be available.

| Expansion Customer | Amount purchased |
|---|---|
| *Phase I* | |
| Tourmaline Oil Company, a Canadian oil producer | 100,000 Dth/d[5] |
| *Phase II* | |
| Tourmaline Oil Company | 51,000 Dth/d |
| Cascade Natural Gas Corporation, a Washington and Oregon utility | 20,000 Dth/d |
| Intermountain Gas Company, an Idaho utility | 79,000 Dth/d |

R.1:16. The agreements included a negotiated rate for service, but, as GTN admits, the negotiated rates "are too low to recover both the Project costs and the costs [to upgrade the compressors]." Declaration of Joshua Gibbon, ECF 74-2, ¶ 8; *see also* R.102:49-52.

In what appears to have been "Phase I" of the Expansion, GTN invoked 18 C.F.R. § 2.55(b), a streamlined FERC procedure intended for basic, routine replacements that do not "result in an incidental increase" in pipeline capacity. 18 C.F.R. § 157.202(b)(2)(i); *see also* Certificate Order ¶ 15. GTN then spent $251 million to replace the three "Avon" compressors, rated at 14,300 horsepower, with larger "Solar Titan" compressors, rated at 23,470 horsepower. R.47:5-6. GTN finished installing the new compressors in November 2021 and included software to artificially limit each compressor to

---

[5] *See* R.1:15; R.304:12 (citing GTN, Delegated Order, Dkt. RP23-578-000 (2023) (explaining that the 100,000 Dth/d contract was sold to Tourmaline)).

14,300 horsepower, consistent with GTN's certificated limit. *See id*.; R.304:9-11.

In what was likely "Phase II," GTN applied to FERC for a certificate to increase its pipeline's capacity by 150,000 Dth/d for $75.1 million. *See* R.1:13-15. The proposed $75.1 million in Expansion costs did not include any of the $251 million that GTN already spent to upgrade its compressors. *See* R.102:48.

GTN stated that the Expansion was self-supporting because the annual revenues from Expansion customers exceeded the Expansion's annual cost of service. *See* R.1:20-21. The annual cost of service included a depreciation expense, spreading the recovery of GTN's $75.1 million investment over a 47-year period. *See id*.; R.102:95-97. The 47-year period was based on the depreciation rate GTN used in its last rate case. *See* R.1:20-21. However, the agreements supporting the Expansion will expire after 30-33 years. R.1:16. GTN did not provide any evidence that demand was likely to continue after the agreements expired. *See generally* R.1.

GTN explained in a footnote that, while it initially sold 250,00 Dth/d in expansion capacity, it later determined it could provide 100,000 Dth/d in new firm capacity with existing facilities. R.1:15, n.6. Thus, GTN only sought authorization for 150,000 Dth/d in new capacity. *Id*. GTN later disclosed that it

11

began providing the other 100,000 Dth/d in new firm capacity to Tourmaline in March 2023. *See* R.304:12.

### 2.  Washington, Oregon, California, environmental advocates, and two utilities protested the Expansion

Washington, Oregon, California, environmental advocates, and two of GTN's utility customers intervened to protest the Expansion. Puget Sound Energy, a Washington utility, argued that GTN's application was "void of the necessary transparency to protect ratepayers." R.47:4. The utility argued that "GTN should be required to explain how it achieved the capability to provide an additional 100,000 Dth/d of service without changing its system," particularly since that service was presented as "Phase I" of the Expansion. *Id*. 47:4-5. FERC must also consider the "appropriate amount of costs from the new compressors" when assessing the Expansion's costs and rate treatment. *Id*. 47:6. A California utility made similar arguments and requested a technical conference to fully explore the costs and impact of the Expansion on existing customers. *See* R.43:4.

The States of Washington, Oregon, and California argued, among other points, that the precedent agreements could not justify a finding of public need for the Expansion because the Expansion's revenue would not pay for all of its costs. *See* R.102:13-16, 19-20. Undisputed expert testimony showed that the

Expansion is not economically viable unless existing customers pay for 100% of the upgraded compressors and millions of dollars in Expansion costs after the precedent agreements expire. *See* R.102:47-52, 95-97. Leaving costs for recovery after the agreements expire will harm future consumers, given the undisputed projections of declining regional demand. *See* R.102:20-21.

Numerous parties and commenters presented evidence to FERC showing anticipated declining demand. For one, mandatory state laws requiring electric utilities to transition to 100% zero-emission electricity over the next two decades will significantly impact the region's future need for gas and, accordingly, gas pipelines:



R.102:89; *see also id.* 102:86-90. For another, dozens of large-scale renewable energy projects are developing in the region, which will compete with demand for gas-fired electricity. *See* R.102:42-45; R.93:6; R.109:45-50. Other factors affecting future demand include: regional consumer trends strongly favoring electric heat pumps over gas furnaces and water heaters; dozens of state and local laws, policies, and regulations that will reduce gas hookups for residential and commercial purposes; and federal subsidies for electric heating and renewable energy. R.102:37-42, 79, 82-86, 91; R.167:1-2; R.109:36-41. In light of these factors, the long horizon of the Expansion and its 47-year term for recovering Expansion costs "increases the risk of creating a stranded asset and can also mean that customers least likely to avail themselves of other fuel choices will be the ones footing the bill for the capacity expansion." R.102:95-97.

### 3.    FERC reviewed undisputed evidence showing that declining regional demand threatens GTN's economic viability

GTN did not dispute the State's evidence projecting declining regional demand. In fact, GTN's application relied on a market report with the same projection. GTN's application cited an "IHS Markit" report for its assertion that, because supplies from the Rocky Mountains were declining, "markets on the West Coast served by Rockies supply will need access to other sources" of

natural gas. R.1:20.[6] IHS Markit projected declining production in the Rockies,

but did not support GTN's claim that West Coast markets needed access to

other sources of natural gas as a result. Like the States' experts, IHS Markit

projected a "steep drop in power sector demand." R.315:9. The combination of

falling regional demand and rising production elsewhere in the Western U.S.

would lead the region to become a net *exporter* of gas as early as 2032. *See id*.

315:53-55. Further, the Expansion "[is] expected to largely displace Rockies

deliveries to [the Pacific Northwest] market," not fill a gap from declining

Rockies production. *Id*. 315:64. IHS Markit indicated that the real motivator of

the Expansion is not to serve new demand in the Western U.S, but to increase

the market share of Canadian gas producers. *Id*. 315:12, 59, 64.[7]

In April 2023, FERC requested GTN to respond to the States' arguments

and provide "any additional information/data/studies that natural gas

consumption in the region is expected to increase, taking account of the recent

legislation." R.300:3. GTN declined, arguing instead that its precedent

agreements superseded any other evidence regarding future demand. *See*

---

[6] GTN's application cited the analysis as confidential, but FERC requested the full document. *See* R.1:20, n.15; R.300:4.
[7] The Canadian Association of Petroleum Producers intervened in this Court to defend the Expansion. *See* Not. Intervention, ECF 10.

R.304:3-4. GTN also argued the effect of state energy laws was speculative, but did not address any of the other factors likely to affect future demand for its pipeline. *Id*.

Five months later, GTN provided FERC the information it had sought, but did so in a parallel case seeking to increase rates on all customers (the "rate filing"). *See* Rehearing Order ¶¶ 4-5 (Clements, Comm'r, dissenting). The rate filing revealed GTN's expectation of dramatic declines in demand for its pipeline as early as 2028 due to the combined impact of competition from renewable energy, rising Canadian gas prices, federal, state, and local laws, and expiring contracts that are unlikely to be renewed. *See* R.566:29-30, 32, 135-45, 158-87. As a result of these significant demand-side risks, GTN did not expect to be profitable after 2050. *See id*. 566:158, 195-97. GTN accordingly requested a new depreciation rate to recover its entire investment before 2050. *See id*.

GTN submitted hundreds of pages of testimony and exhibits to support its position that it was unlikely to be profitable after 2050. *See, e.g.*, R.566:110-920. For example, GTN's witness testified that replacing natural gas with renewable energy is feasible, as "the potential energy from renewable sources within Washington, Oregon, and California equals over 85 times those states'

16

current electricity consumption." R.566:178-179. It is also cheaper than burning natural gas for electricity. *Id*. 566:184. And when renewable sources are unavailable, battery storage increasingly displaces natural gas. *See* R.566:184-87. Battery storage costs have fallen 89% since 2010, followed by an immense rise in utilization. *See id.* 566:186.

In GTN's Expansion Application, GTN made repeated, unsupported claims that its Expansion would provide access to lower-cost gas. *See* R.1:11, 18, 20. In the rate filing, GTN provided sworn expert testimony contradicting those claims. GTN's expert testified that new export terminals in Western Canada and increased demand in Canada will likely increase the price of Western Canadian gas relative to other sources. R.566:139-40. These price increases will "render [GTN] less economic for current and prospective shippers." *Id.* 566:139.

GTN's witnesses also revealed that nearly half of its pipeline contract base will expire as early as 2028 and that it anticipates difficulty re-contracting for that soon-to-be available capacity. *See* R.566:142-44.



*Id*. 566:143. Over half of the expiring contracts belong to California and Oregon utilities, who are subject to state laws requiring transitions to cleaner energy. *See* R.566:80-82. Another sizeable percentage belongs to gas producers, who will likely be drawn to more valuable export markets in Western Canada once new export terminals become operational. *See id*.; R.566:138-39. "These market forces will make it considerably more difficult for GTN to recontract this expiring capacity at maximum tariff rates." R.566:143. Collectively, the capacity held in these expiring contracts is 1.4 billion cubic feet per day, which translates to 1,400,000 Dth/d. *Id*. 566:142. That is more than nine times larger than the 150,000 Dth/d that the Expansion proposes to create, but GTN never explained why this expiring capacity could not be used to meet the Expansion customers' needs. *See* Rehearing Order ¶ 6 (Clements, Comm'r, dissenting).

18

Finally, GTN explained that declining demand will impact future gas consumers. Declining demand will leave "a shrinking customer base to pay the fixed costs of the system" and rate hikes. R.566:161. For example, a 74% decline in demand could require a 384% rate hike for remaining customers. *Id*. 566:161-62. Such increases will cause the remaining customers to "decide to leave the system, thereby causing a spiral of rate increases and more customers leaving the system." *Id*. 566:162. "[A]t some point, gas rates can become prohibitive." *Id*. 566:161.

### 4.    FERC approves the Expansion and denies rehearing

One month after GTN's rate filing, FERC determined that "the public convenience and necessity requires approval of the [Expansion]." Certificate Order ¶ 99. FERC concluded that existing customers would not subsidize the Expansion because the annual revenue from the precedent agreements would exceed the annual costs. *Id*. ¶¶ 17, 40-42. That calculation did not include any of the cost to upgrade the compressors because FERC did not decide whether some of the costs to upgrade the compressors should be allocated to the Expansion. *See id*. ¶¶ 17, 53. Instead, FERC deferred that question to a future rate case. *See id*. FERC also reasoned that the compressor upgrade costs were properly excluded from the Expansion application based on GTN's claim that

19

they were routine replacements under 18 C.F.R. § 2.55(b). *See id.* ¶¶ 16-17.

FERC adopted GTN's proposal to spread the remaining Expansion costs over a

47-year period, citing its "general policy" of using the rate from the last-

approved rate case. *Id.* ¶ 40 n.85. FERC did not explain why this depreciation

rate was justified in light of the declining demand projections. *Id.* FERC next

found that the precedent agreements were proof of market need for the

Expansion, and that the Expansion would provide public benefits: access to

lower-cost gas, supply diversification, and reliability. *Id.* ¶¶ 36, 39.

Commissioner Clements "reluctantly" concurred with the Certificate

Order because the States had "raised serious questions concerning the present

and future need" for more pipeline capacity in their States. *Id.* ¶ 1 (Clements,

Comm'r, concurring in part and dissenting in part). Under the majority's

approach, FERC has "no meaningful ability to assess the risk of over-building

and the concomitant risk of saddling ratepayers with the costs of underused

facilities." *Id.* ¶ 4.

The States, Columbia Riverkeeper, Rogue Climate, and GTN each

sought rehearing. GTN argued FERC should have rolled the Expansion costs

into existing rates because, GTN claimed, the compressor upgrades were

already "reflected in GTN's existing rates." R.564:3; *see also id.* 564:16. GTN

alternatively requested the issue be resolved in a future rate case, not its recently-filed one. R.564:3. This was the first time the States' counsel received notice of the rate filing. *See* R.566:23. The States promptly answered GTN's request to clarify the issues and provide a more complete record. R.566:4-6. Though GTN's rehearing request asserted the cost to upgrade its compressors was already "reflected in GTN's existing rates," R.564:3, its rate filing explained that the last rate settlement simply extended the terms of prior settlements so "GTN's current rates were essentially established in the 2018 Settlement," R.566:28; *see also id*. 566:6-7. GTN's rate filing also explains that it seeks to raise rates to reflect capital expenditures for "work at various compressor stations to replace outdated, less efficient compressor units." R.566:29. This work includes $211 million for a "GTN Xpress" project with an in-service date of November 1, 2021. R.566:54. As the States pointed out in their answer, this coincides with the estimated $251 million that GTN planned to spend to upgrade compressors at the three stations the Expansion relies on, which also went into service in November 2021. R.566:6-7. The States also re-filed GTN's expert testimony and supporting documents, which contradicted GTN's position in the Certificate docket that its Expansion was needed to serve growing regional demand. *See* R.566:7-15.

21

In a 2-1 decision, FERC denied rehearing. The majority rejected the States' answer as jurisdictionally barred and alternatively concluded that GTN's rate filing would not "compel" a different outcome. Rehearing Order ¶¶ 8-10, 78. Commissioner Clements dissented, arguing that GTN's rate filing "so undermines the foundations of the Certificate Order that it cannot rationally be sustained on rehearing." *Id.* ¶ 9 (Clements, Comm'r, dissenting). Had GTN provided information in the Certificate docket consistent with its rate filing, Clements would not have approved the Expansion. *Id.* ¶ 21 n.72. She concluded that FERC's "myopic focus on precedent agreements and its reflexive dismissal of any other evidence of future need as too 'speculative'" abrogated FERC's duty to predict the future need for pipeline capacity and consider all relevant evidence. *Id.* ¶ 10. She also criticized the majority's apparent "double standard in assessing the probative value of record evidence," *id.* ¶ 12, exemplified by the majority's acceptance of GTN's unsworn statements but blanket rejection of sworn testimony and reports showing the opposite. *Id.* ¶ 15.

The States filed a second request for rehearing on the limited issue of FERC's rejection of their answer and evidence in GTN's rate filing. *See* R.628. The request was denied by operation of law on June 14, 2024. *See* R.643; 15

U.S.C. § 717r(a). FERC subsequently issued another 2-1 decision summarily denying the States' request, with Commissioner Clements dissenting, for the reasons previously stated. *See* Second Rehearing Order ¶ 11; *id.* ¶ 1 (Clements, Comm'r, dissenting).

## V.     SUMMARY OF ARGUMENT

The Court should vacate FERC's approval of the Expansion because FERC relied entirely on the existence of precedent agreements without meaningfully addressing evidence undermining their probative value. This warrants reversal for at least three independent reasons.

First, FERC erroneously reasoned that it could defer the question of whether the Expansion improperly shifts costs onto existing customers, or is likely to burden future gas consumers, to a future rate-setting case. Under the Gas Act and FERC's Certificate Policy, the existence of a subsidy is a threshold question that must be resolved before FERC may find that public necessity requires an expansion. FERC cannot defer resolving that question to a future proceeding. FERC also failed to consider how postponing the issue is likely to impact future gas consumers, which ignored an important aspect of the problem as well as its statutory command to use its certificate authority to protect consumers.

Second, FERC erred in relying on the precedent agreements because the Expansion's costs will long outlive the agreements and there was no evidence of future demand to pay those costs. FERC found that the Expansion would have an economic life of 47 years and, accordingly, spread GTN's recovery of its investment until approximately 2071. However, the undisputed evidence showed there would not be sufficient demand to pay for the Expansion's costs after the precedent agreements expire in the early 2050s. FERC did not address this evidence and relied solely on its practice of using the depreciation rate from GTN's last rate case. FERC did not explain the purpose of its general practice or why it could not make an exception to its policy, as it has in other cases. FERC's failure to substantiate its policy was arbitrary, and its finding that the Expansion would have a 47-year economic life is unsupported.

Third, the revenue from the precedent agreements will not pay for any of the costs to upgrade three compressor units on which the Expansion service relies. FERC excluded those costs because GTN had invoked 18 C.F.R. § 2.55(b) for the upgrades. Section 2.55(b) only permits replacements that are substantially equivalent in size and do not incidentally increase the pipeline's capacity. *See* 18 C.F.R. §§ 2.55(b); 157.202(b)(2)(i). While FERC has, historically, permitted replacement compressors with slightly more horsepower

24

than the original, it has done so when the replacement was the closest-available size and the increase was minor, in the range of 500-700 horsepower, not the 9,170 horsepower increase that FERC condoned here. FERC arbitrarily fails to acknowledge its change in position, much less justify it, and its new interpretation does not accord with its regulations or the Gas Act's requirement that it approve new facilities based on a demonstrated public necessity *before* construction begins. *See* 15 U.S.C. § 717f(c)(1)(A).

Even if section 2.55(b) could authorize larger-sized replacements, FERC did not adequately explain and support its determination that a larger size was necessary here. FERC uncritically deferred to GTN's explanation that, because the closer-available compressor would produce about 200 horsepower less than the originals on the coldest days, the super-sized compressors were needed for existing service. Yet FERC never explained how, if that were true, GTN could add 100,000 Dth/d in new firm service following the replacements. Because FERC's decision leaves important questions unanswered, it violates the APA.

Aside from the precedent agreements, FERC recited other public benefits that might occur. Rehearing Order ¶ 89. These vague findings cannot support FERC's order because FERC did not support them with evidence or consider evidence indicating those benefits "may be illusory." *Id*. ¶ 7

(Clements, Comm'r, dissenting). Accordingly, they too must be set aside as unsupported and arbitrary.

Finally, FERC erroneously claimed it could not consider GTN's rate filing, although FERC actually did consider parts of it on its own initiative. *See* Rehearing Order ¶ 36 nn.130-32, ¶ 53 n.208. FERC's consideration of some parts of GTN's rate filing, but refusal to consider other parts that contradicted its conclusions, was arbitrary and capricious. FERC also improperly rejected the States' answer to GTN's rehearing request, which clarified the record and re-submitted key documents from GTN's rate filing in the Certificate docket. FERC claimed its regulation "prohibit[s]" such answers. Rehearing Order ¶ 9. But FERC's regulation allows answers for good cause and FERC never explained why good cause was absent here. The Court need not address this issue to decide in favor of the States on the above issues. However, FERC's treatment of the rate filing highlights the egregiousness of those errors and is another independent reason for reversal.

## VI.    STANDING

To seek judicial review, a party must be aggrieved. *See* 15 U.S.C. § 717r(b). The standard for aggrievement "duplicates the traditional requisites for Article III standing" of injury, traceability, and redressability. *Gulfport*

*Energy Corp. v. FERC*, 41 F.4th 667, 676 (5th Cir. 2022). FERC's approval of

the Expansion directly injures the States' quasi-sovereign and proprietary

interests, which this Court can redress.

**A. The Expansion Injures the States' Quasi-Sovereign Interests in Protecting Consumers and Imposes Regulatory Burdens on the States**

Numerous provisions in the Gas Act demonstrate an intent to allow

States to seek review of FERC orders in order to protect their quasi-sovereign

interests in the traditional governmental field of utility regulation. *See Md.*

*People's Couns. v. FERC*, 760 F.2d 318, 320-21 (D.C. Cir. 1985) (Scalia, J.)

(citing 15 U.S.C. §§ 717r(a)-(b), 717n(a), 717a). This Court has also found that

a State's interest in "protecting their citizens from monopolistic [pipelines,

and] in avoiding the expense of imposing their own regulation of natural gas to

compensate for FERC's decision," established standing. *Pac. Gas & Elec. Co.*

*v. FERC*, 106 F.3d 1190, 1194-96 (5th Cir. 1997); *see also Md. People's*

*Counsel*, 760 F.2d at 320-322 (finding that a state agency had standing as

*parens patriae* to represent the interests of its citizens who purchase gas

affected by a FERC program).

Cascade Natural Gas, a utility serving Washington and Oregon,

contracted for Expansion capacity. *See* R.1:16, 18. Cascade already included its

Expansion contract in its resource plan for consumers in both states, though

both state regulators refused to acknowledge Cascade's last long-term plan. *See*

Roberson Decl., Ex. A at 1-3, 29-33 (attaching staff comments concerning the

prudency of Cascade's GTN Xpress contract); Novick Decl., Ex. A at 6-7

(noting deficiencies in Cascade's approach to forecasting future demand). Now

that FERC has approved the Expansion, it is reasonably certain that Cascade

will seek to pass on the costs of that contract onto state consumers in a future

rate-setting case. *See* Declaration of Jeff Roberson ¶¶ 4-5; Declaration of Steve

Novick, Ex. A at 3 (discussing the relationship between the resource plan and

the rate case).

In a future rate-setting case, or when reviewing Cascade's next resource

plan, regulators will need to expend staff time and resources to determine

whether Cascade's Expansion contract was reasonable. *See* Roberson Decl.

¶¶ 3-11; Novick Decl., Ex. A at 3, Ex. B at 1-2. And even if regulators disallow

recovery of Cascade's contract in consumer rates, that does not avoid all harm

to consumers. Disallowing recovery of an expense in rates "has the very real

effect, among others, of increasing the risks of investing in the utility." *See*

*People's Org. for Wash. Energy Res. v. Wash. Utils. & Transp. Comm'n*,

104 Wash. 2d 798, 811 (1985). Increasing the risk of investment will increase

the utility's cost of capital and, consequently, the utility's overall operating

costs, which consumers ultimately pay. FERC's approval of the Expansion thus

directly harms Washington and Oregon consumers and burdens state resources.

*See Pac. Gas & Elec. Co.*, 106 F.3d at 1194.

## B. The Expansion Injures the States' Quasi-Sovereign and Proprietary Interests by Increasing Air Pollution and Safety Hazards and Harming State-Owned Wildlife

FERC's approval of the Expansion also harms the States' proprietary

and quasi-sovereign interests in protecting its air quality, wildlife, and state-

owned lands, each of which independently suffices for standing.

First, the Expansion will contribute to degraded air quality and

associated harms to human health, vegetation, crops, and water quality in each

State. *See* R.135:73-76, 93; Declaration of Julian Marshall ¶¶ 5-9. Air

pollutants will likely reach state-owned land near the expanded compressor

stations and contribute to degraded air quality on those lands. *See* R.135:93

(using a 20-kilometer radius for air quality impacts); Marshall Decl. ¶¶ 8-9.

Washington and Oregon each own numerous land parcels within a 20-

kilometer radius of the expanded compressor stations in each state. *See*

Declaration of Brandon Kuykendall ¶¶ 5-6; Declaration of Erin Serra ¶¶ 5-6.

The pollutants will likely also cause an increased prevalence of adverse health

effects for Washington residents. *See* Marshall Decl. ¶ 10; *see also* R.103:24-

27, 151-188. The discharge of a pollutant that "contributes to the pollution that impairs" plaintiffs' interests suffices for standing. *See Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546, 556-58 (5th Cir. 1996).

Second, construction activities in Washington and Oregon will "likely increase the rates of stress, injury, and mortality experienced by wildlife." R.135:47; *see also* R.1:499-500. Wildlife are the property of each State. *See* Wash. Rev. Code § 77.04.012; Or. Rev. Stat. § 498.002(1). Injury to state-owned wildlife independently establishes standing. *See Clean Wis. v. EPA*, 964 F.3d 1145, 1159-61 (D.C. Cir.), *judgment entered*, 812 F. App'x 4 (D.C. Cir. 2020) (holding Illinois and Chicago had standing to challenge emissions controls based on harm to government-owned vegetation).

Third, the Expansion will increase the pressure of gas in GTN's pipeline, which creates an "incremental risk to the public due to the potential for accidental release of natural gas," including hazards such as "a fire or explosion following a major pipeline rupture." R.135:89; *see also* Declaration of Richard Kuprewicz ¶¶ 15-19. As one commenter explained to FERC, GTN and its parent company, TC Energy, have a history of violating safety regulations. *See* R.298:1-10. Just last year, another TC Energy gas pipeline exploded near a highway, highlighting these safety risks. R.385.

30

The GTN pipeline intersects 43 state-owned properties, as well as state-owned water bodies and rights of way. Kuykendall Decl. ¶¶ 5, 10-11; Serra Decl. ¶¶ 8-10. The Expansion will likely result in more and greater gas leaks along the pipeline, and even a small leak will damage vegetation on the States' properties. *See* Kuprewicz Decl. ¶¶ 15-16. The Expansion also poses a higher risk of fire, explosion, or fatalities from a pipeline failure on or near these properties. *See* Kuprewicz Decl. ¶¶ 17-19.

This Court has found standing based in part on a project's increased risk of oil spills affecting the plaintiff's property. *See Citizens for Clean Air & Clean Water in Brazoria Cnty. v. U.S. Dep't of Transp.*, 98 F.4th 178, 188 (5th Cir. 2024); *see also Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1317 (D.C. Cir. 2015) (holding that residents had standing to challenge FERC order based in part on heightened safety hazards). As in those cases, the States have standing based on the Expansion's increased safety hazards and risk of property damage to their properties.

For all of these reasons, the States have standing.

## VII.   ARGUMENT

To avoid repetition, the States join and adopt the arguments made by Columbia Riverkeeper and Rogue Climate concerning FERC's violations of

the National Environmental Policy Act. The States' brief focuses on FERC's violations of the Natural Gas Act and APA.

## A. Standard of Review

These petitions challenge FERC's approval of the Expansion under the Natural Gas Act and the APA. Under the Gas Act, FERC must find the construction of new pipeline facilities "is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied." 15 U.S.C. § 717f(e). FERC's findings must be based on substantial evidence. 15 U.S.C. § 717r(b).

Under the APA, a reviewing court "shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious . . . not in accordance with the law . . . [or] unsupported by substantial evidence." 5 U.S.C. § 706(2). Agencies act arbitrarily when they fail to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983). An agency cannot "entirely fail[] to consider an important aspect of the problem [or] offer[] an explanation for its decision that runs counter to the evidence before the agency." *Id*. Nor can an agency shift its understanding of the law and "deny or

downplay the shift [or] gloss over or swerve from prior precedents without

discussion." *Wages & White Lion Invs., LLC v. FDA*, 90 F.4th 357, 381 (5th

Cir. 2024), *cert. granted*, 144 S. Ct. 2714 (2024).

**B. FERC Erred by Relying on Precedent Agreements as Conclusive
Evidence of Need Although the Agreements Would Not Fully Pay for
the Expansion**

It should be common sense that a precedent agreement is significant

evidence of market need only if the amount the new customer agrees to pay

reflects the cost to provide the new capacity. Take this hypothetical: Coffee Co.

opens a new location. Each cup of coffee costs it $2 to produce. But its

customers at the new location will only pay $1.50. There is no market demand

for Coffee Co.'s new location. Likewise, agreements with Coffee Co.'s new

customers to buy coffee for less than the cost of providing it is not evidence

that market demand requires the new location.

GTN's proposal is like Coffee Co.'s. Unlike Coffee Co., GTN seeks to

expand nonetheless because, as a regulated monopoly, it can charge existing

customers whatever price FERC approves. GTN is counting on raising rates on

existing customers to subsidize the Expansion.

FERC approved the Expansion based on the existence of precedent

agreements to buy the Expansion service, but did not engage with evidence that

the agreements would not fully pay for the Expansion's costs. *See* Certificate
Order ¶ 36. FERC's assessment of the Expansion's cost of service, and its
ensuing conclusion to approve the Expansion based on precedent agreements
purporting to cover that cost, was unlawful and arbitrary for three reasons.
First, FERC erroneously reasoned it could approve the Expansion and defer
these cost-recovery issues to another proceeding, although doing so would
harm consumers and violate the Gas Act's requirement to only approve
projects required by the public necessity. Second, FERC did not allocate any of
the $251 million that GTN spent upgrading compressors to the Expansion.
Instead, FERC erroneously concluded this was a routine maintenance expense,
allowable under 18 C.F.R. § 2.55(b), rather than an obvious component of the
Expansion. Third, FERC arbitrarily concluded that the Expansion's useful life
was 47 years (lasting through 2071 at least), although the undisputed evidence
showed demand would not continue after 2050. FERC instead relied on a
general practice used in past cases that it never substantiated.

### 1. FERC's attempt to defer these critical questions to a future rate case is not reasonable

The Court should reject FERC's attempt to defer these issues to a future
rate case. *See* Rehearing Order ¶¶ 43, 50-53. First, the Gas Act does not permit
FERC to defer questions essential to whether a project serves the public

necessity. Second, FERC arbitrarily ignored the potential harm to consumers that would result from such a decision.

### a) FERC cannot defer questions central to its public need finding

FERC arbitrarily found a public need without answering questions central to that finding: will existing customers subsidize the Expansion if the Expansion's cost excludes all the costs to upgrade GTN's compressors? Is it appropriate to postpone recovery of Expansion costs until after the precedent agreements expire, when the undisputed evidence shows there will not be demand sufficient to pay those costs? *See* Rehearing Order ¶¶ 43, 53. FERC acknowledged that both issues may "result in existing customers subsidizing the [Expansion]." *Id.* ¶ 52; *see also id.* ¶ 43. And FERC's Certificate Policy clearly states that the existence of a subsidy is a "threshold requirement in establishing the public convenience and necessity." 88 FERC at ¶ 61,746. Approving a project that may be subsidized violates the Certificate Policy.

Failure to resolve these questions also infects FERC's finding of market need based on the precedent agreements and abrogates FERC's duty to only certificate the construction of new facilities based on a demonstrated public necessity. *See* 15 U.S.C. § 717f(c)(1)(A), (e). As Commissioner Clements explained, the precedent agreements "speak [only] to market demand for

transportation services *at specifically negotiated prices*." Second Rehearing Order ¶ 2 n.12 (Clements, Comm'r, dissenting). If those prices are not reasonable because they exclude substantial costs, "nothing" supports FERC's approval. *Id.* ¶ 2.

FERC policy and common sense dictate that FERC must determine what the Expansion's true costs are, and who will pay them, *before* finding that no subsidy exists and a demonstrated public necessity. The Gas Act does not have a "build first, decide later" policy. *See* 15 U.S.C. § 717f(c)(1)(A), (e). By deferring the issue, FERC approved a project that is either (1) not economically viable or (2) dependent on subsidization from existing customers. *See* R.102:48-51, 92, 95-97; *see also* Gibbon Decl., ECF 74-2, ¶ 8. Neither outcome complies with FERC's obligation under the Gas Act to only approve projects "required by the public convenience and necessity" and fully address important aspects of the problem before it. 15 U.S.C. § 717f(e); *State Farm*, 463 U.S. at 43.

FERC responded that it could postpone the determination of just and reasonable rates to the rate case. Rehearing Order ¶ 51. But the existence of a subsidy is not solely a question of rates. *See* Certificate Policy, 88 FERC at ¶¶ 61,745-47. Regardless, FERC still has a duty to exercise "a most careful

scrutiny and responsible reaction to initial price proposals" in the certificate proceeding. *Atl. Ref. Co. v. Pub. Serv. Comm'n*, 360 U.S. 378, 391 (1959).

In *Missouri Public Service Commission v. FERC*, the D.C. Circuit rejected FERC's argument that it could avoid objections to a proposal by deferring a more detailed evaluation of rates to the next rate case. 601 F.3d 581, 587 (D.C. Cir. 2010). While the review in a certificate case "is not coterminous with the just and reasonable standard" used in rate cases, FERC still has a "duty to use its [certificate] power to protect consumers . . . Indeed, the Commission's usual practice in Section 7 certificate proceedings is to apply, to the extent practicable, the same ratemaking policies that it applies in Section 4 rate cases." *Id.* (cleaned up). FERC's failure to offer a "reasoned explanation" why it could not decide the rate issue in the certificate proceeding violated the APA. *Id.*

Like in *Missouri*, FERC offers no reasonable explain why it could not decide these issues now. Instead, FERC surmises that the compressor costs "appear to be in existing rates." Rehearing Order ¶ 32 n.112. FERC then explains that, if it allocated some compressor costs to the Expansion, GTN would recover those costs twice, once from Expansion customers and once from existing customers. *Id.* ¶ 53. FERC's explanation is irrational. First,

37

GTN's current rate filing, not a past one, seeks to include the costs for compressor upgrades in its "proposed rates," not the existing system rate. *Id.* ¶ 36. Second, the precedent agreements have negotiated rates, so whatever rate FERC sets for the Expansion does not affect what they pay. *Id.* ¶ 52 n.202; *see also* R.102:51-52.

FERC did not have to proceed in the dark here. Certificate applications must include "detailed cost-of-service data supporting the cost of the expansion project" and a "detailed rate impact analysis" on its currently effective rate schedules. 18 C.F.R. § 157.6(b)(8). GTN's failure to submit a complete application was a reason to reject, not approve, it. *See* 18 C.F.R. § 157.5. As this Court has repeatedly held, agencies "cannot play the 'administrative law shell-game' of offering 'future [proceedings] as a response to a claim of agency illegality." *El Paso Elec. Co. v. FERC*, 76 F.4th 352, 366 (5th Cir. 2023); *see also BNSF Ry. Co. v. Fed. R.R. Admin.*, 105 F.4th 691, 699 (5th Cir. 2024).

### b) FERC did not consider the consequences of its decision for future gas consumers

FERC's punt to a future proceeding also fails to address the consequences of that decision on future gas consumers. If demand does not exist to pay the Expansion's costs after 2050, the evidence does not indicate

that GTN can absorb those costs. As GTN explained to FERC, declining demand could render its entire pipeline uneconomic by 2050. R.566:149-198.

Remember Coffee Co. that charged new customers $1.50 for coffee and then increased the prices on its existing captive customers to cover the rest of its costs for the new location? Now the new customers paying $1.50 have moved away, but Coffee Co. has not yet recovered its investment. There also have been substantial declines in demand for coffee overall, shrinking the pool of customers at its original location. The smaller pool of customers must share in the same fixed costs of the original café, plus those of the new location. Coffee Co. will need to drastically increase prices to stay afloat. Unfortunately, these customers tend to be those who could not easily switch to a different beverage already and can least afford the higher prices.

As in Coffee Co., FERC's decision will almost certainly harm future gas consumers. For GTN to remain economic, it will have to drastically raise rates to recover its fixed costs. *See* R.566:161-62. For example, GTN calculated that a 74% decline in gas demand could result in transportation rates increasing by 384%. *Id*. At some point, the rates will become "prohibitive" and GTN may have to abandon service. *Id*.; *see also* R.102:95-97. FERC's decision piles on more unrecoverable expenses without assessing the impact on future gas

consumers. *See* Certificate Order ¶ 4 (Clements, Comm'r, concurring in part and dissenting in part) (criticizing FERC's failure to assess the "risk of saddling ratepayers with the costs of underused facilities").

FERC's failure to decide who should pay for GTN's compressor upgrades, or how Expansion costs will be recovered after the precedent agreements expire, "entirely failed to consider an important aspect of the problem" before it. *State Farm*, 463 U.S. at 43. As one Commissioner explained in another case, "[w]hatever probative weight [the precedent agreements have], the Commission cannot simply point to the agreement's existence and then ignore the evidence that undermines the agreement's probative value. In so doing, the Commission ignores arguably the most import aspect of the problem in this case: Whether the precedent agreement on which it rests its entire determination of need actually tells us anything about the need for this pipeline." *Spire STL Pipeline LLC*, 169 FERC ¶ 61,134, 62,002 (2019), (Glick, Comm'r, dissenting), *vacated by Envir. Def. Fund v. FERC*, 2 F.4th 953 (D.C. Cir. 2021).

### 2. The Expansion's costs will long outlive the agreements, but there was no evidence of future demand to pay for them

FERC calculated the Expansion's annual depreciation expense based on its finding that the Expansion's "useful life is approximately 47 years."

Rehearing Order ¶ 41. As a result, GTN will need to recover millions of dollars

of its investment in the decades after the precedent agreements expire in the

early 2050s. *See* R.102:95-97. The undisputed record evidence shows that

demand for natural gas will be significantly decreased at that time. *See supra*

pp. 12-23. GTN similarly argued to FERC in its rate filing that declining

demand and the inability to recover its costs could render the pipeline

uneconomic by 2050. *See* R.566:158, 195. By ignoring this evidence and

adopting a 47-year depreciation rate, FERC set up the Expansion to become a

stranded asset.

To justify its decision, FERC relied on its policy of using the

depreciation rate from the pipeline company's last rate case. *See* Rehearing

Order ¶ 40. FERC's rationale violates the Gas Act and APA because (1) it did

not substantiate its policy and (2) aside from its unsupported citation to policy,

no evidence supports FERC's finding that the Expansion will have a useful life

of 47 years.

### a) FERC did not substantiate its policy to use a depreciation rate unmoored from the evidence before it

This Court has previously remanded to FERC for establishing a policy

through case-by-case adjudications and then applying it in a particular case

without regard to the individual facts and without substantiating the policy. *See Shell Oil v. FERC*, 707 F.2d 230, 234-36 (5th Cir. 1983); *Fla. Gas Transmission Co. v. FERC*, 876 F.2d 42, 44-45 (5th Cir. 1989); *see also El Paso Elec. Co. v. FERC*, 832 F.3d 495, 503 (5th Cir. 2016). While FERC may announce a general policy through case-by-case adjudication, it must "substantiate[] the application of its policy, either through the development of specific facts or by making a reasoned explanation," in each case. *Fla. Gas Transmission Co.*, 876 F.2d at 45. FERC has made the same error here.

*Florida Gas* and *Shell* illustrate how FERC must substantiate a policy announced in case-by-case adjudication. In *Florida Gas*, FERC explained that its policy was necessary to reduce the "potential for undue discrimination" and because the industry was in a transition period adapting to new rules. *Id*. 44. This Court reversed. Merely stating "a prophylactic purpose" for the policy was insufficient when FERC had rejected alternatives that could equally serve its purpose without explanation. *Id*. 45.

In *Shell*, FERC applied a policy based on a finding that certain producers could utilize existing well footage. 707 F.2d at 234. Shell challenged the policy because Shell did not use existing well footage. *Id*. This Court reversed. FERC had never adduced evidence to support the "critical facts" that producers can

42

utilize existing well footage. *Id*. 235. Since no evidence supported "the facts upon which [the] rule is based[,]" the policy was invalid. *Id*.

As in *Shell* and *Florida Gas*, FERC applies a policy, developed in case-by-case adjudication, without regard to the specific facts before it. *See* Rehearing Order ¶ 40. This case is more straightforward, because FERC offered no explanation of the purpose of its policy, much less evidence supporting the facts underlying it. *See* Rehearing Order ¶¶ 40-43.

In a footnote, FERC cites another case, *Tennessee Gas Pipeline*, which explains that case-by-case review of depreciation rates "may cause undue delay." 169 FERC ¶ 61,230, 62,832 (2019). To the extent this is the policy justification, it is not reasonably explained or supported with evidence. FERC does not cite evidence of delays from case-by-case review of depreciation rates, especially not in cases like this one, where the relevant evidence is undisputed. FERC also does not explain why such delay, if it happens, would be "undue" when FERC already must assess the same evidence regarding future demand to approve a certificate. Finally, FERC did not reasonably explain why an abstract concern of delay outweighs the risk of burdening future gas consumers with stranded assets or approving an uneconomic expansion project.

FERC's application of the policy is also arbitrary because FERC does not consistently apply the policy. *See Tenn. Gas*, 169 FERC at ¶ 62,832. In other cases, FERC has not insisted on using the last-approved depreciation rate when that rate may not accurately reflect the economic life of new facilities. *Wyo. Interstate Co.*, 119 FERC ¶ 61,251, 62,416 (2007); *Gulf S. Pipeline Co., LP v. FERC*, 955 F.3d 1001, 1015 (D.C. Cir. 2020). On rehearing, FERC claimed those policy exceptions only apply to lateral pipes serving a single customer, *see* Rehearing Order ¶ 40, but this is incorrect, *see, e.g., Equitrans, L.P.,* 153 FERC ¶ 61,381, ¶¶ 17, 27, 31 (2015), *aff'd on reh'g* 155 FERC ¶ 61,194 (2016) (approving a depreciation rate based on the contract term where the project "overlays much of Equitrans existing system"); *Tenn. Gas*, 169 FERC at ¶ 62,832. FERC's failure to substantiate its policy was arbitrary and capricious.

### b) No evidence supports FERC's finding that the Expansion would have an economic life of 47 years

FERC's finding that the Expansion would have a useful life of 47 years was also "flatly and overwhelmingly contradicted by [the record] evidence." *MCR Oil Tools, L.L.C. v. U.S. Dep't of Transp.*, 110 F.4th 677, 698 (5th Cir. 2024). Factual findings that run counter to the record evidence violate the APA. *Id.* The undisputed evidence from the States and GTN indicated that the

Expansion's useful life will expire with the precedent agreements in the early 2050s. No evidence suggested the Expansion would be needed after the precedent agreements expire.

Case in point: GTN claimed in its rate filing that the useful life for its entire pipeline would be just 27 years, which was based on "competitive pressure from the declining cost of alternative energy, electrification, and battery storage" and the requirements of federal, state, and local governments. R.566:149.

The evidence in the Certificate docket mirrored GTN's testimony in the rate filing. In its application, GTN cited a market analysis that described "a steep drop in power sector demand" in the Western U.S., as renewable energy out-competes natural gas for electricity generation. R.315:9; *see also id*. 315:48, 55; R.566:178-187. The States also submitted a report from energy planning expert David Hill. Hill explained that 32% of total regional gas consumption is used to generate electricity, but laws in California, Oregon, and Washington will require significant reductions in gas-fired electricity generation by 2045 or earlier. R.102:87-89. This will substantially reduce demand for GTN. *Id*. Moreover, gas demand for other uses, like space and water heating, will also likely decline due to consumer trends favoring electric

heat pumps, building code changes, and federal subsidies to electrify buildings. *Id.* 102:78-80; *see also id.* 102:37-42; R.315:11; R.566:170-172.

Without addressing this evidence, FERC irrationally concluded that "the States provide no evidence to support the Commission deviating from its policy." Rehearing Order ¶ 40. FERC speculated that the Expansion customers "may" extend their precedent agreements, or that GTN could remarket the capacity, but did not explain why this was likely.[8] Rehearing Order ¶ 43; *compare* Rehearing Order ¶ 9 (Clements, Comm'r, dissenting). This "unsubstantiated agency speculation does not overcome" the undisputed evidence projecting declining demand. *Calumet Shreveport Refin., LLC v. EPA*, 86 F.4th 1121, 1142 (5th Cir. 2023).

FERC also erred in stating that an asset's useful life is based "both on wear and tear and on the exhaustion of natural resources." Rehearing Order ¶ 40. That is not the standard. "[C]hanges in demand and requirements of public authorities" are also relevant. 18 C.F.R pt. 201 ¶ 12.B; *see also*

---

[8] FERC only cited a past case, *Northern Border Pipeline*, which found, based on the facts of the case, that it was speculative to assume the project shippers would not continue as customers of the pipeline after their agreements expire. 76 FERC ¶ 61,141, 61,771 (1996); Rehearing Order ¶ 42. But there, the project shippers expressed on the record their intent to continue as customers after their agreements expired, and there was no indication that demand would decline. *Northern Border*, 76 FERC at ¶ 61,771.

*Panhandle E. Pipeline Co., LP*, 181 FERC ¶ 61,211, 62,440 (2022) (finding a 35-year economic life based on changes in demand). As this Court has held, applying the wrong legal standard and ignoring relevant factors renders FERC's rationale arbitrary and capricious. *See Jupiter Energy Corp. v. FERC*, 482 F.3d 293, 298 (5th Cir. 2007); *see also BNSF Ry. Co.*, 105 F.4th at 699.

### 3. The precedent agreements do not pay for upgrading the compressors necessary to expand

FERC arbitrarily concluded that GTN's compressor upgrades were not part of the Expansion. In the Certificate Order, FERC found the Expansion was unsubsidized only because it excluded the cost to upgrade three compressors, citing GTN's explanation that 18 C.F.R. § 2.55(b) separately justified those upgrades. *See* Certificate Order ¶ 16; Rehearing Order ¶ 23. Section 2.55(b) did not authorize the cost to upgrade GTN's compressors because the replacements were not substantially equivalent in size and created new pipeline capacity, which the Expansion will use. FERC therefore should have considered those costs in determining the Expansion's costs.

On rehearing, FERC alternatively claimed that whether the replacements were justified under section 2.55(b) was "outside the scope" of the Certificate proceeding. Rehearing Order ¶ 17. However, as discussed above, FERC cannot determine whether existing customers will subsidize the Expansion if it does

not know whether expansion costs are being incorrectly shifted on existing customers. FERC also cannot rely on the existence of precedent agreements as evidence of market demand if those agreements will not make Expansion economically viable. *See supra* pp. 35-39.

> ### a) FERC's finding that 18 C.F.R. § 2.55(b) authorized the compressor upgrades does not accord with law

FERC's conclusion that section 2.55(b) justified the upgrades must be set aside because it is not a lawful interpretation and, even if it was, it arbitrarily deviates from FERC's past interpretations without explanation. *See* 5 U.S.C. § 706(2)(A); *Univ. of Tex. M.D. Anderson Cancer Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 985 F.3d 472, 477-79 (5th Cir. 2021) (agency incorrectly interpreting its regulations was arbitrary); *Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, 45 F.4th 846, 857 (5th Cir. 2022) (holding agency's shifting interpretations, without acknowledging change in position, was arbitrary).

The Gas Act requires FERC to review and approve any new pipeline "facilities" before construction begins. 15 U.S.C. § 717f(c)(1)(A). FERC regulations create a narrow exception to this rule for replacement of deteriorated or obsolete equipment. *See* 18 C.F.R. § 2.55(b). But section 2.55(b) only permits replacement of deteriorated or obsolete facilities that

"have a substantially equivalent designed delivery capacity." § 2.55(b)(1)(ii).

Previously, FERC "viewed replacement as being limited to like-size facilities."

*Columbia Gas Transmission Corp.*, 68 FERC ¶ 61,043, 61,143 (1994).

Allowing larger-size replacements "could open section 2.55(b) to potential

abuse." *Id*. More costly replacements could also "disturb the assumptions

supporting the original certification." *Id.*

FERC's application of section 2.55(b) to GTN's compressor upgrades

stretches that regulatory exception beyond its logical limits. The upgrades

increased the horsepower of each unit by 9,170, or 64%.[9] A 64% increase, with

a multi-million-dollar price tag, is not a like-size replacement and cannot

reasonably be viewed as "substantially equivalent." § 2.55(b)(1)(ii); *see also*

*Columbia*, 68 FERC at ¶¶ 61,142-43. As FERC acknowledges, it has

occasionally approved section 2.55(b) replacements that were the "closest off-

the-shelf size." Rehearing Order ¶ 24 (citing cases). That is not the case here. A

smaller size was available; GTN just claimed it needed a larger one for

engineering reasons. Rehearing Order ¶ 18; R.102:48.

Moreover, in those past cases, the increased horsepower was "minor,"

generally in the 500-700 range, and the replacements had physical

---

[9] (23,470-14,300)/14,300

modifications to limit horsepower, not artificial software limits.[10] Thus, these closest available size replacements were "substantially equivalent" to the originals. Those cases do not support a replacement that is *not* the closest available size, and instead entailed a 9,170 (64%) increase in available horsepower, based solely on the pipeline company's promise not to use the increased capacity via software controls.[11] *Compare Columbia*, 68 FERC at ¶¶ 61,142-43 (holding section 2.55(b) did not justify replacement of larger-size pipe, even though safety and reliability reasons justified the larger size and it would not increase the main pipeline's capacity). They particularly do not support a replacement whose excess capacity will be "activated and used to

---

[10] *NorAm Gas Transmission Co.*, 82 FERC ¶ 62,121, 64,190 (1998) (authorizing replacement that was 700 horsepower larger because the original unit was no longer manufactured and the increase was minor); *see also Transwestern Pipeline Co.*, 81 FERC ¶ 61,172, 61,752 (1997) (authorizing replacement that was the same model as the original, but due to advanced technology, had 500 more horsepower); *Transwestern Pipeline Co.*, 79 FERC ¶ 62,102, 64,309, n.2 (1997) (authorizing replacement with 1,150 more horsepower due to the unavailability of parts for the existing united and noting that the cost did not exceed the "applicable" cost limit for blanket certificate treatment); *Dominion Transmission, Inc.*, 129 FERC ¶ 61,048, 61,263 (2009) (approving, in a certain proceeding, replacement with 500 more horsepower because no other unit could meet the pipeline's requirement to reduce emissions and the larger size would result in "de minimus" additional capacity).

[11] In fact, only one recent decision relied on the pipeline's use of software controls to limit the horsepower of a larger-sized replacement, but no party filed comments or protests, the increase was still lower than here (3,900 horsepower), and the pipeline company proposed an incremental rate to avoid subsidization by existing customers. *See ANR Pipeline Co.*, 171 FERC ¶ 61,233, 62,688-89 (2020), *vacated in part*, *ANR Pipeline Co.*, 180 FERC ¶ 61,119 (2022). Just because FERC was not presented with objections in that case does not permit it to ignore the valid objections raised in this one.

provide expansion project service," Certificate Order ¶ 53, because section 2.55(b) does not permit replacements that may result in an "incidental increase in capacity," 18 C.F.R. § 157.202(b)(2)(i).

Tellingly, FERC relies on Order 603-A to approve GTN's super-sized replacements, stating that an applicant must "support its prudent decision to use any replacement facility that is not the closest available size or horsepower rating to the facility being replaced." Rehearing Order ¶ 24 (citing Order 603-A, FERC Stats. & Regs. ¶ 31,081, 30,927 (1999) (cross-referenced at 64 Fed. Reg. 54,522, 54,527 (Oct. 7, 1999)). Order 603-A concerns replacements under the blanket certificate, a separate process that would not have allowed GTN's compressor replacements because they were too costly. *See* 18 C.F.R. § 157.208(b); Order 603, 64 Fed. Reg. 26,572, 26,573, 26,580-81 (May 14, 1999). Nothing in Order 603-A suggests that section 2.55(b) allows a pipeline company to replace compressors with units that were not the closest available size.

In fact, FERC's rulemaking in Order 603 and 603-A confirms that FERC's current interpretation of section 2.55(b) is incorrect and impermissibly deviates from its prior interpretation. In Order 603 and 603-A, FERC amended the definition of facilities eligible for replacement under a pipeline's "blanket

certificate" to include compressor replacements "that do not qualify under § 2.55(b) because they will have an impact on mainline capacity." Order 603, 64 Fed. Reg. at 26,579-80; *see also* Order 603-A, 64 Fed. Reg. at 54,523, 54,526-27 (addressing rehearing requests); 18 C.F.R. § 157.202(b)(2)(i) (amended definition). Such replacements may qualify under the pipeline's blanket certificate if they are "done for sound engineering purposes." § 157.202(b)(2)(i).

Order 603 explains the difference between replacements under section 2.55(b) and the blanket certificate. Replacements under section 2.55(b) "should only involve basic maintenance or repair to relatively minor facilities." Order 603-A, 64 Fed. Reg. at 54,524. If the replacement "*may* result in an incidental increase in mainline capacity because the replacement facilities do not exactly match the original," the blanket certificate, not section 2.55(b), applies. *Id*. 54,527 (emphasis added). Applying software controls does not bring a larger-size replacement out of the blanket certificate process and qualify it for section 2.55(b). That is because even under the blanket certificate, pipeline companies "still [must] design the replacements so that they have a substantially equivalent designed delivery capacity." *Id*.

52

The distinction between section 2.55(b) and blanket certificates is not trivial. Section 2.55(b) is automatic. Blanket certificates protect ratepayers from pipelines seeking to super-size replacements to expand capacity at ratepayer expense. Under the blanket, replacements must not exceed certain cost thresholds. *See* 18 C.F.R. § 157.208. This "provide[s] some basis for judging whether a proposed activity is sufficiently routine and will have a sufficiently small impact on ratepayers, so that it should be approved under the streamlined [blanket] procedure." Interstate Pipeline Certificates for Routine Transactions, 47 Fed. Reg. 24,254, 24,258 (1982). If a party protests the replacement, FERC will review and decide the application. *See* 18 C.F.R. § 157.205(a)(2), (f).

These protections responded to ratepayer concerns that pipeline companies would abuse the replacement process to subsidize expansions. Ratepayers commented to FERC that there must be a mechanism to protest blanket certificate replacements that are "not being done for 'sound engineering reasons,' but solely to increase capacity." Order 603, 64 Fed. Reg. at 26,580; *see also* Order No. 603-A, 64 Fed. Reg. at 54,526-27 (addressing similar comments).

Here, FERC's new interpretation of section 2.55(b) evades those ratepayer protections. According to FERC, section 2.55(b) justifies larger-size replacements even if the blanket certificate does not. Rehearing Order ¶¶ 24-25. This interpretation renders the blanket certificate process and its procedural protections superfluous. It is nonsensical to have cost limits on replacements or avenues for parties to obtain administrative review through the blanket certificate if pipelines can simply notice the same replacements under section 2.55(b) and avoid those protections altogether. *See BNSF Ry. Co. v. U.S.*, 775 F.3d 743, 759 (5th Cir. 2015) (rejecting broad interpretation of one provision that would subsume more specific provisions and render them inoperative).

As FERC acknowledged, the increased capacity of the replaced compressors will be "activated and used to provide expansion project service." Certificate Order ¶ 53. The replacement and expansion projects are not independent. *See* R.102:112-113 (GTN's press release announcing "GTN Xpress," a combined replacement and expansion project). FERC's reasoning arbitrarily allows pipeline companies to rely on software and piecemeal regulatory processes to circumvent the Gas Act's mandate that companies obtain a certificate of public convenience and necessity prior to expanding

facilities. FERC's refusal to consider the cost to upgrade compressors when it determined the Expansion's cost was therefore unlawful and arbitrary.

> **b) FERC arbitrarily failed to consider all the evidence or offer a reasonable explanation based on the evidence**

Assuming *arguendo* that section 2.55(b) authorizes larger-size replacements that create incidental capacity (so long as the pipeline promises not to use it via software controls), FERC still did not explain and support its determination here. FERC deferred to GTN's explanation that it could not maintain "existing service levels," with the Solar Mars unit (rated at 15,900 horsepower), which was closer in size to the replaced Avon unit (rated at 14,300 horsepower). Rehearing Order ¶¶ 16-18. But FERC never explained how, if that were true, GTN could add 100,000 Dth/d in new firm capacity following the compressor upgrades. An agency's "conclusory statement [does] not constitute adequate agency consideration of an important aspect of a problem." *La. v. U.S. Dep't of Energy*, 90 F.4th 461, 473 (5th Cir. 2024).

The mid-sized Solar Mars compressors would produce only about 200 horsepower less than the original Avon compressors on the coldest days. *See* R.304:13. FERC uncritically deferred to GTN's claim that losing 200 horsepower would have reduced service through the facilities. *See id*.;

Rehearing Order ¶ 19. Yet *after* replacing the compressors, GTN began providing 100,000 Dth/d in *new* firm service. *See* R.304:11-12. Significantly, this 100,000 Dth/d in new capacity was marketed and sold as "*Phase I*" of GTN Xpress and would begin on or around November 2022. *See* R.1:85-86. Though parties urged FERC to investigate how GTN could increase firm service without modifying facilities, *see* R.47:4-5; R.43:4, FERC never addressed the objection and refused to hold a technical conference to explore it. *See* Certificate Order ¶ 11.

FERC should have investigated and explained how GTN could add 100,000 Dth/d in new service if service at the time of compressor replacement already required the maximum available horsepower. (For context, the Expansion will add 50,980 horsepower to increase service by 150,000 Dth/d, *see* R.1:13-14) FERC's failure to independently determine whether a measly 200 horsepower was actually necessary for existing service did not "examine the relevant data and articulate a satisfactory explanation for its actions." *State Farm*, 463 U.S. at 43.

## C. Without the Precedent Agreements, Nothing Supports FERC's Order

As Commissioner Clements stated, "[w]ithout the precedent agreements, there is nothing to support the Commission's need determination." Second

Rehearing Order ¶ 2 (Clements, Comm'r, dissenting). Instead, FERC offered what one Commissioner termed in another case as a "throw-away paragraph" reciting public benefits that might occur in an "attempt to bolster its finding of need." *Spire*, 169 FERC at ¶ 62,006 (Glick, Comm'r, dissenting). FERC's findings of public benefits are not supported with evidence and ignore record evidence indicating those benefits "may be illusory." Rehearing Order ¶ 7 (Clements, Comm'r, dissenting). They cannot justify FERC's order. *See Env't Def. Fund*, 2 F.4th at 973 (vacating *Spire* in part because FERC "pointed to no concrete evidence to support [its] assertions" of public benefits).

First, FERC found that "the project will likely decrease costs to consumers." Certificate Order ¶ 26. For this, FERC relied on GTN's say-so. *See id.* ¶ 21 (citing R.1:18-19); Rehearing Order ¶ 89. FERC cannot find a benefit is likely to occur based only on a "naked assertion" from the applicant. *La. Env't Action Network v. EPA*, 382 F.3d 575, 586 (5th Cir. 2004).

Additionally, in contrast with GTN's bare assertions in its application, GTN presented sworn testimony in its rate filing indicating that this "purported benefit may be illusory. According to GTN's witness Mr. Kearley, a variety of factors will cause the price of gas from Western Canada to *increase*, thereby making the gas less 'economic' relative to gas from other areas." *See*

Rehearing Order ¶ 7 (Clements, Comm'r, dissenting) (citing R.566:135-136, 139). The FERC majority waved this concern aside and continued to rely on its low-cost finding without further explanation. *See* Rehearing Order ¶¶ 84, 89. But FERC may not simply "disregard those facts or issues that prove difficult or inconvenient" or "refus[e] to come to grips" with the evidence before it. *Jupiter Energy Corp.*, 482 F.3d at 297; *see also La.*, 90 F.4th 461 (stating that an agency's "bare acknowledgment [of a concern] is no substitute for reasoned consideration").

Significantly, FERC's Certificate Policy requires a "market study . . . to explain the basis for [a] projection [of lower gas rates]." 88 FERC at ¶ 61,748. The APA and FERC's Certificate Policy require more than just a hint of consumer benefits before requiring consumers to pay millions of dollars in Expansion costs.

FERC also found the Expansion would "increase supply diversity," adopting GTN's claim that the Expansion was necessary to replace declining production of gas in the Rocky Mountain region. Rehearing Order ¶ 89. For that claim, FERC relied on GTN's submission of a two-page excerpt from its "IHS Markit" report. *Id.* (citing R.304:25-26). The rest of the report, however, described a combination of falling regional demand and rising regional

58

production in other parts of the Western U.S., leading the Western U.S. to become a net exporter of gas by 2032, *see* R.315:57, potentially oversupplying Western markets, *see id*. 315:11. FERC's reliance on a two-page excerpt, without addressing other parts of the report that contradicted its conclusion, was arbitrary and capricious.

FERC also claimed the Expansion would increase "reliability," Rehearing Order ¶ 89, but never cited any evidence to show greater reliability was needed, or explained how the Expansion would meet that need. *See Chamber of Com. v. SEC*, 85 F.4th 760, 776-78 (5th Cir. 2023) (holding agency did not substantiate alleged benefit of reducing improper stock buybacks without evidence showing that improper buybacks were a real problem).

**D. FERC Failed to Develop a Complete Record by Refusing to Consider Evidence from GTN's Rate Filing that Contradicted its Conclusions**

FERC considered parts of GTN's rate filing on its own initiative, then arbitrarily refused to consider parts of the same filing that contradicted its conclusions. *See* Rehearing Order ¶¶ 9-10, 36, 53. FERC also erroneously claimed to be legally barred from considering the States' answer to GTN's rehearing request. *See id*. The Court need not reach this issue in order to vacate FERC's orders for all of the reasons described above; GTN's rate filing

highlights the egregiousness of those errors. Nonetheless, the Court should also reverse FERC's attempt to "unnecessarily tie [its] hands procedurally" and refuse to consider relevant evidence that was already before it in a parallel docket. Rehearing Order ¶ 11 (Clements, Comm'r, dissenting).

First, FERC could consider GTN's rate filing in a parallel docket on its own initiative– a point made obvious by the fact that it did so. *See* Rehearing Order ¶ 36 nn.131-133, ¶ 53 n.208 (citing testimony and cover letter from GTN's rate filing, protest, and FERC order setting case for hearing). "It is not the law that an agency may never rely on data in its files, or on public information, in rendering a decision. Section 556(e) of the APA recognizes that agency decisions often will rest on official notice of material facts not appearing in the record evidence." *Air Prod. & Chemicals, Inc. v. FERC*, 650 F.2d 687, 697 (5th Cir. 1981). Further, where FERC "knew, or should have known" of facts relevant to the public interest, it cannot simply ignore them. *Mich. Consol. Gas Co. v. Fed. Power Comm'n*, 283 F.2d 204, 226 (D.C. Cir. 1960) (holding FERC erroneously refused to consider a settlement proposal submitted after the deadline to request rehearing). FERC has "an affirmative duty to inquire into and consider all relevant facts." *See Scenic Hudson Preserv. Conf. v. Fed. Power Comm'n*, 354 F.2d 608, 620 (2d Cir. 1965); *R.R.*

*Comm'n of Tex. v. FERC*, 874 F.2d 1338, 1343 (10th Cir. 1989). Applicants

have a parallel duty to provide in their applications "all pertinent data and

information necessary for a full and complete understanding of the proposed

project, including its effect upon [the] applicant's present and future

operations." 18 C.F.R. § 157.5(a).

Here, FERC took notice of GTN's rate filing in the Certificate docket.

Rehearing Order ¶¶ 36, 53. Once it did so, it had to consider the whole filing,

including evidence in it contradicting FERC's conclusions, and, if necessary,

modify its order. For instance, FERC relied on some sentences in GTN's cover

letter, but then ignored other parts of the same letter describing expert

testimony projecting declining demand and supply constraints. *See* Rehearing

Order ¶ 36 n.131, ¶ 53 n.208 (citing Transmittal Letter, R.566:26-39). FERC

cannot rely on parts of a filing but disregard the parts contradicting its

conclusions.

Second, FERC had the discretion to consider the States' answer, so its

position that it had no discretion was arbitrary and legal error. Rehearing Order

¶ 9. 18 C.F.R. § 385.213(a)(2) prohibits answers to requests for rehearing

"unless otherwise ordered." *See also* § 385.713(d)(2) (stating FERC "may

afford parties an opportunity to file briefs . . . on one or more issues presented

by a request for rehearing"). FERC permits answers to rehearing requests for good cause, which include "aid[ing] in [FERC's] understanding and resolution of the issues raised," *Wrightsville Power Facility, L.L.C. v. Entergy Ark., Inc.*, 102 FERC ¶ 61,212, 61,615 (2003), being equitable under the circumstances and "of value in developing a full and complete record," *Great Lakes Gas Transmission Co.*, 38 FERC ¶ 61,051, 61,152 (1987), or providing more details about a fact another party presented in their request for rehearing, *City of Kaukauna*, 137 FERC ¶ 61,072, *3 (2011). FERC has also allowed answers to requests for rehearing based on the "nature of the issues raised and because of the particular stake that [State Commissions] and their consumers have in [a] matter." *State-Fed. Reg'l RTO Panels*, 98 FERC ¶ 61,309, 62,322 (2002). Even here, FERC construed section 385.213(a)(2) to allow other "prohibited" answers because they "provide[d] information that assist[ed] [its] decision-making." Certificate Order ¶ 10. Because FERC's regulation affords it discretion to accept answers to requests for rehearing, FERC's categorical rejection of the State's answer is not a reasoned explanation. Rehearing Order ¶ 9.

## VIII. CONCLUSION

The States request the Court grant their petitions, vacate the Orders, and

remand to FERC for further proceedings.


RESPECTFULLY SUBMITTED this 28th day of October, 2024.

FOR THE STATE OF WASHINGTON:          FOR THE STATE OF OREGON:

ROBERT W. FERGUSON                    ELLEN F. ROSENBLUM
Attorney General of Washington        Attorney General of Oregon

*s/ Megan Sallomi*                    *s/ Paul Garrahan*
MEGAN SALLOMI                         PAUL GARRAHAN
SARAH REYNEVELD                       Attorney-in-Charge
Assistant Attorneys General           Natural Resources Section
800 5th Avenue, Suite 2000            Oregon Department of Justice
Seattle, WA 98104                     1162 Court Street NE
(206) 389-2437                        Salem, OR 97301-4096
Megan.Sallomi@atg.wa.gov              Tel: (503) 947-4540
Sarah.Reyneveld@atg.wa.gov            Paul.Garrahan@doj.oregon.gov

# CERTIFICATE OF SERVICE

I certify that a copy of the foregoing has been served upon counsel for all parties to this proceeding as identified below through the court's electronic filing system as follows:

James Holt
Katherine Ann Wade
Betts & Holt LLP
*Counsel for Canadian Association of Petroleum Producers*

Jan Hasselman
Earthjustice
Eric Wriston
Crag Law Center
*Counsel for Columbia Riverkeeper and Rogue Climate*

Robert H. Solomon
Solicitor, Federal Energy
Regulatory Commission
Angela Gao
Attorney, Federal Energy
Regulatory Commission
*Counsel for the Federal Energy Regulatory Commission*

Sean Marotta
Matthew Higgins
Johanna Walker
Hogan Lovells US LLP
*Counsel for Gas Transmission Northwest, LLC*

Dated this 31st day of October, 2024, in Seattle, Washington.

*s/ Megan Sallomi*
Megan Sallomi
Assistant Attorney General

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because it contains 12,960 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated: October 28, 2024_____

_s/ Megan Sallomi_____
Megan Sallomi
Assistant Attorney General