Case No. 24-60002

IN THE

# United States Court of Appeals for the Fifth Circuit

24-60002
consolidated with
24-60197

GAS TRANSMISSION NORTHWEST, LLC,

*Petitioner*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

consolidated with
No. 24-60280

COLUMBIA RIVERKEEPER, ROGUE CLIMATE, STATE OF WASHINGTON, and STATE OF OREGON,

*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

consolidated with
No. 24-60354

STATE OF WASHINGTON and STATE OF OREGON,

*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

On Petitions for Review of Orders of the Federal Energy Regulatory Commission

## PETITIONER GAS TRANSMISSION NORTHWEST, LLC'S OPENING BRIEF

JOHANNAH WALKER
HOGAN LOVELLS US LLP
4 Embarcadero Center
Suite 3500
San Francisco, CA 94111

SEAN MAROTTA
MATTHEW J. HIGGINS
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-4881
sean.marotta@hoganlovells.com

*Counsel for Gas Transmission Northwest, LLC*

October 28, 2024

## CERTIFICATE OF INTERESTED PERSONS

Number and Style of Case: Nos. 24-60002, 24-60197, 24-60280, 24-60354;

*Gas Transmission Northwest, LLC v. Federal Energy Regulatory Commission*.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

James Holt
Katherine Ann Wade
Betts & Holt LLP

*Counsel for Canadian Association of Petroleum Producers*

Maura C. Fahey
Jan E. Hasselman
Earthjustice

*Counsel for Columbia Riverkeeper and Rogue Climate*

Robert H. Solomon
Angela X. Gao

*Counsel for the Federal Energy Regulatory Commission*

Sean Marotta
Matthew Higgins
Johannah Walker
Hogan Lovells US LLP

*Counsel for Gas Transmission Northwest, LLC*

Paul Garrahan
Attorney-in-Charge, Oregon Department of Justice
Steve Novick
Special Assistant Attorney General, Oregon Department of Justice

*Counsel for the State of Oregon*

Megan Sallomi
Sarah M. Reyneveld
Washington State Attorney General's Office

*Counsel for the State of Washington*

American Gas Association

Bp Canada Energy Marketing Corp.

Cascade Natural Gas Corporation

Intermountain Natural Gas Company

MDU Utilities Group and MDU Resources, Inc.

Northwest Natural

Pacific Gas and Electric Company

Puget Sound Energy, Inc.

Shell Energy North America, L.P.

TC Energy Corporation

Tourmaline Oil Marketing Co.

/s/ Sean Marotta
Sean Marotta

October 28, 2024

## STATEMENT REGARDING ORAL ARGUMENT

Petitioner Gas Transmission Northwest, LLC respectfully requests oral argument.  This petition concerns the Federal Energy Regulatory Commission's misapplication of its own precedent and raises complex issues of administrative law in the context of a technical pipeline-ratemaking matter.  Oral argument will assist the Court in resolving these issues and understanding the administrative record.

# TABLE OF CONTENTS

<u>Page</u>

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

STATEMENT REGARDING ORAL ARGUMENT ........................................... iii

TABLE OF AUTHORITIES ................................................................................. vi

JURISDICTIONAL STATEMENT ........................................................................ 1

INTRODUCTION ................................................................................................... 2

STATEMENT OF THE ISSUES............................................................................. 7

STATEMENT OF THE CASE................................................................................ 8

    A. Regulatory Background ................................................................................ 8

        1. *Rolled-in pricing for pipeline expansion projects* ........................... 8

        2. *The predetermination of rolled-in rates* .......................................... 10

    B. Factual And Procedural Background ........................................................ 13

        1. *GTN relies on Section 2.55(b) to replace three fifty-year-old compressor units* ...................................................................... 13

        2. *Years later, FERC authorizes GTN to construct an expansion project* ........................................................................ 16

        3. *FERC denies GTN's request for a predetermination of rolled-in rates* .............................................................................. 17

        4. *FERC denies rehearing* .................................................................. 20

        5. *All challenges to the GTN XPress Project are consolidated in this Court* ................................................................................... 24

SUMMARY OF THE ARGUMENT ..................................................................... 27

STANDARD OF REVIEW ................................................................................... 30

**TABLE OF CONTENTS – Continued**

Page

ARGUMENT ...................................................................................30

  I.   FERC FAILED TO ACKNOWLEDGE ITS DEVIATION FROM ITS RULE THAT SECTION 2.55(B) REPLACEMENTS RECEIVE A PREDETERMINATION OF ROLLED-IN RATES .........................................30

      A. FERC's Longstanding Policy Requires That Replacement Units Authorized Under Section 2.55(b) Receive A Predetermination Of Rolled-In Rates......................31

      B. FERC's Section 2.55(b)-Specific Policy Should Govern Here .............................................................33

      C. FERC's Failure To Acknowledge Its Past Precedent Is Unreasonable.............................................................36

  II.  SECTION 2.55(B) ASIDE, FERC ACTED UNREASONABLY IN DENYING A PREDETERMINATION OF ROLLED-IN RATES FOR THE XPRESS PROJECT .........................................................39

      A. FERC Failed To Address GTN's Point That Removing Artificial Horsepower Limitations Creates Essentially No Costs .....................................................................41

      B. FERC Failed To Explain Its Departure From Past Precedent Holding That A Predetermination Of Rolled-In Rates Is Warranted For The Costs Required To Maintain Existing Service.........................................43

CONCLUSION ...................................................................................48

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

Page

CASES:

Belmont Mun. Light Dep't v. FERC,
  38 F.4th 173 (D.C. Cir. 2022) ...................................................38

BNP Paribas Energy Trading GP v. FERC,
  743 F.3d 264 (D.C. Cir. 2014) .................................................42

Chamber of Commerce of U.S. v. SEC,
  85 F.4th 760 (5th Cir. 2023) ..........................................29, 30, 41

El Paso Elec. Co. v. FERC,
  76 F.4th 352 (5th Cir. 2023) ...........................................41, 42

El Paso Nat. Gas Co. v. FERC,
  966 F.3d 842 (D.C. Cir. 2020) ....................................................8

FCC v. Fox Television Stations, Inc.,
  556 U.S. 502, 515 (2009) ....................................................38

Gulf S. Pipeline Co. v. FERC,
  955 F.3d 1001 (D.C. Cir. 2020) ...............................................42

In re FERC,
  MCP No. 175, 2024 WL 1596933 (J.P.M.L. Apr. 11, 2024) ..............................24

Jupiter Energy Corp. v. FERC,
  407 F.3d 346 (5th Cir. 2005) ...............................................38

Louisiana Pub. Serv. Comm'n v. FERC,
  761 F.3d 540 (5th Cir. 2014) ...............................................30

Louisiana Pub. Serv. Comm'n v. FERC,
  772 F.3d 1297 (D.C. Cir. 2014) ...............................................39

Mexican Gulf Fishing Co. v. U.S. Dep't of Commerce,
  60 F.4th 956 (5th Cir. 2023) ...............................................43

# TABLE OF AUTHORITIES – Continued

Page

*National Ass'n of Regul. Util. Comm'rs v. FERC,*
　475 F.3d 1277 (D.C. Cir. 2007)............................................................41

*New England Power Generators Ass'n v. FERC,*
　881 F.3d 202 (D.C. Cir. 2018).............................................................38

*Placid Oil Co. v. FERC,*
　875 F.2d 487 (5th Cir. 1989) .........................................................*passim*

*PSEG Energy Res. & Trade LLC v. FERC,*
　665 F.3d 203 (D.C. Cir. 2011).............................................................41

*Southwest Airlines Co. v. FERC,*
　926 F.3d 851 (D.C. Cir. 2019).............................................................38

*TransCanada Power Mktg., Ltd. v. FERC,*
　811 F.3d 1 (D.C. Cir. 2015).................................................................43

*University of Tex. M.D. Anderson Cancer Ctr. v. U.S. Dep't of Health &*
　*Human Servs.,*
　985 F.3d 472 (5th Cir. 2021) ...............................................................34

ADMINISTRATIVE PROCEEDINGS:

*ANR Pipeline Co.,*
　171 FERC ¶ 61,233 (2020)...........................................32, 34, 35, 42

*ANR Pipeline Co.,*
　185 FERC ¶ 61,191 (2023)...................................................................46

*Certification of New Interstate Nat. Gas Pipeline Facilities,*
　88 FERC ¶ 61,227 (1999)............................................................*passim*

*Dominion Transmission, Inc.,*
　99 FERC ¶ 61,367 (2002)............................................................12, 19

*Dominion Transmission, Inc.,*
　129 FERC ¶ 61,048 (2009)..........................................................*passim*

*East Tenn. Nat. Gas, LLC,*
　186 FERC ¶ 61,210 (2024)..................................................10, 32, 40

# TABLE OF AUTHORITIES – Continued

Page

*Eastern Shore Nat. Gas Co.*,
   132 FERC ¶ 61,204 (2010) .................................................................9

*Kern River Gas Transmission Co.*,
   96 FERC ¶ 61,137 (2001) .................................................................18

*National Fuel Gas Supply Corp. Empire Pipeline, Inc.*,
   164 FERC ¶ 61,084 (2018) ..............................................................12

*Northern Nat. Gas Co.*,
   174 FERC ¶ 61,189 (2021) ...........................................................9, 11

*Paiute Pipeline Co.*,
   104 FERC ¶ 61,078 (2003) .......................................................*passim*

*Pipeline Service Obligations and Revisions to Reguls. Governing Self-Implementing Transp. Under Part 284 and Regul. of Nat. Gas Pipelines After Partial Wellhead Decontrol*,
   78 FERC ¶ 61,186 (1997) .................................................................8

*Southern Nat. Gas Co.*,
   83 FERC ¶ 62,168 (1998) ................................................................31

*Tennessee Gas Pipeline*,
   165 FERC ¶ 61,217 (2018) ..............................................................35

*Texas E. Transmission, LP*,
   153 FERC ¶ 61,311 (2015) ..........................................................11, 12

*Transcontinental Gas Pipeline Co.*,
   130 FERC ¶ 61,010 (2010) ..............................................................12

*Transcontinental Gas Pipe Line Co.*,
   185 FERC ¶ 61,130 (2023) ..............................................................46

*Transcontinental Gas Pipe Line Co.*,
   161 FERC ¶ 61,012 (2017) .......................................................*passim*

**STATUTES:**

5 U.S.C. § 706(2)(A) ..........................................................................30

## TABLE OF AUTHORITIES – Continued

Page

15 U.S.C. § 717c ................................................................................12

15 U.S.C. § 717f(c)(1)(A) .....................................................................8

15 U.S.C. § 717r
  (a) ..................................................................................................1
  (b) ..................................................................................................1

28 U.S.C. § 2112(a)(1) ........................................................................24

**REGULATIONS:**

18 C.F.R. § 2.55
  (b)(1) ............................................................................................13
  (b)(1)(i) ........................................................................................13
  (b)(1)(ii) .................................................................................13, 14
  (b)(1)(iii) ......................................................................................13

**OTHER AUTHORITY:**

FERC, *Cost-of-Service Rate Filing*, https://www.ferc.gov/natural-
  gas/general-information/cost-service-rate-filings (last visited Oct. 25,
  2024) ...............................................................................................8

# JURISDICTIONAL STATEMENT

This Court has jurisdiction under 15 U.S.C. § 717r(b).  FERC issued its order certifying the GTN XPress Project and denying GTN's request for the predetermination of rolled-in rate treatment.  R. 521:1-80 (*Certificate Order*, 185 FERC ¶ 61,035 (Oct. 23, 2023)).[1]  GTN timely sought rehearing of FERC's certificate order on November 22, 2023.  FERC did not act on GTN's rehearing application within 30 days, or December 22, 2023, and the petition for rehearing "may be deemed to have been denied" on that date.  15 U.S.C. § 717r(a).  GTN timely petitioned for review in this Court on January 2, 2024.  *See* Dkt. 1 (Jan. 2, 2024).  This Court has jurisdiction and is an appropriate venue because GTN has its principal place of business in Houston, Texas. 15 U.S.C. § 717r(b).

FERC issued its order addressing arguments raised on rehearing on April 16, 2024.  *See* R. 620:1-127 (*Rehearing Order*, 187 FERC ¶ 61,023 (Apr. 16, 2024)). GTN timely petitioned for review of that order on April 22, 2024.  *See Gas Transmission Northwest, LLC v. FERC*, No. 24-60197, Dkt. 1 (Apr. 22, 2024).

---

[1] We cite the Commission's Certificate Order and Rehearing Order as "*Certificate Order* P [Paragraph Number]" and "*Rehearing Order* P [Paragraph Number]," respectively.  We cite all other original-record documents as R. [Record Item Number in FERC's Certified Index]:[Page Number of the Document].  We cite these documents by their overall PDF page number, even when the document has internal pagination.  Citations to "Dkt." refer to the docket entry for the lead case in this Court, Case No. 24-60002.

This Court then consolidated the petitions on GTN's motion. *See* Dkt. 73 (May 3, 2024).

The State of Washington, State of Oregon, Riverkeeper, and Rogue Climate moved to dismiss GTN's petitions for lack of Article III standing and ripeness. *See* Dkt. 57 (Apr. 18, 2024). The Court denied the motion. *See* Order, Dkt. 92 (June 26, 2024).

## INTRODUCTION

This petition for review is about the Federal Energy Regulatory Commission's longstanding precedent that the costs of natural-gas pipeline infrastructure projects designed to improve the reliability of existing service by replacing existing capacity should be presumptively borne by the pipeline's existing customers. Although ratemaking for natural-gas pipelines can be technical, the FERC's violations of the Administrative Procedure Act here are straightforward. FERC failed to explain why it was departing from its own decades-old precedent; failed to respond to the pipeline operator's significant objections; and failed again to explain why it was departing from a second, unbroken line of administrative cases that contradicted the rate determination in its orders.

The story begins in March 2020, when petitioner Gas Transmission Northwest, LLC (GTN), a natural-gas pipeline operator, sought authorization to

replace three aging compressor units on its system. These units were 50 years old and needed to be replaced to ensure reliable service for the pipeline's *existing* customers. To replace the three units, GTN invoked 18 C.F.R. § 2.55(b), which allows pipelines that give advance notification to use a streamlined process for replacing facilities that have or will soon become physically deteriorated or obsolete. After FERC staff found that GTN's advance notifications satisfied Section 2.55(b)'s requirements, GTN purchased and installed the three new replacement compressor units. The units cost approximately $251 million, and the costs were then built into the existing customers' rates because the replacement units were installed *solely* to benefit existing customers.

Here's the wrinkle—or, at least, what FERC later decided was a wrinkle. The replacement compressor units use newer technology and can compress more gas than the 50-year-old units that they were replacing. But the new units FERC approved were still the best, most cost-effective models available to maintain the same level of existing service. The new units were essentially the same physical size as the three aging units, and unlike smaller currently available models, they could operate at the cold temperatures found in eastern Washington State and along the Idaho-Canada border where they would be installed.

GTN followed FERC's standard practice for when a replacement compressor unit has a higher horsepower than the compressor unit that it is

replacing.  It placed software controls on the new units so that they could not exceed the 14,300 horsepower limit that FERC had previously authorized.  With these software controls, GTN's system was unchanged.  The only difference was that its service became more reliable for GTN's existing customers.

Two years after beginning to install these replacement compressor units, GTN sought authorization from FERC to construct a new pipeline expansion project.  Named the GTN XPress Project, GTN proposed changes that would allow its system to provide an additional 150,000 dekatherms per day of natural-gas transportation service.  Remarkably, the GTN XPress Project would achieve these gains while maintaining the system's same physical footprint—minimizing adverse impacts to nearby landowners and communities.  As part of the GTN XPress Project, GTN would, among other things, remove the artificial software restrictions on the replacement units so that they could compress more gas.

GTN also requested that FERC grant what is called a predetermination of rolled-in rate treatment for the GTN XPress Project.  FERC is statutorily required to ensure that a natural-gas pipeline's rates are just and reasonable.  At times, this requires pipeline customers that use expansion facilities to pay an additional, or "incremental," rate on top of what the pipeline's pre-existing customers pay.  The incremental rate—when conditions are appropriate—ensures that existing shippers do not unjustly subsidize an expansion project that does not directly benefit them.

But when a pipeline expansion leads to lower average costs, the costs and revenues of the expansion are "rolled in" to the general system rate, meaning that all customers pay the same rate and that all share in the expansion's cost savings.

FERC's policy is to presumptively decide which rate structure applies at the same time it certificates an expansion project, so that the pipeline (and its customers) have certainty regarding the expansion's financial viability. If a pipeline can show that the expansion's projected additional revenues will be higher than its additional costs, then FERC grants the "predetermination" of rolled-in rates, under which a presumption of rolled-in rate treatment will apply in the pipeline's next Commission ratemaking proceeding. GTN explained that this was the situation here. The GTN XPress Project's projected additional revenues far exceeded its additional costs, making predetermination a no-brainer.

But FERC denied GTN's request. Its reason: GTN XPress Project shippers may need to single-handedly pay for a portion of three replacement units authorized in March 2020. Again, the costs of the three replacement compressor units were already embedded in GTN's existing system rates, such that the costs were already being recovered from existing system shippers. But FERC ruled that a portion of those costs might somehow be *re-allocated* to GTN XPress Project shippers—meaning they would be the GTN XPress Project shippers' sole responsibility. FERC came to that conclusion because the GTN XPress Project

removed the units' software controls for horsepower and because the GTN XPress Project shippers could be using a portion of the replacement compressor units' newly available capacity. FERC reasoned that if costs of the three replacement compressor units are re-allocated to GTN XPress Project shippers, then the GTN XPress Project's additional revenues may no longer exceed its additional costs, thus making the predetermination of rolled-in rates inappropriate.

FERC's premise—that the costs of the pre-existing replacement units could be *re-allocated*—is arbitrary and capricious for two independent reasons. *First*, FERC has a decades-old policy that replacement facilities authorized and installed under 18 C.F.R. § 2.55(b) qualify for a predetermination of rolled-in rate treatment. GTN's three replacement compressor units were authorized under Section 2.55(b), and therefore FERC's *Section 2.55(b)-specific* rule should govern. But FERC never even acknowledged that its Section 2.55(b)-specific rule exists, much less explained why that rule should not apply—a classic example of arbitrary-and-capricious decisionmaking.

*Second*, setting Section 2.55(b) aside, FERC's re-allocation ruling was unreasonable. GTN explained that removing software restrictions cannot factor into a cost allocation because the removal is essentially costless. FERC did not respond to this critical concern—another textbook example of unreasonable decisionmaking. And FERC's reliance on the GTN XPress Project shippers' use

of newly available capacity is directly at odds with longstanding FERC policy, which holds that when expansion and replacement projects overlap, expansion shippers are presumptively responsible only for the costs that exceed those required to maintain existing service.  FERC departed from this line of precedent as well, and once again gave no explanation for doing so.

For any one of these reasons, GTN's petition should be granted and the Commission's decision to deny a predetermination of rolled-in rates remanded for further consideration.

## STATEMENT OF THE ISSUES

1.     Whether FERC acted unreasonably by failing to explain why it departed from its decades-old policy that replacement facilities authorized under 18 C.F.R. § 2.55(b) qualify for a predetermination of rolled-in rates.

2.     Whether FERC acted unreasonably by failing to respond to GTN's critical point that removing horsepower restrictions on three pre-existing compressor units could not factor into the GTN XPress Project's cost allocation because removal of the horsepower restrictions was essentially costless.

3.     Whether FERC acted unreasonably by failing to explain why it departed from its longstanding policy that when expansion and replacement projects overlap, expansion shippers are allocated only the costs that exceed those necessary to maintain existing service.

## STATEMENT OF THE CASE

### A.      Regulatory Background.

*1.  Rolled-in pricing for pipeline expansion projects.*

Natural-gas pipeline operators must receive a certificate of public convenience and necessity from FERC before constructing or expanding their transportation facilities.  *See* 15 U.S.C. § 717f(c)(1)(A).  And FERC has a distinct set of standards for certificating pipeline expansion projects.  The "threshold requirement" is that the pipeline must be able to financially support the expansion "without relying on subsidization from existing customers."  *Certification of New Interstate Nat. Gas Pipeline Facilities*, 88 FERC ¶ 61,227, 61,746 (1999) (*1999 Policy Statement*).  In other words, an expansion project must be paid for by the customers that will ship gas along the pipeline's expansion, and not by customers that ship gas on the pipeline's pre-existing facilities.[2]

---

[2] Pipelines may recover their costs in what is called a "cost-of-service" rate method.  *See El Paso Nat. Gas Co. v. FERC*, 966 F.3d 842, 849 (D.C. Cir. 2020). Under that framework, a pipeline's rates are designed based on the pipeline's cost of providing service to a given class of customers—that is, shippers.  *See generally* FERC, *Cost-of-Service Rate Filing*, https://www.ferc.gov/natural-gas/general-information/cost-service-rate-filings (last visited Oct. 25, 2024).  Pipelines "allocate the costs" of service among its "various classes" of customers to determine the rate that each class pays.  *Pipeline Service Obligations and Revisions to Reguls. Governing Self-Implementing Transp. Under Part 284 and Regul. of Nat. Gas Pipelines After Partial Wellhead Decontrol*, 78 FERC ¶ 61,186, 61,777 n.101 (1997).

FERC often avoids subsidization by requiring that expansion projects be "incrementally priced." *Id.* ¶ 61,745. Incremental pricing means there is one set of rates for service along the pipeline's pre-existing facilities and a separate set of rates for service that uses the pipeline's new expansion facilities. *Id.* ¶ 61,744.

But incremental pricing is not always appropriate. FERC has recognized that under certain circumstances, "rolled-in pricing" better avoids subsidization. *Id.* ¶ 61,746. Rolled-in pricing permits a pipeline to incorporate the costs and revenues of an expansion into the overall rates charged to existing customers, with existing and expansion customers paying the same (lower) rate. *Id.*; *see also, e.g., Northern Nat. Gas Co.*, 174 FERC ¶ 61,189 at P 20 (2021) (rolled-in pricing "roll[s] the costs of a project into [the pipeline's] system-wide rates" paid by all customers).

FERC has explained that a rolled-in pricing structure should apply when an expansion lowers the pipeline's average cost of providing service. *E.g. Eastern Shore Nat. Gas Co.*, 132 FERC ¶ 61,204 at P 44 (2010) (noting that "rolled-in rate treatment would lower system rates generally"). That occurs, for example, "in cases of inexpensive expansibility that is made possible because of earlier, costly construction." *1999 Policy Statement*, 88 FERC ¶ 61,227 at 61,746. The existing customers have already borne the "cost of the earlier, more costly construction in their rates." *Id.* Incremental pricing could therefore result in expansion customers

paying rates that do not reflect "the full cost of the [previous] construction that makes their new service possible." *Id.* Existing customers, meanwhile, would shoulder the full cost of previous construction that now benefits the entire newly expanded pipeline network. An incremental rate structure under these circumstances would violate FERC's cardinal prohibition against expansion customers receiving a "subsidy from the existing customers." *Id.* Rolled-in rates offer a solution by having expansion and existing customers pay the same rate for service and ensuring that expansion customers pay their share for previous construction that now benefits the whole system.

By the same token, non-expansion "facilities constructed to improve the reliability of service to existing customers or to improve service by replacing existing capacity" should also receive rolled-in rate treatment. *East Tenn. Nat. Gas, LLC*, 186 FERC ¶ 61,210 at P 45 (2024); *see also 1999 Policy Statement*, 88 FERC ¶ 61,227 at 61,746 n.12. Because such replacements do not, by themselves, "increase the levels of service," it would violate the anti-subsidization principle to pass those costs onto expansion shippers through an incremental rate. *East Tenn. Nat. Gas*, 186 FERC ¶ 61,210 at P 45.

### 2. *The predetermination of rolled-in rates.*

FERC has also recognized that it should "always" decide whether to presumptively apply rolled-in rate treatment to an expansion project "before the

construction of the pipeline." *1999 Policy Statement*, 88 FERC ¶ 61,227 at 61,746.

A pipeline otherwise may be forced to commence construction without knowing

whether the expansion project will be financially viable. *See*, *e.g.*, *National Fuel

Gas Supply Corp. Empire Pipeline, Inc.*, 164 FERC ¶ 61,084 at P 25 (2018) ("We

make this [rolled-in rates] determination in the certificate proceeding to provide

certainty regarding the potential economic impacts of a project before it goes

forward.").

 FERC's policy is to "make a finding supporting rolled-in rate treatment" in

the certificate proceeding. *Texas E. Transmission, LP*, 153 FERC ¶ 61,311 at P 31

(2015); *see also, e.g.*, *Northern Nat.*, 174 FERC ¶ 61,189 at P 19 ("[I]t is the

Commission's practice to make such a finding" at the certificate proceeding). To

receive what is called a "predetermination" of rolled-in rates, the pipeline must

"demonstrate that rolling the costs associated with the construction and operation

of new facilities is not expected to result in existing customers subsidizing the

expansion." *Texas E.*, 153 FERC ¶ 61,311 at PP 8, 31. In general, this means that

a pipeline must show "that the revenues to be generated by an expansion project

are expected to exceed the costs." *Id.* P 31.

 That makes sense. An expansion that creates more additional revenues than

additional costs lowers the average cost of service. And, again, those cost-savings

should be shared evenly among all customers by rolling in the costs and revenues

of the expansion to lower the system-wide rate. *Transcontinental Gas Pipeline Co.*, 130 FERC ¶ 61,010 at P 10 (2010) (rolling in prices when expansibility is cheap puts "downward pressure" on the system-wide rates).

A predetermination of rolled-in rates "shifts the burden of proof" at the next administrative ratemaking proceeding. *Texas E.*, 153 FERC ¶ 61,311 at P 33. Although FERC establishes the initial rates that apply to expansion shippers at the time it certificates an expansion project, FERC addresses the rate impact of the expansion project's costs on non-expansion shippers in separate administrative ratemaking proceedings, *see* 15 U.S.C. § 717c, which often take place years after an expansion project has gone into service. At the ratemaking proceeding, a pipeline without a predetermination of rolled-in rates bears the burden to demonstrate that rolled-in rates for an expansion project are appropriate. *Texas E.*, 153 FERC ¶ 61,311 at P 33. With a predetermination of rolled-in rates, by contrast, the pipeline's protesting customers "will have the burden of demonstrating" that rolled-in rates are no longer appropriate and that their proposed, alternative rates are just and reasonable. *Dominion Transmission, Inc.*, 99 FERC ¶ 61,367 at P 68 n.17 (2002); *see also National Fuel Gas Supply Corp.*, 164 FERC ¶ 61,084 at P 30 (predetermination of rolled-in rates is a "rebuttable presumption in favor of the certificate-holder").

## B.     Factual And Procedural Background.

### 1. *GTN relies on Section 2.55(b) to replace three fifty-year-old compressor units.*

GTN owns and operates a natural-gas pipeline system that extends from northern Idaho, through Washington State, to the Oregon-California border. *Certificate Order* P 2.  In March 2020, GTN relied on 18 C.F.R. § 2.55(b) to replace three aging gas compressor units in its system.  *Rehearing Order* P 14. Section 2.55(b) allows a pipeline to construct replacement facilities without going through a full-blown certificate proceeding when the existing facilities "have or will soon become physically deteriorated or obsolete."  18 C.F.R. § 2.55(b)(1).  To qualify for Section 2.55(b), the pipeline must show that the replacements will not "result in a reduction . . . of service," *id.* § 2.55(b)(1)(i); demonstrate that "[t]he replacement facilities will have substantially equivalent designed delivery capacity," *id.* § 2.55(b)(1)(ii); and give notice to FERC at least 30 days before beginning construction, *id.* § 2.55(b)(1)(iii).

GTN explained that these criteria were met for its three deteriorating compressor units.  The Rolls Royce Avon compressor units were located at GTN's Kent Compressor Station in Sherman County, Oregon;[3] its Starbuck Compressor

---

[3] Section 2.55(b) Advance Notification for Kent Compressor Station, FERC Docket No. CP20-85-000 (Mar. 10, 2020) (*Kent Advance Notification*).

Station in Walla Walla County, Washington;[4] and its Athol Compressor Station in Kootenai County, Idaho.[5]  They were installed in the 1970s and were so old that they created a "reliability risk to the system."[6]

GTN proposed three new Solar Titan 130 units as replacements, which would be located in the exact locations as the units that they were replacing.  These updated models were "the closest available size" to the Rolls Royce Avon units. *Rehearing Order* P 18.  And unlike other potential alternatives, the Solar Titan 130 units would not "fail[] at [the] colder temperatures" they would be operating in. *Id.*  Largely due to technological advances, the Solar Titan 130 units were also capable of compressing more gas than the outdated Rolls Royce Avon units.  The Solar Titan 130 replacement units could operate at 23,470 horsepower, while the Rolls Royce Avon units were certificated to operate at 14,300 horsepower.  *Id.* P 5.

GTN proposed implementing software controls so that the Solar Titan 130 units would have a "substantially equivalent designed delivery capacity" as the Rolls Royce Avon units.  *See* 18 C.F.R. § 2.55(b)(ii).  These software controls

---

[4] Section 2.55(b) Advance Notification for Starbuck Compressor Station, FERC Docket No. CP20-86-000 (Mar. 10, 2020) (*Starbuck Advance Notification*).

[5] Section 2.55(b) Advance Notification for Athol Compressor Station, FERC Docket No. CP20-82-000 (Mar. 10, 2020) (*Athol Advance Notification*).

[6] *Athol Advance Notification* 1; *Kent Advance Notification* 1; *Starbuck Advance Notification* 1.

would ensure that the Solar Titan 130 units would not exceed the "existing certificated" horsepower of 14,300.[7]

GTN explained that the "replacement[s] will provide greater system reliability, flexibility and security to existing shippers."[8]  None of GTN's customers objected to GTN's advanced notifications, and FERC staff concluded that those notifications "adequately addressed the requirements set forth under 2.55(b)(3)." *Rehearing Order* P 15 (alteration omitted).  GTN promptly began construction, and the replacement compressor units were put into service in October and November 2021.  *Id.*  The three replacement units cost $251 million.[9]  Those costs were then "included in GTN's existing system rate."  *Rehearing Order* P 53; *see also Certificate Order* P 53 ("[T]he costs of the replacement compressors appear to be in existing rates.").

---

[7] *Athol Advance Notification* 1; *Kent Advance Notification* 1; *Starbuck Advance Notification* 1.

[8] *Athol Advance Notification* 1; *Kent Advance Notification* 1; *Starbuck Advance Notification* 1.

[9] *Athol Advance Notification* 1 ($82 million); *Kent Advance Notification* 1 ($79 million); *Starbuck Advance Notification* 1 ($90 million).

   2.  *Years later, FERC authorizes GTN to construct an expansion project.*

In October 2021—nineteen months after GTN began installing its replacement compressors—GTN sought FERC's authorization to construct an expansion project called the GTN XPress Project.  R. 1:1-40.  The GTN XPress Project was designed to meet rising demand for natural gas driven by "residential, commercial, and industrial customers in the Pacific Northwest."  R. 1:8.  It would also provide supply reliability to that region, as natural-gas production in the Rocky mountains has continued to decline.  R. 1:9.  The GTN XPress Project would create 150,000 dekatherms per day of additional capacity on GTN's system. R 1:8; *see also Certificate Order* PP 1, 3.  GTN executed binding precedent agreements with three shippers to purchase the GTN XPress Project's additional capacity, with contract terms ranging from 30 to 33 years.  R. 1:16.  The three GTN Xpress Project shippers would pay negotiated rates, instead of cost-of-service rates.  *Id.*

The GTN XPress Project achieved its capacity gains while maintaining the pipeline system's same physical footprint, minimizing adverse impacts.  R. 1:25. GTN proposed three main system modifications.  First, GTN would install a separate (non-replacement) Solar Titan 130 compressor unit at the Starbuck Compressor Station.  R. 1:14; *see also Certificate Order* P 4.  Second, GTN would install additional auxiliary facilities, including gas-cooling bays and associated

piping at the Starbuck Compressor Station and the Kent Compressor Station.  R.

1:14; *see also Certificate Order* P 4.  And third, GTN would "uprate" the three

replacement Solar Titan 130 compressor units at the Athon, Kent, and Starbuck

Compressor Stations so that they could operate at 23,470 horsepower, instead of

the 14,300 horsepower that they were then certificated for.  R. 1:13-14; *Certificate*

*Order* P 4.  Uprating would not require any additional facilities; GTN would

simply lift the units' artificial software controls.  R. 1:13-14; *Certificate Order* P 4.

In total, these changes would cost approximately $75.1 million.  R. 1:15.  FERC

determined that the GTN XPress Project served the public interest and certificated

it in October 2023, *Certificate Order* PP 1, 99-100—two years after the

replacement compressors were put into service.

### 3. FERC denies GTN's request for a predetermination of rolled-in rates.

At the same time that GTN asked FERC to certificate the GTN XPress

Project, GTN also asked FERC for a predetermination of rolled-in rates.  R. 1:20-

22.  GTN explained that the predetermination of rolled-in rates was appropriate

because the GTN XPress Project's additional revenues would exceed its additional

costs.  *Id.*  Indeed, the replacement Solar Titan 130 compressor units offered

"cheap expansibility," making the GTN XPress Project an ideal candidate for the

predetermination of rolled-in rates.  *1999 Policy Statement*, 88 FERC ¶ 61,227 at

61,746.  In the GTN XPress Project's first year, it would generate approximately

$14.1 million in revenue and impose only $10.6 million in additional costs.  R. 1:21.

With more additional revenues than costs, the GTN Xpress Project would bring down the average cost of service on GTN's system.  And rolled-in rates would lower the overall system rate, ensuring that existing shippers also share in those reductions.  *E.g.*, *Kern River Gas Transmission Co.*, 96 FERC ¶ 61,137, 61,581 (2001) ("The [1999] Policy Statement and subsequent orders make clear that expansion costs should be rolled-in if doing so results in lower rates for existing customers.").

But one of GTN's existing shippers, Puget Sound Energy, wanted more.  Puget Sound protested rolled-in rate treatment on the theory that lifting the software controls on the replacement compressors' horsepower meant that some costs from those three pre-existing units—which were *already* included in the rates of the existing system—"should be" *re-allocated* to the three GTN Xpress Project shippers through an incremental rate.  R. 52:6; *see also* R. 47:5-7.  That would create a massive windfall for existing shippers.  Not only would they reap the pricing and efficiency benefits from having more customers on the same pipeline

system,[10] but expansion shippers would be solely responsible for a portion of the replacement units that were installed to benefit "existing shippers,"[11] and that existing shippers would continue to pay absent the GTN XPress Project. *Certificate Order* P 53 (replacement costs are already in the "existing rates").

Puget Sound's theory was that if some of the costs of the three replacement compressor units were "added to the costs" of the GTN XPress Project, then the project's revenues may not exceed its costs and rolled-in rate treatment would be inappropriate. R. 47:6. Because it was then uncertain how much of the replacement compressor units' capacity that the expansion shippers would use, Puget Sound asserted that "it would be premature" for FERC to make a predetermination regarding rolled-in rates. R. 52:6.

GTN explained that Puget Sound's approach was at odds with FERC's practice. R. 50:5-7. GTN highlighted that under FERC precedent, costs for replacement units authorized under Section 2.55(b) are "presumed to be rolled-into system rates" and not allocated to later expansion projects. R. 50:5-6 & nn.18-19 (citing *Dominion Transmission, Inc.*, 129 FERC ¶ 61,048 at P 26 (2009) and

---

[10] Likely for that reason, Puget Sound was careful to "emphasize that it is not opposed to the GTN Xpress Project, but it is opposed to the requested pre-determination of rolled-in rate treatment." R. 47:7.

[11] *Athol Advance Notification* 1; *Kent Advance Notification* 1; *Starbuck Advance Notification* 1.

*Paiute Pipeline Co.*, 104 FERC ¶ 61,078 at P 31 (2003)).  Moreover, GTN

explained that because the replacement compressor units were installed to benefit

the existing shippers, forcing expansion shippers to single-handedly pay a portion

of those costs violates FERC's "overarching" anti-subsidization policy.  R. 50:7.

FERC sided with Puget Sound.  The Commission concluded that because the

GTN XPress Project "will involve the removal of the horsepower restrictions on

the replacement compressor units," the parties should be able to "raise the

question" at a future administrative ratemaking proceeding "of whether some

allocation of the compression costs to the GTN Xpress Project is appropriate."

*Certificate Order* P 17.  FERC therefore denied GTN's request for a

predetermination of rolled-in rates.  *Id.* P 53.

### 4.  *FERC denies rehearing.*

GTN sought rehearing of FERC's denial for a predetermination of rolled in

rates.  R. 564:1-20.  As relevant here, GTN raised two arguments.  *First*, GTN

explained that FERC violated its own policy when it allowed replacement costs

authorized under Section 2.55(b) to potentially be re-allocated to the GTN XPress

Project.  R. 564:4.  In support, GTN cited a passage from a prior FERC decision

declaring that "replacement facilities" constructed under Section 2.55(b) "qualify

for a presumption in favor of rolled-in pricing."  R. 564:11 n.34 (quoting *Paiute*,

104 FERC ¶ 61,078 at P 27).

*Second*, GTN explained that denying a predetermination of rolled-in rates violated FERC's " 'no-subsidy' policy." R. 564:12. Because the three pre-existing compressor units were installed to "improve the reliability of service to existing customers," forcing expansion customers to independently bear a portion of those costs results in an unlawful subsidy. *Id.* The Solar Titan 130 models were the best and most cost-effective replacement units available and were the models that would have been selected and installed even if there were no later expansion project. *Id.* It was therefore appropriate for those costs to be rolled-into the general system rates.

GTN challenged FERC's rationale that lifting the software controls on the replacement units means that a portion of those units' costs "could potentially be allocated to [GTN XPress] Project shippers." R. 564:14. GTN highlighted that "the costs of the Solar Titan 130 units do not vary based upon the amount of horsepower being utilized, and the [GTN XPress] Project in no way increases the costs that GTN incurred in order to implement the replacements." *Id.* Because the costs of the replacement units were the same regardless of their certificated horsepower, and because the replacements were installed to benefit existing shippers, expansion shippers should not be allocated a portion of those costs through an incremental rate. R. 564:14-15.

The Commission denied rehearing.  *Rehearing Order* PP 29-32.  FERC did not squarely address GTN's argument that FERC failed to apply its policy that Section 2.55(b) replacement costs must be presumptively rolled into system rates and not allocated to a later expansion project.  *See Rehearing Order* P 31.  Nor did FERC acknowledge that it even has a Section 2.55(b)-specific policy.  FERC instead asserted that it has a "general[]" policy of allocating replacement costs between existing shippers and expansion shippers when "proceedings" involve replacements and expansions.  *Id.*  FERC relied on this general policy to reject GTN's challenge even though it understood GTN's Section 2.55(b)-specific theory.  *See Certificate Order* P 15 ("GTN responds that the previous compressor unit replacements were carried out under section 2.55 of the Commission's regulations and are appropriately excluded from the GTN XPress Project costs."); *Rehearing Order* P 30 (acknowledging GTN's emphasis that the replacement compressor units were "installed pursuant to section 2.55").

Next, FERC doubled-down on its position that charging GTN XPress Project shippers for prior replacement costs through an incremental rate may not result in an unlawful subsidy.  *Rehearing Order* P 32.  It offered two reasons: First, the GTN Xpress Project "will involve the removal of the horsepower restrictions on the replacement compressor units."  *Id.*  And second, "it appears that a portion of the horsepower from the replacement units will be used to support the [GTN

XPress] Project." *Id.* FERC never responded GTN's point that because removing the software controls creates essentially no new costs, lifting those controls cannot factor into the GTN XPress Project's cost allocation. And FERC did not consider that the Solar Titan 130 replacement units would have been selected even if there were no GTN XPress Project. With FERC's denial of a predetermination of rolled-in rates, GTN would now "have the burden of proving that costs should be rolled-in in a future general section 4 rate proceeding." *Id.*

At that future ratemaking proceeding, FERC will decide whether GTN met its burden to show that "a portion of the costs associated with the compression previously installed by GTN under section 2.55(b)" should not be re-allocated to expansion shippers through an incremental rate. *Rehearing Order* P 53. If FERC rules against GTN, then a portion of the $251 million in costs associated with the three pre-existing compressor units would be re-allocated to the GTN XPress Project shippers. Depending on the size of that allocation, the GTN XPress Project's costs and revenues would also not be rolled into the overall system rates, but instead allocated solely to the expansion shippers through an incremental rate.

But because GTN agreed to negotiated rates with its three GTN XPress Project shippers, *Certificate Order* P 5, the expansion shippers' rates will not increase simply because more costs would now be allocated to them. GTN instead would have to either not recover whatever costs are incrementally allocated to the

23

expansion shippers or re-negotiate their negotiated rates.  *See* Dkt. 74-1 at 8, 11 (May 6, 2024).

> 5.  *All challenges to the GTN XPress Project are consolidated in this Court.*

On January 2, 2024, GTN petitioned for review in this Court, challenging FERC's denial of a predetermination of rolled-in rates.  Dkt. 1 (Jan. 2, 2024).  Two days later, Columbia Riverkeeper and Rogue Climate petitioned for review in the D.C. Circuit, challenging FERC's certification of the GTN XPress Project.  *See Columbia Riverkeeper v. FERC*, Case No. 24-1002 (D.C. Cir. Jan. 4, 2024).[12]  The petitions were referred to the Judicial Panel of Multidistrict Litigation (JPML) under 28 U.S.C. § 2112(a)(3).  *See In re FERC*, __ F. Supp. 3d __, MCP No. 175, 2024 WL 1596933 (J.P.M.L. Apr. 11, 2024).

The JPML held that GTN's petition was the only one filed soon enough to qualify for 28 U.S.C. § 2112(a)(3)'s multicircuit lottery procedures.  *Id.* at *3.  On that basis, the JPML ruled that all challenges to the GTN XPress Project should be consolidated in this Court and directed FERC to file the administrative record here.  *Id.* at *4 (citing 28 U.S.C. § 2112(a)(1)).

---

[12] The States of Washington and Oregon subsequently filed a separate joint petition for review in the D.C. Circuit, which the D.C. Circuit consolidated with Riverkeeper and Rogue Climate's petition. *See* No. 24-1025 (D.C. Cir.).

FERC filed the record on April 25, 2024, triggering 28 U.S.C. § 2112(a)(5)'s requirement that all related petitions "shall" be "transfer[red]" to this Court. But Riverkeeper, Rogue Climate, Washington, and Oregon resisted that statutory command, asking the D.C. Circuit to hold their petitions lest this Court get a hold of them. *See* Petitioners Columbia Riverkeeper and Rogue Climate's Motion to Govern Further Proceedings at 4-6, Case No. 24-1002 (D.C. Cir. Apr. 26, 2024). The D.C. Circuit declined; it applied 28 U.S.C. § 2112(a)(5)'s plain language and promptly ordered that Riverkeeper, Rogue Climate, and the States' petitions be transferred to this Court. Order, Case No. 24-1002 (D.C. Cir. May 13, 2024) (per curiam).

Riverkeeper, Rogue Climate, Washington, and Oregon also moved to dismiss GTN's petition for review for lack of standing or ripeness and alternatively to transfer the related cases back to the D.C. Circuit. Dkt. 57 (Apr. 18, 2024). GTN explained that FERC's denial of a predetermination of rolled-in rates amounted to concrete harm because, among other reasons, GTN negotiated its rates with expansion shippers on the reasonable belief that, consistent with long-standing Commission policy, it would be allowed to roll expansion costs into the overall system rates. Dkt. 74-1 at 12 (May 6, 2024). And that claim was ripe because GTN's challenge turned on the purely legal question of whether there could be *any* re-allocation of the replacement compressor units' costs. *Id.* at 13-14.

This Court agreed.  After full briefing, it denied the States' motion to and denied their request to re-transfer the petitions to the D.C. Circuit.  *See* Dkt. 92 (June 26, 2024).

But Riverkeeper, Rogue Climate, and the States were determined to get their petitions out of this Court.  In August 2024, as part of a global settlement to resolve all issues in GTN's then-ongoing Natural Gas Act section 4 rate proceeding, GTN entered an agreement in principle with its existing shippers that provided that if FERC were to decide at a future administrative ratemaking proceeding that some of the replacement compressor units' costs should be re-allocated to the GTN XPress Project, then that future allocation would be "cap[ped]" at $50 million.  Case No. 24-60280, Dkt. 40, at 7 (5th Cir. Aug. 5, 2024).  The States, Riverkeeper, and Rogue Climate moved to hold the consolidated cases in abeyance, asserting that GTN's petition would become moot if the agreement in principle were finalized and approved by FERC, and that at that point, the remaining petitions should be transferred back to the D.C. Circuit.  Case No. 24-60280, Dkt. 21-1, at 7-9 (5th Cir. July 24, 2024).

This Court denied abeyance.  Case No. 24-60280, Dkt. 42 (5th Cir. Aug. 6, 2024).  As GTN explained, its petition would not become moot if GTN ratified and FERC approved an agreement that simply capped its financial loss at $50 million,

and there was no reason to further postpone merits briefing.  Case No. 24-60280, Dkt. 40, at 12-13 (5th Cir. Aug. 5, 2024).

A briefing notice was issued in late August 2024—nearly nine months after GTN petitioned.  Dkt. 117 (Aug. 26, 2024).  The merits are now—finally—before the Court.

## SUMMARY OF THE ARGUMENT

FERC's fundamental error was holding that a portion of the costs associated with the three pre-existing replacement compressor units could potentially be re-allocated to GTN XPress Project shippers.  That misstep led to FERC's denial of a predetermination of rolled-in rates for the GTN XPress Project.  FERC's ruling on the rate treatment of the three replacement compressor units was unreasonable for two, independent reasons.

I.      FERC failed to acknowledge it was departing from its longstanding policy that replacement facilities authorized under Section 2.55(b) receive a predetermination of rolled-in rates.  *Placid Oil Co. v. FERC*, 875 F.2d 487, 489 (5th Cir. 1989) (FERC must "either conform to its prior precedent" or policy or "explain its reasoning for departure from that precedent").  For decades, FERC has consistently interpreted its 1999 Policy Statement to mean that facilities constructed "under Section 2.55 of the Commission's regulations . . . qualify for a presumption in favor of rolled-in pricing."  *Paiute*, 104 FERC ¶ 61,078 at P 31.

Because the three Solar Titan 130 replacement units were constructed under Section 2.55(b), *Paiute* should have applied.

But FERC never even acknowledged this binding precedent. FERC instead denied a predetermination of rolled-in rates for the GTN XPress Project based on a "general[]" policy of allocating replacement costs between exiting shippers and incremental expansion shippers. *Rehearing Order* P 31. FERC's *Section 2.55(b)-specific* policy should govern here: The three replacement compressor units should qualify for a predetermination of rolled-in rates because they were authorized and constructed under that regulatory provision. FERC departed from that precedent, and by failing to acknowledge its departure, FERC acted unreasonably. *Placid Oil*, 875 F.2d at 489.

II.     Section 2.55(b) aside, FERC's decision regarding potential re-allocation of the three pre-existing compressor units' costs was unreasonable. Because the three replacement units were constructed to benefit existing shippers—and would have been constructed absent the GTN XPress Project—re-allocating a portion of their costs to GTN XPress Project shippers through an incremental rate would violate FERC's anti-subsidization principle. FERC offered two contrary rationales, and both are unreasonable.

First, FERC held that a portion of the replacement compressor units costs could potentially be allocated to GTN XPress Project shippers because the GTN

XPress Project "will involve the removal of the horsepower restrictions on the replacement compressor units." *Rehearing Order* P 32.  But GTN explained that the removal of the horsepower controls is irrelevant to the GTN XPress Project's cost allocation because the removal costs are essentially nothing.  R. 564:15.  FERC was required, and failed, to respond to GTN's critical point—a textbook case of unreasonable decisionmaking.  *Chamber of Commerce of U.S. v. SEC*, 85 F.4th 760, 774 (5th Cir. 2023).

Second, FERC reasoned that certain replacement compressor costs potentially could be re-allocated because "it appears that a portion of the horsepower from the replacement units will be used to support the [GTN XPress] Project." *Rehearing Order* P 32.  But that rationale also departs, without explanation, from FERC's longstanding precedent.  For decades, FERC has held that when replacement and expansion projects overlap, expansion shippers may be allocated only the costs in excess of those necessary to maintain reliable service for existing shippers.  *E.g.*, *Dominion*, 129 FERC ¶ 61,048 at P 24; *Transcontinental Gas Pipe Line Co.*, 161 FERC ¶ 61,012 at P 61 (2017).  Everything else—that is, the costs necessary to maintain existing service—qualifies for a predetermination of rolled-in rate treatment.  This Commission policy dictates that the replacement costs for the three compressor units should presumptively be rolled into existing system rates because those units were authorized and installed to benefit *existing*

29

*shippers* and were needed to maintain existing service. FERC acted unreasonably by failing to explain why it was departing from its clear and consistent policy.

## STANDARD OF REVIEW

This Court reviews FERC orders "under the standards set forth in the Administrative Procedure Act." *Louisiana Pub. Serv. Comm'n v. FERC*, 761 F.3d 540, 551 (5th Cir. 2014). Under those standards, this Court will set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). FERC's explanations are not satisfactory—and therefore fail arbitrary-and-capricious review—where they depart, without explanation, from past FERC precedent, *Placid Oil*, 875 F.2d at 489, or fail to respond meaningfully to objections, *Chamber of Commerce of U.S.*, 85 F.4th at 774.

## ARGUMENT

I. **FERC FAILED TO ACKNOWLEDGE ITS DEVIATION FROM ITS RULE THAT SECTION 2.55(B) REPLACEMENTS RECEIVE A PREDETERMINATION OF ROLLED-IN RATES.**

Section 2.55(b) sits at the center of FERC's decision to deny a predetermination of rolled-in rates for the GTN XPress Project. FERC ruled that a portion of replacement costs authorized and incurred under Section 2.55(b)—and already reflected in existing shippers' rates—could potentially be re-allocated to GTN XPress Project shippers. Those additional costs could significantly change

the GTN XPress Project's financial picture.  Depending on how much replacement

costs are re-allocated to the GTN XPress Project, its additional revenues may no

longer exceed its additional costs, and rolled-in pricing for the GTN XPress Project

may therefore no longer be appropriate.

But FERC's longstanding policy points in the *opposite* direction.  For

decades, FERC has held that costs authorized under Section 2.55(b) are

presumptively rolled-in to general system rates—not allocated to a future

expansion project through an incremental rate for expansion shippers.  But FERC

never even acknowledged that unbroken practice in these proceedings.

**A.    FERC's Longstanding Policy Requires That Replacement Units Authorized Under Section 2.55(b) Receive A Predetermination Of Rolled-In Rates.**

FERC's policy requires that facilities authorized under Section 2.55(b)

presumptively receive rolled-in rate treatment.  This policy was in place before

FERC issued its seminal 1999 Policy Statement.  *See Southern Nat. Gas Co.*, 83

FERC ¶ 62,168, 64,283 (1998) ("Pipeline replacement projects that qualify under

Section 2.55 for automatic authorization are entitled to a presumption in favor of

rolled-in pricing.").  Then, in *Paiute Pipeline Co.*, FERC interpreted the 1999

Policy Statement to mean that replacement facilities constructed "under Section

2.55 of the Commission's regulations . . . qualify for a presumption in favor of

rolled-in pricing."  104 FERC ¶ 61,078 at P 31 (2003).  FERC has consistently

applied that policy ever since. *E.g., Dominion Transmission, Inc.* 129 FERC ¶ 61,048 at P 26 (reaffirming that "under Section 2.55 of the Commission's regulations . . . projects qualify for a presumption in favor of rolled-in pricing").

FERC's longstanding policy makes sense. As discussed, rolled-in rate treatment is warranted for "facilities constructed to improve the reliability of service to existing customers or to improve service by replacing existing capacity." *East Tenn. Nat. Gas, LLC*, 186 FERC ¶ 61,210 at P 45 (2024); *Transcontinental Gas Pipe Line Co.*, 161 FERC ¶ 61,012 at P 44 (rolled-in rate treatment applies where "the costs incurred are attributable to the maintenance of safety and reliability for the benefit of existing customers"); *see also 1999 Policy Statement*, 88 FERC ¶ 61,227 at 61,746 n.12. And Section 2.55(b) provides a streamlined process for replacement facilities that do just that. *See, e.g., Rehearing Order* P 26 (agreeing that Section 2.55(b) is used to avoid "potential reliability risk" for existing shippers and provide greater "reliability, flexibility, and security" for the existing system).

FERC recently applied this Section 2.55(b)-specific policy again in *ANR Pipeline Co.*, 171 FERC ¶ 61,233 (2020). In *ANR*, the pipeline had relied on Section 2.55(b) to "replace an old compressor unit" with a brand-new compressor unit. *Id.* P 4. The old, now-replaced unit operated at 12,000 horsepower, and to

qualify as a replacement under Section 2.55(b), ANR derated its new compressor to 12,000 hp. *Id.*

At the same time, the pipeline sought FERC's approval for an expansion project to increase pipeline capacity by 400,000 dekatherms per day. *Id.* PP 2-5. As part of that concurrent expansion project, ANR sought to "uprat[e] the new . . . compressor unit from 12,000 hp to 15,900 hp." *Id.* P 5. The pipeline also requested a predetermination that it could roll in the compressor unit's replacement costs "into system rates." *Id.* P 21.

FERC certificated ANR's proposed expansion project—including its uprating request—and also granted ANR's request for a predetermination of rolled-in rates for the replacement costs of the compressor. *Id.* PP 21, 32. Because the compressor unit was properly replaced under Section 2.55(b), the presumption of rolled-in rates necessarily followed.

### B.    FERC's Section 2.55(b)-Specific Policy Should Govern Here.

Because GTN's three Solar Titan 130 replacement units were authorized under Section 2.55(b), FERC's policy applying a predetermination of rolled-in rates to Section 2.55(b) facilities should govern. FERC determined that the three Solar Titan 130 units were the best available to meet the needs of "existing shippers." *Rehearing Order* PP 14, 26. The units provided existing shippers with greater "flexibility[] and security," while "prevent[ing] a potential reliability risk to

the system" that existing shippers used. *Id*. P 14.  The Solar Titan 130 units were "the nearest reliable size available to the original units," *id.*; would be located in the same physical site; *id.*; and, unlike other up-to-date models, could operate in colder temperatures, *id.* P 18.  Section 2.55(b)'s requirements were therefore met. *Id.* PP 22-25.

The Section 2.55(b)-specific rule that FERC followed in *ANR* should therefore govern here, too.  Just as in *ANR*, GTN used Section 2.55(b) to replace aging compressor units with new, higher-horsepower, and de-rated compressor units.  *Compare Certificate Order* P 19, *with ANR Pipeline*, 171 FERC ¶ 61,233 at P 4.  And just as in *ANR*, GTN used formal certificate proceedings to uprate its replacement compressor units.  *Compare Rehearing Order* P 28 (noting GTN properly sought to utilize "de-rated capacity" in a certificate proceeding), *with ANR Pipeline*, 171 FERC ¶ 61,233 at P 5 (seeking certificate for expansion project to "uprat[e]" newly-installed replacement units).  FERC therefore should have reached the same conclusion it did in *ANR*: GTN is entitled to a predetermination of rolled-in rates for the whole cost of the replacement units, regardless of any uprating.  *See ANR Pipeline*, 171 FERC ¶ 61,233 at P 21; *see also University of Tex. M.D. Anderson Cancer Ctr. v. U.S. Dep't of Health & Human Servs.*, 985 F.3d 472, 479 (5th Cir. 2021) ("It is a bedrock principle of administrative law that

an agency must treat like cases alike." (internal citations omitted) (collecting sources)).

In fact, GTN's entitlement to the predetermination of rolled-in pricing is even stronger than the *ANR* pipeline's. The pipeline in *ANR* sought Section 2.55(b) authorization for its replacement compressor at the same time it sought to certificate an expansion, *see ANR Pipeline*, 171 FERC ¶ 61,233 at PP 4-5, while GTN's replacement compressors went into service two years before the GTN XPress Project was certificated. During that period, the existing shippers were indisputably responsible for 100% of the replacement costs. *Certificate Order* P 53; *Rehearing Order* P 53.[13]

As FERC has explained, "[i]t is not appropriate to include the embedded cost of existing capacity reserved" for an expansion project in the expansion shippers' rates when "those costs are already included in the [pipeline's] current rates." *Tennessee Gas Pipeline*, 165 FERC ¶ 61,217 at P13 (2018). Because the full costs of the replacement compressor units had already been included in GTN's

---

[13] FERC's notice to proceed, which authorized GTN to begin construction, did not come until April 2024. *See* Dkt. 74-2 ¶ 7 (May 6, 2024). And after that, the XPress Project would take four-to-five months to construct, *id.*, meaning that existing shippers were allocated the full cost of the replacement units for *three years* before expansion shippers could even conceivably contribute.

system rates—which would continue absent any expansion—it would violate a

second layer of FERC policy to now *re-allocate* those costs to expansion shippers.

**C.    FERC's Failure To Acknowledge Its Past Precedent Is Unreasonable.**

To pass arbitrary and capricious review, FERC must "either conform to its

prior precedent" or policy or "explain its reasoning for departure from that

precedent." *Placid Oil*, 875 F.2d at 489.  By ignoring its own Section 2.55(b)-

specific policy, FERC fails that test.

GTN explained to FERC that the Commission's past precedent and policy

applying the presumption of rolled-in rates to Section 2.55(b) replacement units

governs here.  *See* R. 50:5-6; R. 564:11 & n.34.  GTN's rehearing request

highlighted FERC's express declaration: "[R]eplacement facilities under Section

2.55 of the Commission's regulations . . . qualify for a presumption in favor of

rolled-in pricing."  R. 564:11 n.34 (quoting *Paiute*, 104 FERC ¶ 61,078 at P 31).

FERC apparently understood GTN's argument.  Its certificate order

acknowledged that "GTN responds that the previous compressor unit replacements

were carried out under section 2.55 of the Commission's regulations and are

appropriately excluded from the GTN XPress Project costs." *Certificate Order*

P 15.  And its rehearing order recognized that "install[ing]" the replacement

compressor units "pursuant to section 2.55" was key to GTN's argument.

*Rehearing Order* P 30.

Yet in addressing GTN's challenge, FERC never acknowledged that it had adopted this Section 2.55(b)-specific policy. FERC's order denying rehearing instead asserted that it has a "general[]" policy of allocating replacement costs between exiting shippers and incremental expansion shippers when "proceedings" involve replacements and expansions. *Rehearing Order* P 31. And FERC then relied on that general policy to deny GTN's request for the predetermination of rolled-in rates. *Id.*

For support, FERC cited *Paiute*, 104 FERC ¶ 61,078, and *Dominion*, 129 FERC ¶ 61,048. *Rehearing Order* P 31 n.108. But those cases support GTN: They plainly state that when replacement units are authorized under Section 2.55(b), the costs of those replacements are presumptively rolled into general system rates. Again, *Paiute* held that the pipeline could have constructed "replacement facilities under Section 2.55 of the Commission's regulations," which would "qualify for a presumption in favor of rolled-in pricing." 104 FERC ¶ 61,078 at P 31. And FERC in *Dominion* reiterated that the pipeline "could construct [a compressor] unit as a replacement facility under section 2.55 of the Commission's regulations" and that the 1999 Policy Statement "states that such projects qualify for a presumption in favor of rolled-in pricing." 129 FERC ¶ 61,048 at P 26. Yet nowhere in these proceedings does FERC acknowledge that it has a specific policy governing the predetermination of rolled-in rates for facilities *authorized under Section 2.55(b)*.

That is unreasonable. FERC has a clear and consistent policy that replacement units authorized under Section 2.55(b) are entitled to a presumption of rolled-in rates. But, without explanation, FERC did not apply that policy in this case. The Commission's failure to acknowledge that it was departing from its past precedent and practice is arbitrary and capricious. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (agency must "display awareness that it is changing position"); *Jupiter Energy Corp. v. FERC*, 407 F.3d 346, 349 (5th Cir. 2005) (FERC must "supply a reasoned analysis for any departure from other agency decisions") (quotation omitted); *see also Belmont Mun. Light Dep't v. FERC*, 38 F.4th 173, 187 (D.C. Cir. 2022) (FERC's failure to recognize "changing position[s]" is unreasonable); *see also New England Power Generators Ass'n v. FERC*, 881 F.3d 202, 213 (D.C. Cir. 2018) ("FERC's failure to come to terms with its own precedent reflects the absence of a reasoned decisionmaking process.") (internal quotation marks and citation omitted); *Southwest Airlines Co. v. FERC*, 926 F.3d 851, 858 (D.C. Cir. 2019) (if FERC departs from prior precedent, it must "acknowledge that it is doing so" (alteration omitted) (quoting *Louisiana Pub. Serv. Comm'n v. FERC*, 772 F.3d 1297, 1303 (D.C. Cir. 2014)).

In sum, FERC denied the predetermination of rolled-in rates for the GTN XPress Project because it (inexplicably) denied the predetermination of rolled-in rates for the three pre-existing—and already allocated—Section 2.55(b)

replacement units. This Court should remand to FERC so that it can either follow its policy of applying the predetermination of rolled-in rates to Section 2.55(b) facilities or reasonably explain why it is departing from that policy.

## II.  SECTION 2.55(B) ASIDE, FERC ACTED UNREASONABLY IN DENYING A PREDETERMINATION OF ROLLED-IN RATES FOR THE XPRESS PROJECT.

Even without Section 2.55(b), FERC's denial of a predetermination of rolled-in rates was arbitrary and capricious.

The key point is this: GTN's proposed rate treatment would have benefited existing shippers. GTN proposed that the costs of the GTN XPress Project be rolled into general system rates and that the costs of the pre-existing replacement units continue to be rolled into those same rates. R. 50:5-6. Existing shippers would share in the GTN XPress Project's efficiency gains because the expansion project would *lower* the overall system rates that all shippers, including existing shippers, must pay. *See supra* pp. 17-18.

But FERC left another option on the table—one that creates a one-sided and undeserved windfall for existing shippers. Under an incremental rate structure, existing shippers would pay a general system rate that reflects only a portion of the costs of the three pre-existing replacement units. Expansion shippers, meanwhile, would pay an incremental rate that exceeds the general system rate because it includes all of the costs of the GTN XPress Project *plus* a re-allocated portion of the $251 million paid for the three replacement compressor units. In other words,

existing shippers would not pay at all for a portion of the replacement compressor units that were installed solely to benefit them and that they would continue to fully pay for if there were no GTN XPress Project.  R. 50:7.

FERC should have presumptively rejected that unjust result in its certificate order.  To avoid subsidization from expansion shippers, rolled-in rate treatment is appropriate for "facilities constructed to improve the reliability of service to existing customers or to improve service by replacing existing capacity."  *East Tenn. Nat. Gas*, 186 FERC ¶ 61,210 at P 45.  On that basis, the predetermination of rolled-in treatment should have applied to GTN's three pre-existing replacement compressor units.  *See supra* p. 10.  And with those replacement costs rolled into the general system rate, there is no dispute that the GTN XPress Project's revenues would exceed its costs, making a predetermination of rolled-in rate treatment for the GTN XPress Project appropriate.

But FERC ruled that the replacement costs for the three pre-existing compressor units could potentially be re-allocated to GTN XPress Project shippers through an incremental rate.  It gave two rationales: First, "the GTN XPress Project will involve the removal of the horsepower restrictions on the replacement compressor units."  *Rehearing Order* P 32.  And second, "it appears that a portion of the horsepower from the replacement units will be used to support" the GTN XPress Project.  *Id.*  Both justifications are unreasonable.

40

### A. FERC Failed To Address GTN's Point That Removing Artificial Horsepower Limitations Creates Essentially No Costs.

To pass arbitrary-and-capricious review, FERC must consider a party's "points that, if true and adopted, would require a change" in the Commission's position. *Chamber of Commerce of U.S.*, 85 F.4th at 774-775; *see also PSEG Energy Res. & Trade LLC v. FERC*, 665 F.3d 203, 208 (D.C. Cir. 2011) (FERC must "respond meaningfully" to objections). FERC's conclusion that removing the replacement compressor units' artificial horsepower restrictions can factor into the GTN XPress Project's cost allocation flunks that test.

FERC denied a predetermination of rolled-in rates for the GTN XPress Project because GTN would have to "remov[e]" the three pre-existing compressors' "horsepower restrictions" to support the expansion. *Rehearing Order* P 32. But GTN explained that lifting horsepower restrictions cannot support an incremental rate for expansion shippers because removing those restrictions "in no way increases the costs that GTN incurred in order to implement the replacements." R. 564:14.

That follows FERC's foundational cost-causation principle, which requires costs to be allocated "to those who cause the costs." *El Paso Elec. Co. v. FERC*, 76 F.4th 352, 361 (5th Cir. 2023) (quoting *National Ass'n of Regul. Util. Comm'rs v. FERC*, 475 F.3d 1277, 1285 (D.C. Cir. 2007)). Under that principle, lifting artificial software controls does not cause any costs because lifting the software

41

controls is essentially free for GTN. The cost of the three pre-existing Solar Titan 130 units is effectively the same regardless of whether the GTN XPress Project is constructed, whether software controls initially limit their horsepower, or whether the software controls are later lifted. The GTN XPress Project was estimated to cost $75.1 million—a figure computed by tallying the "cost of facilities." R. 1.73. Software modifications are not listed on the GTN XPress Project's estimated costs, *id.*, and they are certainly not a cost that expansion shippers are causing.

The software modifications therefore may not be used to allocate additional costs to expansion shippers. *Gulf S. Pipeline Co. v. FERC*, 955 F.3d 1001, 1009 (D.C. Cir. 2020) ("Properly designed rates should produce revenues from each class of customers which match, as closely as practicable, the costs to serve each class or individual customer.") (citation and alteration omitted); *BNP Paribas Energy Trading GP v. FERC*, 743 F.3d 264, 267 (D.C. Cir. 2014) (rates must "reflect to some degree the costs actually caused by the customer who must pay them") (citation omitted);[14] *see also ANR Pipeline*, 171 FERC ¶ 61,233 at PP 4, 21 (rolling-in rates for aspects of expansion project, even though those aspects included lifting artificial horsepower restrictions on replacement compressor unit). GTN explained that to FERC: Because "costs of the Solar Titan 130 units do not

---

[14] This Court has relied on *BNP Paribas* to vacate a FERC order for violating the cost-causation principle. *See El Paso Elec. Co.*, 76 F.4th at 361.

vary based upon the amount of horsepower being utilized . . . any allocation of the replacement costs to Project shippers would violate Commission policy." R. 564:14-15.

But FERC never responded. *Rehearing Order* P 32. And because FERC never addressed GTN's point that removing horsepower restrictions through software modifications does not create additional costs and thus cannot be the basis for a cost re-allocation, its predetermination ruling fails arbitrary-and-capricious review. *See Mexican Gulf Fishing Co. v. U.S. Dep't of Commerce*, 60 F.4th 956, 973 (5th Cir. 2023) (agency acted unreasonably because it "did not address the issue at all"); *TransCanada Power Mktg., Ltd. v. FERC*, 811 F.3d 1, 12 (D.C. Cir. 2015) (FERC did "not address the valid concern raised by" party and thus acted unreasonably).

### B.  FERC Failed To Explain Its Departure From Past Precedent Holding That A Predetermination Of Rolled-In Rates Is Warranted For The Costs Required To Maintain Existing Service.

FERC also denied a predetermination of rolled-in rates because "it appears that a portion of the horsepower from the replacement units will be used to support the [expansion] Project." *Rehearing Order* P 32. That reasoning, once again, violates FERC's mandate to "either conform to its prior precedent" or policy or

"explain its reasoning for departure from that precedent." *Placid Oil*, 875 F.2d at 489.

GTN highlighted that the Solar Titan 130 replacement units were the "only units that allowed GTN to meet its existing service obligations." R. 564:13. On that basis, "Commission policy and precedent clearly demonstrate that the full costs of those replacement units should be borne by all shippers via rolled-in rate treatment," not allocated to expansion shippers through an incremental rate. *Id.* FERC disagreed, holding that GTN XPress Project shippers might be allocated some of the replacement units' costs because the GTN XPress Project will use a portion of their newly available capacity. *Rehearing Order* P 32.

FERC's rationale runs headlong into well-established FERC policy. Expansion shippers are not allocated costs associated with replacement facilities simply for using compression capacity on those facilities. *E.g., Transcontinental Gas Pipe Line Co.*, 161 FERC ¶ 61012 at P 61 ("[T]he Commission generally does not allocate any existing plant costs to an incremental rate, despite the fact that service to the expansion shippers requires use of existing plant") (collecting sources). Instead, when replacement and expansion projects overlap, FERC's policy is to identify the costs equal to the least expensive replacement facilities that would maintain reliable service for existing shippers and grant a predetermination to roll those costs into the general system rate. Expansion shippers are

presumptively allocated whatever costs are leftover—that is, the costs in excess of those necessary to maintain reliable service for existing shippers.

FERC has consistently applied that policy. In *Dominion*, FERC accepted that the expansion shippers' rates should "reflect the additional costs of the facilities to be built in excess of the costs of replacement facilities that would be needed to provide existing service." 129 FERC ¶ 61,048 at P 24. FERC then determined that a "Solar Centaur 50 model 6200 LS turbine compressor unit" was the appropriate choice for "estimating the cost of maintaining existing service," *id.* P 26, and granted predetermination to roll those costs into general system rates, with expansion shippers presumptively getting the remainder, *id.* P 27.

Similarly, in *Transcontinental Gas Pipe Line Co.*, service to expansion shippers required the expansion shippers to use a pre-existing storage plant's "storage capacity, injection wells, withdrawal wells, [and] measuring equipment." 161 FERC ¶ 61,012 at P 61. FERC held that it was not appropriate to re-allocate those pre-existing costs onto expansion shippers through an incremental rate "regardless of whether the expansion shippers must also use those [pre-existing] facilities." *Id.* Critically, FERC explained that because "the pre-expansion shippers would pay any pre-existing plant costs *if there were no expansion*," the costs of the pre-existing facilities should be rolled into the overall system rate, not allocated to expansion shippers. *Id.* (emphasis added).

45

FERC followed that approach again in *ANR Pipeline Co.*, 185 FERC ¶ 61,191 (2023) and in *Transcontinental Gas Pipe Line Co.*, 185 FERC ¶ 61,130 (2023). In *ANR Pipeline*, FERC considered what the replacement compressor costs "would have been . . . , absent the request for [expansion] service" when deciding which portion of the project's costs qualified for the predetermination for rolled-in rates. 185 FERC ¶ 61,191 at PP 38, 46. And in *Transcontinental Gas Pipe Line*, FERC accepted that the costs of certain replacement facilities "would have been the same, even without the proposed expansion," 185 FERC ¶ 61,130 at P 49, and accordingly ruled that those replacement costs qualified for the predetermination of rolled-in rate treatment, *id.* PP 65-66.

Here, as explained, the replacement Solar Titan 130 compressor units were the best, most cost-effective option that would maintain reliable service to existing shippers. *See supra* p. 14. And the replacement units cost the same with or without later expansion service. R. 564:14. Because the replacement compressor units' costs would be unchanged "if there were no expansion," those costs qualify for the predetermination of rolled-in rates. *Transcontinental Gas Pipe Line Co.*, 161 FERC ¶ 61,012 at P 61.

That rule aligns with FERC's broader policy goals. As FERC has explained, existing shippers should "be allocated the full costs associated with replacement facilities, even when the replacement projects are paired with incremental

expansions." *Dominion*, 129 FERC ¶ 61,048 at P 27.  That is because "there are economies of scale in all expansion projects depending upon existing facilities," and "the existence of these economies does not dictate that the Commission reevaluate the costs of the underlying existing facilities to allocate a portion of those costs to the expansion project." *Paiute*, 104 FERC ¶ 61,078 at P 30.

These principles apply squarely here.  As FERC policy dictates, GTN's existing shippers' rates already include "the full costs associated with replacement facilities." *Dominion*, 129 FERC ¶ 61,048 at P 27.  And now, the GTN XPress Project has created economies of scale by allowing more customers to make use of those same replacement facilities. *Paiute*, 104 FERC ¶ 61,078 at P 30.  But that does not mean that the cost allocation of the "underlying" and already-in-service replacement compressor units should be "reevaluate[d]." *Id.*  The cost of the replacement facilities should instead continue to be embedded in the general system rate that all GTN customers pay.

Expansion shippers bear the cost of replacement facilities that existing shippers would not otherwise bear.  And the costs of replacement facilities cannot be *re-allocated* simply because a later expansion project makes use of those facilities.  A predetermination of rolled-in rates is therefore warranted for replacement costs equal to those necessary to maintain existing service.  FERC's policy is clear, and its unexplained departure from that policy was unreasonable.

## CONCLUSION

This Court should grant GTN's petition for review and remand to FERC for the limited purpose of reconsidering of FERC's denial of GTN's request for the GTN XPress Project to receive a predetermination of rolled-in rates.

Respectfully submitted,

/s/ Sean Marotta
SEAN MAROTTA
MATTHEW J. HIGGINS
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
sean.marotta@hoganlovells.com

JOHANNAH WALKER
HOGAN LOVELLS US LLP
4 Embarcadero Center
Suite 3500
San Francisco, CA 94111

*Counsel for Gas Transmission Northwest, LLC*

October 28, 2024

**CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing with the Clerk of the Court

for the United States Court of Appeals for the Fifth Circuit by using the appellate

CM/ECF system on October 28, 2024.  I certify that all participants in the case are

registered CM/ECF users and that service will be accomplished by the appellate

CM/ECF system.


/s/ Sean Marotta

Sean Marotta

**CERTIFICATE OF COMPLIANCE**

1.  This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 10,551 words.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point, Times New Roman.

/s/ Sean Marotta
Sean Marotta